**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GANNETT CO., INC.<br><br>                                          *Plaintiff*,<br><br>           -against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>                                          *Defendants*. | CIVIL ACTION NO. 1:23-cv-5177<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PARTIES ............................................................................................................ 6

JURISDICTION AND VENUE ......................................................................... 7

FACTUAL ALLEGATIONS .............................................................................. 8

I.      BACKGROUND ....................................................................................... 8

    A.      The Sale of Online Display Advertising ...................................... 8

    B.      Ad-Tech Products ........................................................................ 10

    C.      Google's Manipulation of Real-Time Bidding ........................... 14

          1.      Dynamic Allocation ......................................................... 15

          2.      Last Look .......................................................................... 16

          3.      Unified Auction ................................................................ 18

          4.      Other Forms of Insider Trading ....................................... 19

II.     RELEVANT MARKETS AND GOOGLE'S MARKET POWER ................... 19

    A.      Publisher Ad Servers .................................................................. 19

          1.      Market Definition ............................................................. 19

          2.      Monopoly Power ............................................................... 21

    B.      Ad Exchanges ............................................................................. 22

          1.      Market Definition ............................................................. 22

          2.      Monopoly Power ............................................................... 23

    C.      General Search Services ............................................................. 25

          1.      Market Definition ............................................................. 25

          2.      Market Power .................................................................... 26

III.    UNLAWFUL CONDUCT ........................................................................ 27

    A.      Google Monopolizes Publisher Ad Serving ............................... 27

1.    Google ties AdX to DFP (2008 – 2018) ........................................ 28

2.    Google Ad Manager (2018 – Present) ...................................... 31

3.    Google Eliminates Client-Side Header Bidding (2014 – Present)........... 31

B.    Google Abuses DFP to Monopolize the Market for Ad Exchanges.................... 32

1.    Google Hashes User IDs (2009 – Present) ................................. 33

2.    Last Look (2014 – 2019).................................................. 35

3.    Enhanced Dynamic Allocation (2014 – Present)................................... 38

4.    Project Bernanke (2013 – Present) ......................................... 40

5.    Dynamic Revenue Share (2014 – Present) ............................... 43

6.    Exchange Bidding (2018 – Present) ...................................... 46

7.    Minimum Bid to Win (2018 – Present) ...................................... 48

8.    Projects Poirot and Elmo (2018 – Present)................................ 50

9.    Google Redacts Datasets (2018 – Present) ................................ 51

10.   Google Manipulates DFP to Artificially Deflate Bids from Rival
      Exchanges (2017 – Present)................................................. 52

11.   Google Eliminates Prices Floors and Imposes Unified Pricing Rules
      (2018 – Present) ......................................................... 54

C.    Google Abuses its Search Monopoly to Monopolize Ad Exchanges (2016 –
      2021) .................................................................... 58

IV.   ANTICOMPETITIVE EFFECTS..................................................... 61

A.    Publisher Ad Servers........................................................ 62

B.    Ad Exchanges ............................................................... 63

CLAIMS ........................................................................... 66

I.    COUNT 1 — MONOPOLIZATION OF THE MARKET FOR PUBLISHER AD
      SERVERS IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2........................ 66

II.   COUNT 2 — MONOPOLIZATION OF THE MARKET FOR AD EXCHANGES
      IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2 ........................... 66

III.    COUNT 3 — ATTEMPTED MONOPOLIZATION OF THE MARKET FOR AD
        EXCHANGES IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2 ................. 67

IV.     COUNT 4 — UNLAWFUL TYING IN VIOLATION OF THE SHERMAN ACT,
        15 U.S.C. § 1 ................................................................................................. 68

V.      COUNT 5 — UNLAWFUL DECEPTIVE ACTS OR PRACTICES IN VIOLATION
        OF NEW YORK GENERAL BUSINESS LAW §§ 349-350 ......................................... 69

VI.     COUNT 6 — COMMON-LAW FRAUD ....................................................... 73

VII.    COUNT 7 — UNJUST ENRICHMENT ....................................................... 74

PRAYER FOR RELIEF ............................................................................... 75

DEMAND FOR JURY TRIAL ...................................................................... 75

## INTRODUCTION

1.      Plaintiff Gannett Co., Inc. is a digitally focused media and marketing solutions company that owns over 500 digital news and media brands, including *USA TODAY* and its network of local properties in the United States and the United Kingdom, as well over 200 daily print news media brands.  By total daily circulation, Gannett is the largest news media publisher in the United States.

2.      For centuries, Gannett has been in the business of local news — its oldest newspaper, the *Poughkeepsie Journal Sentinel*, has been in circulation since 1785.  Today, 43 states are home to a Gannett publication, including longstanding local papers like *Detroit Free Press*, *Indianapolis Star*, and *Arizona Republic*.  Gannett's newspapers deliver leading national news and the local stories that bind our communities together and encourage civic engagement.

3.      As Gannett's readers have moved online, its publications have innovated to provide sophisticated and engaging content on the internet.  For example, *USA TODAY* has been a pioneer in reader-friendly charts and graphics for decades.  Gannett's local publications have adopted video formats and photo galleries to deliver the news.  And, most importantly, the internet has made it possible for Gannett's publications to circulate more news stories and reach a wider audience.  Never before has there been a greater opportunity for readers to get the news.

4.      Digital news publishing also has opened a new frontier for news and other publications to earn revenue:  digital advertising.  Now publishers can do more than negotiate print advertising deals on an advertiser-by-advertiser basis.  Across its publications, Gannett can use sophisticated, enterprise-level software to auction off ad space to advertisers who want to display an ad on a particular page to a particular user.  Because ad space is bought and sold electronically, Gannett can sell *millions* of ad slots (called "impressions") *every day*.

5.      Today, online digital advertising is a $200 billion business — a nine-fold increase since 2009.  Yet, despite the opportunity for publishers to produce more news content and earn more revenue, news publications' advertising revenue has declined by nearly 70% over the same timeframe.  As a result, newspaper newsroom employment has dropped by more than half, and more than 20% of all newspapers have closed.  The circulation of daily and weekly newspapers has decreased by more than 40%.

6.      Gannett has not been spared.  Since 2019 — just the past four years — over 170 Gannett publications have been shuttered.  For Gannett's largest remaining publications, average daily circulation fell by nearly 20% between 2020 and 2021 *alone*.  The result is less news where it is needed most.  Communities throughout the United States now do not have a suitable local paper to advise on local events, hold local officials to account, or encourage the civic bonds that are paramount in an increasingly polarized country.

7.      Publishers are not suffering because readers demand less online content.  Growing numbers of U.S. readers get their news online, and spending on online advertising to reach those readers has exploded.  Rather, publishers do not see the growing ad spending because Google and its parent Alphabet unlawfully have acquired and maintain monopolies for the advertising technology ("ad tech") tools that publishers and advertisers use to buy and sell online ad space.

8.      Google controls how publishers sell their ad slots, and it forces publishers to sell growing shares of that ad space to Google at depressed prices.  The result is dramatically less revenue for publishers and Google's ad-tech rivals, while Google enjoys exorbitant monopoly profits.

9.      Virtually all major U.S. news publishers, and many thousands of smaller publishers, use a "publisher ad server" to manage their inventory of impressions.  Among other

core functions, the ad server identifies when an impression is available for sale, solicits bids for the impression, and ultimately chooses which bid is the winner. Google's publisher ad server, DoubleClick for Publishers ("DFP"), controls over 90% of the publisher-ad-server market.

10. When an ad server calls for bids to fill an impression, it usually does not call advertisers directly. Rather, the ad server solicits bids from "ad exchanges," which organize real-time auctions among participating buyers. Each exchange returns a bid from its winning buyer, and the ad server then chooses the winning exchange. Google's exchange, DoubleClick Ad Exchange ("AdX"), controls over 60% of the exchange market. Most of Google's exchange rivals have market shares in the single digits. And, critically, the buyers in Google's exchange are unique. Google largely prohibits them from participating in any other exchange.

11. With control over the largest ad exchange and ad server — both of which Google acquired rather than developed — Google has carried out a sophisticated, anticompetitive, and deceptive scheme for well over a decade.

12. First, Google has tied its ad exchange (AdX) to its publisher ad server (DFP). Gannett and the entire U.S. publishing industry cannot practically reach 60% of buyers without using DFP. Predictably, Google's tie has forced publishers to use DFP, which has eliminated virtually every remaining publisher-ad-serving rival.

13. Second, with control over ad serving, Google defeats competition among exchanges and drives down prices for publishers' inventory. Google's market manipulations have evolved over the years, but the goal has remained the same: Google prohibits publishers from soliciting competitive bids from rival exchanges, while at the same time rigging AdX's bids by trading on inside information from DFP. To take one example: Google prohibits publishers from communicating publisher-owned data about readers to rival exchanges, which results in

rival exchanges returning substantially lower bids.  Then, AdX trades on those depressed bids by returning bids that are a penny higher, even though AdX buyers originally submitted substantially higher bids to AdX for the same ad slot.  That means Google wins more inventory at depressed prices.

14.     Google's scheme has been wildly profitable.  For example, in 2022 alone, Google made $30 billion from manipulating auctions for ad space across the internet.  That is six times more revenue than every single U.S. news publication made from digital advertising, combined.  Google, as middleman, has dwarfed the content creators that invest in journalists, editors, photographers, and many others to produce important news content.

15.     And Google, as search monopolist, generates billions of dollars in *additional* revenue by copying publishers' content on its search engine and other platforms without proper attribution or compensation.  In 2022, Google made upwards of $60 billion from third-party news content on its search page.  Google thus makes money off publishers both when readers visit a Google page, and even when readers go straight to the source.

16.     That result is not what should occur in a functioning, competitive market.  For that reason, and now for years, antitrust enforcers in the United States and throughout the world have recognized that Google's unlawful monopolization must be stopped:

    a.      The U.K. Competition and Markets Authority identified Google's misconduct and the harm to publishers, but concluded it had insufficient injunctive authority to implement a remedy.  *See Online Platforms and Digital Advertising Market Study Final Report* at 20, 60, 394-406 (July 1, 2020) ("Google's strong position at each level of the intermediation value chain creates clear conflicts of interest, as it has the

ability and incentive to exploit its position on both sides of a transaction to favour its own sources of supply and demand.").

b.       The Australian Competition and Consumer Commission identified Google's misconduct and the harm to publishers, and is prescribing compensation and a code of conduct to remedy some of Google's practices.  *See Digital Advertising Services Inquiry Interim Report* (Dec. 2020).

c.       The U.S. House Antitrust Subcommittee studied the conduct of Google and other platforms, collecting 1.3 million documents and holding seven hearings.  The House Subcommittee found that Google is harming "the free and diverse press" and endangering "political and economic liberty."  *Final Report and Recommendations, Investigation of Competition in Digital Markets*, at 57-77, 206-11 (Apr. 15, 2021).

d.       In December 2020, a bipartisan group of 17 State Attorneys General filed suit against Google alleging monopolization and misrepresentations similar to those described in this Complaint.  *See Texas v. Google LLC*, No. 20-cv-00957 (E.D. Tex. Complaint filed Dec. 16, 2020, Fourth Amended Complaint filed May 5, 2023).

e.       Likewise, in January 2023, the United States and 17 additional State Attorneys General filed suit against Google for unlawful monopolization of the advertising technology markets at issue in this Complaint.  *See United States v. Google LLC*, No. 23-cv-00108 (E.D. Va. Complaint filed Jan. 24, 2023).  Among other remedies, the United States is seeking a breakup of Google's digital advertising monopolies.

f.       Last week, the European Commission filed its own case against Google alleging unlawful abuse of monopoly power in digital advertising.  Like the United States, the Commission is seeking a breakup remedy.  In a statement, the head of the

Commission explained why divestiture of Google's ad-tech tools is necessary: "As long as these conflicts of interest remain in place, Google could continue such self-preferencing practices or it could engage in new ones. This market is highly technical market. It is very dynamic. The detection of these behaviours can therefore be very challenging. We have seen this play out concretely: each time a practice was detected by the industry, Google subtly modified its behaviour so as to make it more difficult to detect, but with the same objectives, with the same effects. A remedy requiring Google just to change its behaviour would allow Google to continue doing what it has been doing so far, just under a different disguise." Remarks by Executive Vice President Margrethe Vestager, AT.40670 Google – Adtech and Data-related practices (June 14, 2023).

g.    Finally, the leadership of both the Senate and House Antitrust Subcommittees have introduced bills that, among other things, would break Google's unlawfully acquired dominance over several advertising technology markets and provide additional resources to antitrust enforcers to address Google's conduct.

17.    Gannett brings this antitrust action for compensation and for injunctive relief to restore competition in the monopolized markets and safeguard news content for readers.

## PARTIES

18.    Plaintiff Gannett Co., Inc. ("Gannett") is a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in McLean, Virginia. With over 500 news and digital media brands, Gannett is the largest news publisher in the United States. Gannett was formed in November 2019 as the result of a merger between New Media Investment Group, Inc., parent of GateHouse Media, Inc., and Gannett Co., Inc., now known as Gannett Media Corp. and a wholly owned subsidiary of Gannett.

19.     Defendant Google LLC ("Google") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mountain View, California.  Google is an online advertising company providing internet-related products, including various online advertising technologies, directly and through subsidiaries and business units it owns and controls.  Google maintains an office in this District at 111 8th Avenue, New York, New York 10011.

20.     Defendant Alphabet Inc. ("Alphabet") is a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.  Alphabet was created as a holding company for Google in late 2015, and Alphabet controls Google's day-to-day operations.  Virtually all of Alphabet's revenue comes from Google.  Since December 2019, Alphabet and Google have had the same Chief Executive Officer.  As a result of Alphabet's operational control, Google is Alphabet's alter ego.  This Complaint refers to Google and Alphabet together as "Google."

## JURISDICTION AND VENUE

21.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  The Court has subject-matter jurisdiction under 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337(a).

22.     In addition to pleading violations of federal antitrust law, Gannett alleges violations of state law and seeks relief thereunder.  All claims under federal and state law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that ordinarily would be tried in one judicial proceeding.  This Court therefore has jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).  Exercising jurisdiction over the state-law claims will avoid unnecessary duplication of actions and supports the interests of judicial economy, convenience, and fairness.

23.     The Court may exercise personal jurisdiction over Google because Google does extensive business within this District — including by providing the monopolized products in this District to Gannett — and this action arises out of Google's contacts within this District.

24.     Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Gannett's claims occurred in this District, and because Google transacts business and is found within and resides in this District.

25.     Google's conduct affects interstate trade and commerce.

26.     Google's conduct has a direct, substantial, and reasonably foreseeable effect on commerce within the United States, which in turn injures Gannett's United States operations.

## FACTUAL ALLEGATIONS

### I.     BACKGROUND

#### A.     The Sale of Online Display Advertising

27.     For over a century, Gannett's newspapers have made high-quality journalism available to Americans from all walks of life.  *USA TODAY* and hundreds of local newspapers have offered engaging, affordable news by selling advertisements alongside their content.  Any revenue generated from subscriptions or newsstand fees cannot, alone, fund Gannett's extensive investments in national or local news.  The cost of news for most Americans would be unsustainable without advertising revenue to sustain core news-reporting operations.

28.     Historically, with paper circulations, Gannett's publications could sell ad space only for static print advertisements.  Everyone who picked up a print newspaper saw the same ads, despite their varied profiles and interests.  That meant advertisers would have to present ads to a wide and variable audience just to reach the slice of readers they actually wanted to target.

As a result, readers saw ads that were not relevant to them, advertisers spent money to reach customers outside the market, and publishers' ad space was less valuable.

29.     Americans' move online fundamentally has transformed news publishing and advertising.  Today, more than 86% of Americans consume news content over the internet. Publishers can deliver new forms of content — *e.g.*, infographics, videos, photo essays — almost instantaneously to readers.  No longer must readers wait for the next day's paper to get the news.

30.     And rather than the static print ads of the twentieth century, publishers present what are known as "display ads" to their readers — image, text, and video-based ads that appear on the reader's screen alongside the publisher's content.  With the move to online content, Gannett can display unique ads on each page and for each reader that visits its news sites.

31.     Specifically, publishers like Gannett sell their ad space to advertisers on an "impression-by-impression" basis.  As each reader loads a Gannett webpage — for any of its national or local newspapers — Gannett can fill each ad slot (called an "impression") with an ad targeted to that particular user.  So, different readers on the same Gannett page can see different ads that are relevant to them.  That makes publishers' ad space markedly more valuable to advertisers, who no longer need to spend ad dollars where they are unlikely to make a difference, and to readers, who are more likely to see advertisements in line with their interests.

32.     Generally speaking, publishers sell impressions through two sales channels:  the "direct" and "indirect" channels.  Direct sales are pre-negotiated between publishers and advertisers, including advertising campaigns sold by the publisher's internal sales staff.  Gannett often reserves its most valuable advertising space (*e.g.*, banners at the top of the page, full-screen sponsored ads during important sporting events) for the direct-sales channel.  Advertisers also value direct sales because they permit greater flexibility and customization in how an advertiser

can present its advertisement.  For example, they can purchase a set of impressions over a particular time frame, targeted to a particular audience, and appearing on a particular section of a publisher's website.  When a reader arrives at a Gannett site and fulfills a direct deal's criteria, Gannett instantaneously loads the direct advertisement pursuant to the direct deal.

33.     Indirect sales, by contrast, do not involve prior negotiation between publisher and advertiser.  Instead, publishers auction off their ad space in real time through electronic trading venues called "ad exchanges."  When a reader arrives at a Gannett site, and no direct deal applies or is available, Gannett solicits bids from exchanges, who contact their participating advertisers and solicit their offers for the impression.  At the conclusion of this process, Gannett chooses the winning ad and loads it onto the webpage, all before the page finishes loading on the browser. The process of auctioning off impression "inventory" and loading the ad takes less than half a second.

34.     This process is repeated for *each* reader and *each* page the reader visits on a Gannett website.  As discussed, that allows advertisers to target their ads to the particular reader, depending on the data available about that individual.  Further, every page has several slots where publishers can serve an ad.  Gannett has millions of readers and therefore fills many millions of impressions every day.

35.     While Gannett sells roughly two-thirds of its ad inventory through the indirect sales channel, the remaining third of direct sales accounts for nearly half of Gannett's online advertising revenue.

**B.     Ad-Tech Products**

36.     To facilitate the sale of these impressions, all within milliseconds, publishers and advertisers use a series of specialized and distinct products.

37.     Certain publishers will sell their advertising inventory using "ad networks," which pool inventory across the internet for sale to advertisers affiliated with the network.  Ad networks offer relatively limited functionality and do not permit publishers to sell impressions to advertisers outside the network.

38.     Other publishers like Gannett, who either have a larger supply of ad inventory, desire greater control over their inventory, or both, do not rely on ad networks.  Instead, they license several different ad tech tools with the goal of exercising greater control over their inventory and reaching a broader base of advertisers.

39.      The core tool for large publishers is the "publisher ad server," which organizes and sells their ad inventory both directly and indirectly across all platforms:  desktop, mobile web, and mobile applications.

40.     When a user visits a webpage through any of these channels, the publisher ad server accesses the reader's anonymized user ID either from a "cookie" stored on the user's browser or from an identifier stored on the user's mobile device.  The ad server then checks whether a direct deal is available to serve the impression(s) on the reader's specific webpage.

41.     If no direct deal is available, the ad server calls "ad exchanges" to organize auctions for each impression.  As part of the bid request to an exchange, the ad server communicates the reader's anonymized user ID.

42.     Once called, each exchange requests participating "demand-side platforms" ("DSPs") to place bids on behalf of their advertisers.  A DSP is automated ad-buying software that advertisers use to buy display ad inventory.  As part of the request to the DSPs, the exchange passes the anonymized user ID, and the DSPs cross-reference that ID with various databases to

ascertain whether the reader is a good candidate for a particular ad.  The DSPs, based on advertiser demand and the available user information, then enter bids for the impression.

43.    Each exchange collects the available bids, picks a winning DSP, and submits the winning bid to the publisher ad server.  While exchanges return bids for individual impressions, each bid is priced in terms of "Cost-Per-Mille" ("CPM"), or the price for one thousand impressions.  So, for example, when an exchange wants to bid $0.01 for an individual impression, the bid is communicated to the ad server as $10 CPM.

44.    Finally, the ad server decides which exchange's bid to accept.  If the ad server rejects all bids, it can place a "house ad" — *e.g.*, an ad from a Gannett newspaper advertising its own brand — to fill the impression.

45.    At the conclusion of this auction process, publishers make money when ads are loaded on their pages rather than when users click on them.  That is because advertisers pay for impressions — *i.e.*, the right to display their ads on a publisher's webpage page.  Each ad-tech product then exacts a fee for its services, often on a per-impression basis.  For example, the ad server charges the publisher monthly depending on the volume of impressions served. Exchanges, meanwhile, charge the publisher a percentage (called a "revenue share" or "take rate") of each impression's sale price.  To account for that revenue share, exchanges submit bids to the ad server on a "net" basis, *i.e.*, the winning bid submitted by its DSPs less the revenue share.  Finally, DSPs charge their advertisers a fee (also a revenue share) for their services — including identifying relevant users and then assessing whether the ads shown were effective.

46.    The below graphic depicts the relevant ad-tech products, with buyers (*i.e.*, advertisers) on the left and sellers (*i.e.*, publishers) on the right.

**Figure 1:  Ad-Tech Products**



47.     Google is the dominant player for each of these ad-tech products, and thus controls the buying and selling of display ad inventory across most of the internet.  Google's publisher ad server — "DoubleClick for Publishers" ("DFP") — controls more than 90% of the market for publisher ad serving.  Google offers both a free version of DFP and a paid version for publishers that require certain additional features to monetize their inventory.

48.     Google's exchange — "DoubleClick Ad Exchange" ("AdX") — controls more than 60% of the exchange market.  Finally, Google offers two DSPs — "Google Ads" (for small advertisers) and "Display & Video 360" ("DV360") (for larger advertisers) — that control more than 70% of the DSP market.

49.     For years, Gannett has licensed DFP as its publisher ad server across its publications.  AdX is Gannett's primary exchange.  Today, AdX controls 60% of all programmatic impressions served across Gannett's newspaper websites.  By contrast, the next highest exchange competitor intermediates only 6% of Gannett's impressions.

50.     Google acquired rather than built its ad-tech dominance.  Google purchased its leading ad server and exchange when it acquired DoubleClick in early 2008.  Google acquired rival AdMeld — which publishers had started to use to introduce competition among exchanges — in 2011.  And Google has acquired several other ad-tech services over the years — including

the leading ad serving technology for small mobile app developers (AdMob) and the forerunner for Google's data management platform (Google Analytics, previously Adometry).

51.     With control over each ad-tech product market, Google exacts fees from publishers and advertisers alike — for the sale of *each* impression.  By default, Google charges publishers a fee to serve the impression and then a second fee (for AdX, typically 20% of the sale price) to manage the auction in its exchange.  On the advertiser side, Google charges a revenue share for its DSP service and then other fees for data analytics.

52.     Because Google charges revenue shares, it exacts an exchange fee from publishers only if AdX wins the right to intermediate the transaction.  Likewise, its DSP exacts a fee only if it ultimately provides an ad to fill the impression.  If Google's exchange and DSP lose out the impression, Google makes nothing.  While ordinarily that would provide Google with an incentive to return the most competitive bid possible, Google can abuse its monopoly positions to return depressed bids yet win *more* publisher inventory.  The result is more money for Google.

### C.     Google's Manipulation of Real-Time Bidding

53.     Because publishers sell high volumes of impressions in milliseconds, it is infeasible to hold multi-round auctions, where bidders can respond to each other's bids until the highest bid prevails.  Rather, a publisher has only one chance to accept and assess bids.

54.     To encourage competition among advertisers, publishers solicit bids in "real time" — *i.e.*, publishers want as many advertisers as possible to bid immediately when an impression becomes available.  The faster the bids are submitted, the faster the publisher can load the page for the reader.  And, the more bids the publisher receives, the higher the price it gets for its ad space.  Advertisers bid higher when there are more competitors for the same inventory.

55.     Google represents that its publisher ad server, as a tool for publishers, maximizes the yield for publishers' inventory.  But Google operates under a conflict of interest.  With its

control over publisher ad serving, Google controls how publishers solicit and evaluate real-time bids for their inventory. Meanwhile, by operating the dominant exchange and dominant buy-side software, Google is the most powerful buyer of that inventory. The mechanics of Google's conduct have evolved over time, but the result has remained the same: Google manipulates the process of real-time bidding to exclude rival exchanges, underpay for publisher inventory, and ultimately reduce the quality and quantity of online news.

### 1. Dynamic Allocation

56. Shortly after acquiring DoubleClick in 2008, Google introduced "Dynamic Allocation" to its ad server, DFP. Dynamic Allocation was the decision rule governing how AdX competed against non-Google exchanges. First, Dynamic Allocation required publishers to estimate an historical average CPM (a "static bid") for each non-Google exchange it used. Second, once an impression became available, DFP sent the highest static bid as a "price floor" to Google's exchange, AdX, and called AdX to run a real-time auction and submit a bid. AdX would win the impression if its real-time bid was higher (even one penny higher) than the highest static bid. Once AdX beat the highest static price, no other exchange was permitted to compete for the impression. Thus, with DFP, AdX was the only exchange that could bid in real time for each impression.

57. Dynamic Allocation caused substantial financial harm to publishers, including Gannett. Because Gannett could call exchanges only one at a time, it could not compare offers between exchanges. That left Gannett to accept AdX's bid even though, had a subsequent exchange been permitted to bid, it would have offered more for the impression. Further, even though AdX was bidding in real time, it was competing against only the highest *static* bid. A static bid is just a publisher's estimate of an exchange's historical, average bidding price, so it systematically underestimates the exchange's willingness to pay for valuable impressions. Real-

time bids, meanwhile, respond to the value of the particular impression and thus are higher than static bids for valuable inventory. As a result, competing against static bids only, AdX could buy Gannett's most valuable inventory at one penny above average prices. Put another way, AdX could buy box seats at the ballpark for the price of the grandstands.

58. How DFP operated in practice, with Dynamic Allocation, directly contradicted the representations Google had made to induce publishers to use its ad server. For example, Google agreed with Gannett that DFP would not use Gannett's data "for purposes of informing bids" placed by Google through its exchange. Google also had assured publishers that DFP would serve their interests and that Dynamic Allocation in particular would "maximize yield." Similarly, Google told publishers that Dynamic Allocation was a "risk-free way to get the highest real-time revenues for all their non-guaranteed impressions." As Google knew and discussed internally, however, Dynamic Allocation depressed publishers' revenue. When exchanges competed head-to-head, Google found that publishers' clearing prices increased by an average of 40%. Google therefore knew that its ad server, while supposedly a tool to maximize publishers' revenue, in fact operated against publishers' interests.

### 2.   Last Look

59. To work around the inadequacies in Google's ad server, publishers eventually developed a solution called "client-side header bidding." Publishers could configure an auction in the reader's browser where multiple exchanges bid on a per-impression basis in real time. Because header bidding occurred before the publisher called DFP to fill the impression, publishers could collect header bidding's per-impression bids and correspond them to a "line item" in DFP to compete against AdX. This was the first time that publishers could compare real-time offers from several exchanges at once.

60.     In the years since, some firms have introduced "server-side" header bidding, where exchanges compete in real time on a third party's servers rather than on the browser.  For example, since 2018, Google has offered its own server-side option originally called "Exchange Bidding," and now named "Open Bidding."

61.     The results of client-side header bidding were favorable for publishers and consumers:  increased competition for publisher inventory led to higher prices and more investment in online content.  After setting up client-side header bidding, between 2016 and 2019, Gannett saw a substantial increase in CPMs for its inventory.  Even Google recognized that "pitting multiple exchanges against one another fostered price competition, which was good for [publishers'] business."

62.     But client-side header bidding did not restore competition for publishers' inventory, because AdX still did not compete against rival exchanges in real time — *i.e.*, it did not submit its bid at the same time as its rivals.  AdX instead cheated off its rivals before setting its own bid.  Applying Dynamic Allocation, DFP sent the winning bid from client-side header bidding to AdX as a price floor.  AdX then won the impression if it could outbid the winning header-bidding bid by a penny.  Because the header-bidding auction was conducted first, AdX's access to rivals' inside information was called "Last Look."

63.     Last Look caused Gannett significant financial harm for several years.  Rather than AdX submitting the highest bid available from its participating DSPs, based on the value of the impression to those DSPs, AdX shaved off the top because it knew the next highest price to beat.  For example, if header bidding returned a $4.00 bid, Google could win the impression for $4.01 rather than offer the best price (*e.g.*, $6.00) from its DSPs.  By contrast, without access to inside information, Google would have offered the highest possible bid so as to maximize its

revenue share and minimize the chance of losing the impression.  In short, Google traded on inside information and bought Gannett's inventory on the cheap.

### 3. Unified Auction

64.     In 2019, Google claimed to give up its Last Look advantage when it changed the DFP auction rules and enforced a so-called "Unified Auction."  But, as part of the Unified Auction, Google created a functionally identical advantage it now calls "Minimum Bid to Win."

65.     After an auction concludes, DFP tells the "Authorized Buyers" in the Unified Auction — the DSPs participating in AdX (including Google's DSPs:  DV360 and Google Ads) and certain other exchanges — what the minimum price to win the impression would have been. This is *not* merely the price at which the impression sold; rather, Google tells the winning bidder the second highest price that was placed in the auction — *i.e.*, the cheapest price at which the winner could have won the impression.  Minimum Bid to Win thus provides functionally the same information as Last Look:  the next highest price to beat.

66.     The only difference from Last Look is that Google now knows the minimum winning price immediately *after*, rather than *before*, an auction closes.  For Google Ads and DV360, this difference proves to be immaterial.  DSPs buy impressions by the thousands.  The minimum price at which a prior auction could have cleared is an incisive predictor into the minimum clearing price of the next, similar auction.  Google can use the minimum clearing price from one auction to inform its bid on the next impression for the *same* user on the *same* page.

67.     To this day, Gannett continues to suffer significant financial injury on account of Minimum Bid to Win, much like it did on account of Last Look.  Google can buy an inflated share of Gannett's ad inventory at artificially depressed prices.

#### 4.    Other Forms of Insider Trading

68.    Last Look and Minimum Bid to Win are only two of the many ways that Google exploits its access to rivals' bid information.  As described in detail below, Google employs several other tricks to rig its bids.  For example, "Dynamic Revenue Share" allows AdX to adjust its 20% "revenue share" fee when manipulating the bidding price alone would not be enough to win impressions by a penny.  See *infra* § III.B.5.  Further, with "Project Bernanke," AdX returns bids even *lower* than what would prevail if Google relied on Last Look alone, but then charges advertisers the higher (though still deflated) Last Look price.  Google pockets the difference — which amounts to an additional hundreds of millions of dollars stolen from publishers — and uses it to manipulate its bids in billions of other auctions.  See *infra* § III.B.4.

69.    Ultimately, however styled, Google's misuse of rival bidding information is the core of its business model.  Because Google controls the ad server, it can control when its exchange submits bids for impressions, and what information it has beforehand.  Because Google does not compete in real time, it undermines the competitive process that publishers need to sell their inventory at competitive prices.

## II.    RELEVANT MARKETS AND GOOGLE′S MARKET POWER

### A.    Publisher Ad Servers

#### 1.    Market Definition

70.    Publisher ad servers for display inventory in the United States form a relevant antitrust product market.  Publisher ad servers are inventory management systems that publishers use to manage their online display ad inventory available on desktops, mobile web, and mobile applications.  Among other features, ad servers (1) collect user-identification information; (2) manage direct and indirect sales channels; (3) forecast what inventory will be available to

sell; (4) permit a publisher's sales team to input requirements and parameters for the publisher's display ads; (4) allocate inventory among exchanges; (5) generate reports on ad inventory performance; (6) load ads on the publisher's website or mobile app; (7) create invoices for a publisher's direct sales; and (8) manage display ad inventory for both websites and mobile applications.

71.     Most publishers use only one ad server to manage their ad inventory. "Multihoming" among multiple ad servers is impracticable.  A publisher cannot feasibly use two different sets of software to sell the same inventory.  For example, using multiple ad servers can create conflicts between a publisher's inventory.  Further, it is too costly to use different ad servers to sell different sets or even different kinds of inventory (*e.g.*, banner ads v. video ads). Among its many publications, it is commercially reasonable for Gannett to manage its online display inventory only by licensing a single ad server.

72.     Publisher ad servers also are unique — they are not interchangeable with ad exchanges or ad networks.  For example, an exchange cannot route inventory to other exchanges, nor can it load advertisements on the publisher's webpage and provide reports regarding inventory performance across multiple sources of demand.  An ad network likewise cannot manage and organize multiple demand sources.  For an ad-supported publisher like Gannett, a publisher ad server is the only tool a publisher can use to manage its inventory.

73.     Internally, Google recognizes that the market for ad servers is distinct from markets for other ad-tech products.  Google calculates its share of the ad-server market without accounting for ad exchanges or networks.

74.     Publicly, Google has recognized that publisher ad servers form a distinct market. When Google acquired DoubleClick and its leading ad server, Google represented to the FTC

that an ad server was "not [a] direct substitute[]" for an ad network, calling any assertion to the contrary "seriously flawed and utterly divorced from commercial reality."  According to Google, an increase in the price for DoubleClick's ad server would have caused publishers to "switch to other publisher-side ad serving products, such as those" available at the time from "24/7 Real Media [and] Atlas/aQuantive."

75.     Nor is building an ad server a substitute for licensing an ad server.  Building an ad server from scratch requires scale, substantial capital, and deep access to highly sophisticated engineering sources; it is not a viable option for Gannett.  Gannett, like other news publishers, is a content company, not a technology company.

76.     The relevant geographic market is the United States.  Ad servers available in other countries are not a reasonable substitute for ad servers available in the United States.

### 2.     Monopoly Power

77.     Google is a monopolist in the relevant publisher-ad-serving market.  Google's DFP (since rebranded as part of "Google Ad Manager") today has more than a 90% market share.  Google's market share nearly has doubled since it purchased DoubleClick in 2008.  Since then, several ad-serving rivals — including 24/7 Real Media, aQuantive, and ValueClick — have exited the market.  There are almost no ad-serving competitors left.

78.     Google's market share has grown consistently since it acquired DoubleClick's ad server.  In 2010, just two years after acquiring DFP, Google internally estimated that its ad server managed 78% of gross spending on display advertising across the top 400 publishers in North America.  By 2012, approximately 85% of publishers in the United States licensed Google's ad server.  That number grew to more than 90% by 2015.

79.     Google's monopoly power is confirmed by direct evidence.  For years, Google has degraded the quality of its ad server with severe limitations despite widespread

dissatisfaction among publishers.  As discussed below, Google has, *inter alia*, (1) degraded publishers' ability to measure performance among exchanges; (2) limited publishers' ability to set higher prices for their inventory; (3) reduced real-time competition between exchanges; and (4) permitted Google's exchange to return bids based on rivals' bid information.

80.     Google's monopoly in publisher ad serving is protected by high barriers to entry. Switching ad servers is costly and resource intensive.  Publishers like Gannett would need to reconfigure hundreds of millions of webpages to change ad servers — and there would be a significant risk to revenue if there were any glitch during the transition process.

81.     Another barrier to entry is that Google has tied its ad server to AdX, which is the dominant exchange in the ad exchange market.  Today, publishers cannot access real-time bids from AdX without using DFP.  *See infra* § III.A.1.  Any ad-serving competitor therefore would have to enter the ad exchange and ad serving markets simultaneously — and at sufficient scale to convince publishers to forgo AdX.  Such simultaneous entry in the exchange and ad serving markets is all but impossible.

**B.     Ad Exchanges**

**1.     Market Definition**

82.     The market for display advertising exchanges in the United States is a relevant antitrust product market.  These exchanges are marketplaces that auction publishers' webpage and app-based display inventory to end-advertisers through ad-buying programs (including DSPs) on an impression-by-impression basis.

83.     Ad exchanges are not interchangeable with ad networks, which are marketplaces designed for smaller publishers and smaller advertisers.  Unlike ad networks, ad exchanges do not bear inventory risk and are designed to integrate with multiple DSPs so that publishers can entertain more bids for their inventory.  Further, most large advertisers buy inventory primarily

through exchanges rather than ad networks.  Reflecting that ad networks are not a substitute for ad exchanges, Gannett sells 82% of its United States indirect display inventory to exchanges, not networks.

84.     Ad exchanges also are not interchangeable with the direct sales channel.  Buying and selling ad inventory directly is costly; a publisher must employ a dedicated sales staff to manage, sell, and serve online ad campaigns.  It would be infeasible for Gannett to scale up its direct deals to substitute for its indirect deals.

85.     Additionally, cost aside, it remains commercially infeasible for a publisher like Gannett to sell advertising inventory only through direct sales.  Gannett's supply of impressions can expand or contract depending on the news cycle — there is no way to pre-negotiate the sale of a moving target.  Advertisers negotiating direct deals also do not want to appear alongside certain stories that, while important, are somber or tragic and so are not well suited for certain advertising campaigns.

86.     Google itself analyzes the exchange market without reference to ad servers, ad networks, or DSPs.  Specifically, Google measures AdX's market share by tracking its percentage of overall exchange market revenue and exchange impression volume, *i.e.*, how many impressions AdX intermediates as compared with other exchanges.  Meanwhile, Google describes direct sales and ad networks as separate channels with "distinct characteristics."

87.     The relevant geographic market is the United States.  Ad exchanges available in other countries are not a reasonable substitute for display ad exchanges in the United States.

### 2.     Monopoly Power

88.     Google is a monopolist in the relevant ad exchange market.  Google's exchange (AdX) transacts over 60% of all display ad inventory sold on ad exchanges.  For instance, from October 2018 to October 2019, AdX transacted over 60% of all display inventory sold through

23

exchanges in the United States.  Another market study shows that AdX controls upwards of 64% of display advertising spending.  AdX likewise transacts more than 60% of Gannett's *entire* programmatic ad inventory.  Meanwhile, AdX's next largest competitors — Rubicon, AppNexus, and Index Exchange — transact a much smaller share (typically 4% or 5% each) of display impressions for most publishers, including Gannett.  Rivals' market share has not grown appreciably in years, and many rivals (*e.g.*, Microsoft, Yahoo!) have exited the market.  In 2018, Google's exchange transacted $7.6 billion in gross revenue — more than all other exchanges combined.

89.     There is also direct evidence of Google's monopoly power in the relevant ad exchange market.  Most importantly, AdX is able significantly to underpay for publishers' inventory without losing market share.  Google returns lower prices for Gannett's inventory but nonetheless transacts more of it through its exchange.

90.     Additionally, Google charges a substantially higher revenue share than its rivals, and its market share has grown (and rivals' share has not grown) despite rivals *reducing* their revenue shares over the last few years.  In 2017, for instance, rival exchanges slashed their take rates to 12% or lower.  Many other exchanges charge at most a 15% take rate.  By contrast, AdX maintains an average take rate of 20% and still is able to increase its market share.

91.     Google internally recognized that functioning market forces would be expected to push exchange rates down to 5%, because "20% for just sell-side platform/exchange isn't likely justified by value."  Yet AdX's take rate has not budged.  Google therefore can impose substantial, non-transitory price increases without losing (and in fact while increasing) its share of the exchange market.

92.     Google's market power in the exchange market is protected by barriers to entry.
Google's exchange is uniquely powerful because it includes all advertisers who also are buying
search ad inventory on Google's monopoly search results pages.  *See infra* §§ II.C, III.A.1.
Those advertisers are not available through any other exchange.  To compete, rival exchanges
would have to provide search inventory at a similar scale to Google and then control the
complementary demand for display inventory, which is impossible in the foreseeable future.

93.     Google's anticompetitive conduct has erected additional barriers to entry.
Google's ad server, DFP, insulates AdX from competition as discussed at length below (*see infra*
§ III.B), meaning that a better ad exchange still would not have the same access to publishers'
inventory as AdX.

C.      **General Search Services**

1.      **Market Definition**

94.     General search services in the United States is a relevant antitrust market.
General search services allow consumers to find responsive information on the internet by
entering keyword queries in a general search engine.  In the United States, there are four
meaningful general search providers:  Google, Bing, Yahoo!, and DuckDuckGo.

95.     General search services are unique because they offer consumers the convenience
of a "one-stop shop" to access an extremely large and diverse volume of information across the
internet.  Consumers use general search services to perform several types of searches, including
navigational queries (seeking a specific website), informational queries (seeking knowledge or
answers to questions), and commercial queries (seeking to make a purchase).

96.     Other search tools, platforms, and sources of information are not reasonable
substitutes for general search services.  Offline and online resources, such as books, publisher
websites, social media platforms, and specialized search providers such as Amazon, Expedia, or

Yelp, do not offer consumers the same breadth of information or convenience. These resources are not "one-stop shops" and cannot respond to all types of consumer queries, particularly navigational queries. Few consumers would find alternative sources a suitable substitute for general search services. Thus, there are no reasonable substitutes for general search services, and a general search service monopolist would be able to maintain quality below the level that would prevail in a competitive market.

97.     The United States is the relevant geographic market for general search services. Google offers users in the United States a local domain website with search results optimized based on the user's location in the United States. General search services available in other countries are not reasonable substitutes. Google analyzes search market shares by country, including the United States.

### 2.     Market Power

98.     Google has monopoly power in the United States general search services market. Google today dominates the market with an 88% market share, followed far behind by Bing with about 7%, Yahoo! less than 4%, and DuckDuckGo with less than 2%. Moreover, for searches from mobile devices specifically, Google accounts for almost 95% of all searches.

99.     There are significant barriers to entry in general search services. The creation, maintenance, and growth of a general search engine require a significant capital investment, highly complex technology, access to effective distribution, and adequate scale. For that reason, only two U.S. firms — Google and Microsoft — maintain a comprehensive search index, which is just one, albeit fundamental, component of a general search engine.

100.     Scale is also a significant barrier to entry. Scale affects a general search engine's ability to deliver a quality search experience. The scale needed to compete successfully today is greater than ever.

101.     Google's large and durable market share and the significant barriers to entry in general search services demonstrate Google's monopoly power in the United States.

## III.     UNLAWFUL CONDUCT

### A.     Google Monopolizes Publisher Ad Serving

102.     Publishers program the ad server to auction available ad space.  As a result, the publisher ad server is key to monetizing a publisher's webpage.

103.     Google's strategy has been to monopolize publisher ad serving so it can control how publishers sell their ad inventory.  Google now controls over 90% of the publisher-ad-serving market.  With that control, Google routes publishers' inventory to its own exchange without having to compete against rival exchanges.

104.     Google monopolizes publisher ad serving by tying its ad exchange (AdX) to its publisher ad server (DFP).  Today, Google permits publishers to clear transactions for impressions through AdX only if they also use DFP.

105.     This tying arrangement coerces Gannett to continue using DFP as its publisher ad server.  Gannett would not use DFP as currently offered by Google but for the tie with AdX.  It is not in Gannett's interest to employ an ad server that does not promote competition among exchanges.  Competition for inventory leads to higher prices and higher revenues for Gannett.

106.     Nonetheless, Gannett must accede to the tie and use DFP because AdX — with over 60% of the exchange market and currently the clearinghouse for more than 60% of Gannett's programmatic impressions — is a must-have exchange for Gannett.

107.     With control over publisher ad serving achieved and now entrenched by tying, Google also has maintained its monopoly by eliminating its greatest competitive threat:  client-side header bidding.  For years, Google worried that publishers would develop client-side header bidding into an alternative to DFP.  So, by abusing DFP to route impressions away from header-

bidding participants and to AdX, Google ensured that client-side header bidding never could achieve the scale or investment necessary to become a substitute for DFP.

### 1. Google ties AdX to DFP (2008 – 2018)

108.   With the DoubleClick acquisition in 2008, Google acquired the market's leading publisher ad server (DFP) and a nascent ad exchange (AdX).  Almost immediately thereafter, Google set the foundation for an illegal tie between the two.

109.   *First*, Google leveraged its search monopoly to lock advertiser demand for display inventory into AdX.  As Google began selling ad space on its search results pages, Google required advertisers to use a DSP called "AdWords" to purchase Google's search ad inventory — the largest and most valuable source of search ad inventory available.  Further, AdWords usually was an advertiser's *only* DSP because multihoming was too difficult and costly except for the most sophisticated buyers.  To capitalize on its control over advertisers, Google permitted advertisers to purchase publishers' online display inventory through AdWords, but *only* by bidding through AdX.  That confined a substantial percentage of available demand to Google's exchange and made it a must-have exchange for publishers.

110.   The link between AdWords (now called "Google Ads") and AdX remains today. In 2016, Google started routing Google Ads advertiser demand to non-Google exchanges, but only on a limited and ultimately immaterial basis.  And, as before, most advertisers continue to use only one DSP, which is usually Google Ads.  Consequently, millions of small- to medium-sized businesses now use Google Ads (and no other DSP) to bid on and purchase digital ad space.  That demand is available to publishers only if they sell inventory through AdX.

111.   Google Ads demand (and therefore AdX) is particularly important for Gannett. With hundreds of local publications, Gannett needs advertising spending from local advertisers. Smaller advertisers are disproportionately likely to use Google Ads as their DSP.

112.     Google also has taken steps to lock even large advertisers into AdX.  Google makes many of the features in DV360 unavailable to advertisers if they participate in exchanges other than AdX.  As a result, advertisers must move more of their spending into AdX, thereby enhancing its market power.  The vast majority of DV360 advertising spend is intermediated by AdX.

113.     *Second*, with much of the available advertiser demand captured in AdX, Google permitted AdX to bid in real time only if a publisher licensed DFP.  With a different ad server, AdX would not enter bids in real time.  This arrangement made no short-term economic sense for Google, because an exchange placing static bids, which are systematically lower than real-time bids, is less likely to win an impression.  A lower win rate, in turn, generates less money for the exchange, as an exchange can take its revenue share only if it wins the impression.  Google therefore decided to forgo immediate revenue from real-time bids in order to exert control in the publisher-ad-serving market.

114.     With the largest cross section of advertiser demand captured in AdX, and by offering more valuable, real-time bids only to publishers using DFP, Google forces Gannett to use DFP as its ad server.  Gannett could not afford to forgo the most valuable real-time bids from the largest exchange, even though it did not want to hand over control of its inventory to Google.

115.     Additionally, Google never has confirmed that all demand that ordinarily participates in AdX is available if a publisher uses a different publisher ad server.  In fact, other publishers have cautioned Gannett that the full slate of AdX demand is *not* available if a publisher uses a different publisher ad server.

116.     The tie plainly worked:  while DFP was roughly 50% of the publisher-ad-serving market when Google acquired it, it controls more than 90% today.  Google did not acquire that

market share by building a better ad server — indeed, DFP causes Gannett significant and ongoing financial injury — but rather by capitalizing on the fact that Gannett and others must do business with AdX.

117.    Gannett has no interest in a single firm providing it with an ad exchange along with an ad server.  To the contrary, having the same company control the sell-side and the exchange creates a conflict of interest — *e.g.*, the owner of the exchange will abuse the ad server to route inventory to its exchange even when the publisher could make more money elsewhere. It is nearly impossible for a publisher to manage whether, when, and how often this is occurring, because the firm controlling the publisher ad server also can limit the publisher's access to price and other information necessary to police the auction.  As discussed below (*see infra* § III.B), Google is engaging in precisely that kind of self-dealing, to the detriment of Gannett and ultimately its readers.

118.    There is no technological or legitimate business reason for an exchange to decline to bid in real time depending on the publisher ad server.  AdX is the *only* exchange that limits real-time functionality to a particular ad server.  All non-Google exchanges submit real-time bids to the ad server of the publisher's choosing.  Moreover, any ad-serving rival readily would accept real-time bids from AdX, because that would permit it to offer a competitive ad server without having simultaneously to develop its own powerful exchange.

119.    Nor is there any technological or legitimate business reason for an exchange to withhold demand based on which ad server the publisher licenses.  No other exchange operates in that manner.  That Google ties real-time bids from AdX to DFP is an exercise of power, not a technological or business necessity.

### 2. Google Ad Manager (2018 – Present)

120. In 2018, Google rebranded DFP and AdX as a single offering called "Google Ad Manager" ("GAM"). Google renegotiated contracts with publishers, including Gannett, to phase out separate AdX and DFP agreements and thereby force publishers to agree to a combined contract for both DFP and AdX. Now that DFP and AdX are contractually linked as GAM, it is impossible for a publisher with a GAM account to access AdX without using DFP as the ad server. If a publisher is to access the largest source of available advertiser demand, it must license DFP as its ad server.

121. Despite the GAM rebranding, DFP and AdX remain separate products. DFP and AdX continue to function as before, providing the same ad-serving and exchange functionality that existed before Google introduced GAM. DFP and AdX have provided no material performance benefits to Gannett since the introduction of GAM. Indeed, Google only has increased the financial injury to Gannett. Google continues to charge separate fees for ad-serving and ad-exchange services.

122. GAM is the culmination of the tying arrangement Google first enacted after the DoubleClick merger. Google coerced most publishers to use its ad server by offering real-time bids from AdX only to DFP. Now, to sweep in any stragglers and entrench its control over ad serving, Google does not permit *any* bids from AdX unless a publisher uses DFP.

### 3. Google Eliminates Client-Side Header Bidding (2014 – Present)

123. With control over publisher ad serving, Google has defeated competition from its greatest threat: client-side header bidding. As discussed at length below (*see infra* § III.B), Google insulates AdX from competition against header-bidding exchanges and secures for AdX a growing share of publishers' inventory. As a result, there are fewer participants and less investment in client-side header bidding than would occur in a competitive market.

124.    Google's neutralization of client-side header bidding maintains Google's monopoly in publisher ad serving because, as Google recognized for years, client-side header bidding offers one critical function much like DFP — routing publisher inventory to exchanges. Google executives fretted that "[i]f header bidding consolidates all non-Google demand, we could lose our must-call status and be disintermediated."

125.    In a competitive market with adequate investment, publishers, header-bidding developers, or a well-funded rival could have expanded client-side header bidding's functionality to make it a viable DFP alternative.  Google's repeated efforts to stave off header bidding over many years have stymied the entry of that potential competitor.

**B.      Google Abuses DFP to Monopolize the Market for Ad Exchanges**

126.    The goal of monopolizing publisher ad serving is to give Google control over access to publishers' inventory.  Google then funnels publishers' inventory to its exchange, even though publishers would make more money if their ad space were sold through rivals.

127.    Google has an economic incentive to manipulate the market in favor of its own exchange.  Google generally takes a 20% revenue cut from every transaction routed through its exchange — often higher than the fee charged by its exchange competitors.  If another exchange manages the transaction, Google makes nothing.

128.    To stay ahead of publishers and further its control over the exchange market, Google has forced publishers to adopt ever-changing auction rules in DFP for many years.  But Google's scheme has retained the same basic core:  exclude rival exchanges from submitting bids for publishers' inventory in real time, depress prices for that inventory, and reduce the number of ad slots available.  Then, Google takes a growing share of that shrinking pie.

1.      **Google Hashes User IDs (2009 – Present)**

129.    Before Google acquired DoubleClick, it assured that data stored in and generated by DFP belonged to publishers.  Google represented to publishers and Congress that DoubleClick "data is owned by the customers, publishers and advertisers, and DoubleClick or Google cannot do anything with it."  Likewise, Google represented to publishers and the FTC that "customer and competitor information that DoubleClick collects currently belongs to publishers, not to DoubleClick."  Google committed itself to the "sanctity" of that principle.

130.    For years, Google's contracts with publishers, including Gannett, similarly established that publishers "own[ed]" all data "derived from the use of" DFP and AdX.  For that reason, it remains the responsibility of the publisher, and not Google, to obtain the right for Google to use any data — including data on readers — in connection with providing ad-serving and exchange services.

131.    Yet, shortly after acquiring DoubleClick, Google started to manipulate publishers' data for its own ends.  In 2009, Google programmed DFP to start "hashing" (*i.e.*, encrypting) the user IDs that publishers had been using to solicit targeted ads from advertisers.  As a result, the IDs were unusable for buyers.  With one exception:  Google permitted *itself* to use the very same user IDs when setting its own bids.  So, while Google blocked publishers from accessing and sharing their own user IDs with non-Google exchanges, Google shared the same IDs with AdX and its DSPs.  Google's discrimination against rivals persists to this day.

132.    The result is significant financial harm to Gannett.  In order to sell an impression at a price reflective of its true value, publishers need to be able to adequately identify the user who will view the impression.  User IDs permit publishers and their exchanges to understand the value of inventory, cap the number of times users see the same ad, and effectively target and

track online advertising campaigns.  When exchanges and their DSPs cannot identify users in auctions, the prices of impressions fall by 50%, according to one Google study.

133.    Google's publicly stated reason for DFP eliminating publishers' ability to share their user IDs with non-Google exchanges is the protection of user privacy.  But that justification is belied by Google's self-dealing.  Google prevents others from doing what it does itself: passing user IDs to its exchange and DSPs.  In fact, Google presents a far greater threat to personal privacy than any publisher.  Among many reasons, only Google can combine publisher's data stored in DFP with data from its owned and operated properties, including YouTube, Gmail, and Google Maps.  Google's access to data at such scale is unmatched, and Google uses that data to fuel algorithms that glean and expose ever-increasing amounts of information about users, including highly personal data.  Google told publishers and regulators before the DoubleClick acquisition that it never would combine DoubleClick with Google data, but that also was a false promise.  Google began combining the datasets in 2016.

134.    Google's privacy rationale is also not procompetitive.  All customers for Google's ad-tech products — *i.e.*, publishers and advertisers — desire additional insight into the end user.  Google's withholding of publishers' user IDs therefore does not make ad servers, exchanges, or DSPs more desirable to any customer.  And, because it is the publisher's responsibility to gain a user's consent for data collecting in connection with ad serving and ad intermediation, readers do not need protection from their ad sources.  They always can turn to a different news source if they are uncomfortable with the terms offered by Gannett or anyone else.

135.    At bottom, Google's hashing of user IDs is irrational but for its effect on rival exchanges.  Any profit-oriented operator of a publisher ad server would want to maximize the volume and value of impressions that are served.  Serving more, higher value impressions means

more money for the ad server.  But Google nonetheless hashes user IDs, which depresses the price for publishers' inventory, undermines investment in additional online content, and thereby reduces the number of impressions available for sale.  By hashing user IDs, Google sacrifices ad-serving revenues in order to handicap its exchange rivals.

### 2.    Last Look (2014 – 2019)

136.    Before header bidding, exchanges originally ran second-price auctions:  the winning DSP would pay one penny higher than the second highest bid.  Second-price auctions were popular at that time because exchanges did not compete in real-time.  An exchange would win the impression so long as its bid cleared the publisher's price floor, which was static and typically lower than what a second exchange would have offered in real time.  Without having to compete among themselves, exchanges could afford to bid less than the most competitive bid from their participating DSPs.

137.    Client-side header bidding introduced real-time competition among exchanges, which meant that exchanges had to compete more vigorously for publishers' inventory. Accordingly, most exchanges moved to first-price auctions, where the winning bidder pays the full price of his bid.  With more exchanges competing in real time for the same inventory, exchanges no longer could afford to withhold their DSPs' best offers.

138.    Except for Google's AdX.  With Dynamic Allocation, AdX knew the winning bid from header bidding (*i.e.*, the price to beat), *before* it called its DSPs to submit bids for the impression.  AdX could run a second-price auction but adjust the clearing price when needed to outbid a competitor by a penny.  This Last Look advantage allowed Google to preserve AdX's second-price auction and stabilize its prices only slightly higher than its competitors, rather than submit its highest bid based on the value ascribed to the impression by its DSPs.  In that way, Google's trading on inside information depressed publishers' revenue.

139.    For example, without Last Look, if header bidding returned a bid of $4.00 and AdX ran a typical second-price auction with $6.00 and $3.00 bids, the AdX auction would clear at $3.01, and the wining header-bidding exchange would win the impression for $4.00.  Without inside information, AdX would have needed to submit a $6.00 bid to win the auction.  However, because of Last Look, AdX did not need to compete on a first-price basis and place the available $6.00 bid.  Instead, AdX could increase its bid from $3.01 to $4.01 and win the impression by a penny.  Only because AdX knew the price to beat for the impression could it maintain a second-price auction with little risk of losing to first-price competitors.

140.    Without Last Look, AdX would have moved to a first-price auction with the rest of the competition.  AdX gets paid only if it intermediates a transaction; thus, Google's incentive would have been to bid higher prices to ensure victory.  Yet, while most exchanges ran first-price auctions by 2017, AdX did not purport to move to a first-price auction until 2019.  And even then, Google has continued to develop auction rules that effectively entrench and expand Last Look (*see infra* § III.B.7).

141.    Last Look not only permitted AdX to compete less vigorously for impressions; it also helped AdX manage a greater share of transactions.  To take the previous example, a DSP valuing the impression at $6.00 would face two options:  bid in header bidding where it would have to pay full price, or bid in AdX, which could get a $1.99 discount.  For DSPs, that is not a difficult call.  Google's access to inside information coalesced more demand in AdX.

142.    Last Look also permitted AdX to maintain its 20% revenue share — several times higher than its competitors — despite price competition from rivals.  Because exchanges present bids to the ad server on a "net" basis, *i.e.*, with the revenue share subtracted out, DSPs submit their bids to AdX knowing that the ad server will see only 80% of the actual bid that wins in

AdX.  So, if a DSP wins the $6.00 impression for $4.01, it actually must pay $5.01.  That is still a good deal because AdX is trading with Last Look.  But, without that advantage, a $6.00 bid through AdX is more expensive than a $6.00 bid through a lower-priced rival.  DSPs naturally would have moved spending to rival exchanges unless AdX lowered its revenue share.

143.    A Google study confirms that Last Look caused advertisers to migrate from non-Google exchanges to AdX and Google's DSPs.  And Google has admitted internally that "Last Look is inherently unfair."

144.    Google's Last Look behavior was monopsonistic:  rather than bid at competitive prices and compete with rivals for advertiser demand on price and quality of service, Google secured more advertisers bidding in AdX at reduced prices.  Thus, Google was able to take exchange volume from rivals and intermediate a higher share of lower-value transactions.

145.    Moreover, Google did so while lying to publishers, including Gannett.  For years, Google explicitly has  agreed in its DFP and AdX (and now GAM) contracts not to use "data entered by [publishers] . . . that is not generally shared with buyers" — including header-bidding bids entered as line items in DFP — "for purposes of informing bids" made by Google.  In that way, and in conjunction with its myriad promises that Dynamic Allocation "maximizes yield," Google concealed its market manipulation from Gannett and induced it to permit DFP to run Dynamic Allocation across its inventory.

146.    Google now claims that it ended Last Look in 2019.  Its assurances are false.  As discussed at length below, Google has enacted additional auction rules across publisher inventory that substantively parallel Last Look and inflict even greater harm on publishers.  Additionally, in one recent regulatory filing, Google confirmed that Last Look against publishers' direct deals persists to this day.

### 3.     Enhanced Dynamic Allocation (2014 – Present)

147.    Not long after publishers introduced client-side header bidding, Google doubled down on Last Look with Enhanced Dynamic Allocation.  DFP began converting publishers' *direct* deals into "temporary" CPMs, which DFP sent to AdX as a price floor.  AdX then could beat out prior, directly negotiated deals so long as it could bid one penny higher than the DFP-assigned "temporary" CPM.  For many years, AdX was the *only* exchange that DFP permitted to compete against a publishers' directly sold inventory.  Google also has introduced an add-on to Enhanced Dynamic Allocation called "Optimized Competition," which, by use of an algorithm, lowers a direct deal's temporary CPM before passing it along as a price floor.

148.    Enhanced Dynamic Allocation further entrenches AdX's control over the exchange market.  By giving AdX exclusive access to publishers' direct-deal inventory, not only could AdX intermediate transactions that rivals could not reach, but AdX also could do so aided by Last Look.  Exchanges participating in header bidding, meanwhile, were not permitted to compete against direct deals for many years.  AdX thereby resurrected the pre-header bidding regime for publishers' direct deals — only AdX could bid in real time.  That depressed Gannett's revenue and created a new incentive for advertisers to bid through AdX.

149.    Additionally, Google never has given publishers insight into how DFP calculates the temporary CPM it sends as a price floor, or how Optimized Competition adjusts that temporary CPM.  Publishers cannot verify whether the temporary CPM understates the value of a direct deal for any particular impression.  As a result, AdX can win impressions even if a direct deal would have paid more.

150.    Moreover, DFP can allocate to AdX the most valuable impressions while leaving publishers' direct deals, which publishers and advertisers previously had negotiated in good faith, to fill less valuable inventory at higher, previously contracted prices.  Even worse, AdX

could supplant direct deals entirely, so that publishers would fail to deliver on their commitments to advertisers. Naturally, over time, AdX's attacks on direct sales depresses the prices that publishers can receive for what used to be their most valuable inventory.

151. Google induced publishers, including Gannett, to enable Enhanced Dynamic Allocation by falsely telling them it "maximizes yield." In 2014, Google employees repeatedly pressured Gannett to enact Enhanced Dynamic Allocation, promising higher revenue. Shortly thereafter, Google even commissioned a study to assure Gannett that Enhanced Dynamic Allocation increased revenue by 19%.

152. Google also represented to Gannett that Enhanced Dynamic Allocation would not cause Gannett to under deliver on its direct deals with advertisers. And Google assured Gannett that a certain subset of the most valuable direct deals, called "sponsorships," would be completely immune from Enhanced Dynamic Allocation.

153. Gannett enabled and continued to use Enhanced Dynamic Allocation for many years on the basis of these representations. They were false. Internally, as investigations from domestic and foreign antitrust enforcers recently have revealed, Google knew that Enhanced Dynamic Allocation improved only its yield, not publishers' bottom line. Enhanced Dynamic Allocation allowed Google to cherry-pick Gannett's best impressions while reducing the value of Gannett's current and future direct deals.

154. Google also lied about how Enhanced Dynamic Allocation operates. For months, in 2014, Gannett complained to Google that DFP was not delivering on direct deals, despite Google's explicit assurances otherwise. Google initially denied there was a problem, then later claimed to have fixed the problem, but it never offered Gannett any proof that the under-delivery issue had been resolved. And, despite Gannett's repeated requests, Google never has made

available any data or analytics that would allow Gannett to track how AdX competes with direct deals with Enhanced Dynamic Allocation (*e.g.*, how DFP calculates "temporary" CPMs.).

155.    Google's representations regarding "sponsorship" direct deals were likewise false. In 2018, Gannett discovered that Enhanced Dynamic Allocation had permitted AdX to steal inventory from Gannett's sponsorship deals — potentially for years.  Google claims to have resolved that issue, too.  But, as with Enhanced Dynamic Allocation generally, Gannett has limited ability to oversee whether and how AdX continues to compete against sponsorships.

156.    Gannett now cannot feasibly shut off Enhanced Dynamic Allocation.  With "Project Bernanke" (see *infra* § III.B.4), Google siphons revenue from publishers who decline to enable Enhanced Dynamic Allocation and reallocates it to publishers who do.  Further, if Gannett were to disable Enhanced Dynamic Allocation (which since has been rebranded as just "Dynamic Allocation") today, AdX would refuse to submit live, competitive bids for its impressions.  In fact, today, there is no identifiable option to disable Enhanced Dynamic Allocation in DFP's user interface.  Thus, Gannett has no choice but to accede to Enhanced Dynamic Allocation and accept depressed prices for its most valuable inventory.

### 4.    Project Bernanke (2013 – Present)

157.    In parallel with Last Look, Google has developed an additional bid-rigging scheme that capitalizes on AdX's unlawful access to inside information.  As noted above, exchanges historically ran second-price auctions — auctions in which the highest bidder paid only a penny higher than the second highest bid.  From 2010 to 2019, Google publicly and repeatedly professed that AdX ran a "sealed bid second-price auction."  For example, Scott Spencer, a Google Executive, represented in a media interview that "AdX is a second price auction with minimum CPMs set by the publisher."  Other senior Google executive made similar representations in an academic paper published in 2014 in *American Economic Review*.

158.    What publishers only recently discovered, however, is that Google's representations about AdX were false.  In 2013, Google became frustrated that Google Ads lost out on impressions to competing DSPs in the AdX auction, and that AdX would lose out on impressions to other exchanges.  As a result, Google's "gTrade" team developed and launched "Project Bernanke," which dramatically increased Google Ads' and AdX's win rates by depressing the prices that Google paid to publishers for billions of impressions every month.

159.    Specifically, with Project Bernanke, Google paid publishers on a *third-price* basis while charging advertisers on a *second-price* basis.  Google either pocketed the difference or redirected the stolen funds so Google Ads and AdX could win a growing share of impressions.

160.    For example, when at least the two highest bids received by AdX were from Google Ads, Google would pay the publisher a penny more than the *third*-highest bid (so long as the third-price bid cleared publisher floors and beat out header bidding).  So, if header bidding returned a bid of $8.99, and AdX received 2 Google Ads bids for $19 and $18 and a third non-Google DSP bid for $9, AdX would return a bid of $9.01 (third price) rather than $18.01 (second price), less its revenue share.  As with Last Look, AdX could get away with its third-price scheme because it already knew the results of header bidding and could rig its bids accordingly.

161.    But while Bernanke switched AdX to a third-price auction for publishers, nothing changed for advertisers — they still paid a penny above the *second*-highest price.  Google keeps the difference and moves it to a "pool" to boost bids from Google Ads when it otherwise would lose the auction in AdX, and AdX would lose the final auction among exchanges in the ad server.  Capitalizing on its artificial information advantage, Google used rival bids and un-hashed user IDs from publishers' ad servers to determine precisely how much to inflate Google bids in order to take impressions from competing DSPs and exchanges.

162.    In an internal study, Google found that Bernanke could depress a publisher's revenue by upwards of 40%.  That revenue hit, like with Last Look, is a direct result of Google rigging its bids to win merely by a token amount over rivals, rather than bidding without inside information to win an impression based on its value to advertisers.  Publishers, meanwhile, had no way to know that Google was altering auction mechanics and hoarding their revenue in this way, until the facts of the program were revealed by government investigation.

163.    Since it was introduced in 2013, Bernanke has gone through three variations.  For each, the mechanics of the auction manipulation are similar, but they differ in how and where Google collects and spends the Bernanke "pool."

164.    Starting in 2013, the first version of Bernanke operated on a per-publisher basis.  Google would siphon revenue from an AdX auction for a particular publisher's impression, and then would use the stolen funds to inflate Google bids in future auctions for that same publisher's inventory.  The original iteration of Bernanke also set third-price auctions based on publisher-set floors.

165.    In May 2015, Google launched "Global Bernanke."  Google no longer restricted the Bernanke pool to a single publisher.  Rather, as the name suggests, Global Bernanke skimmed revenue from *all* publishers' auctions and placed it into a "Global" pool to boost Google bids worldwide.  Global Bernanke also permitted Google to rig third-price auctions based on the results of header bidding or temporary CPMs from direct deals.

166.    The third variation of Bernanke, known as "Bell," is the most punitive.  For publishers who attempt to counteract AdX's bid rigging or other anticompetitive advantages — *e.g.*, by declining to enable Enhanced Dynamic Allocation — Google places deflated bids in third-price auctions and then withholds *all* Bernanke pool money in future auctions.  Google thus

purposefully *loses* millions of auctions — and thereby forgoes revenue — solely for the purpose of punishing noncompliant publishers.  It is no surprise that Google hid Bell from publishers, instructing its employees to tell publishers to "just make sure [Enhanced Dynamic Allocation] is working or AdX is booked higher" in a publisher's server.  Bell only recently has been uncovered by government enforcers and, according to their investigations, persists to this day.

167.    Bernanke, in its various forms, is irrational but for its destruction of competition.  By depressing its bids yet further in third-price auctions, AdX forgoes immediate revenue solely because it can trade on inside information to win a greater share of impressions in the future.  Further, for the Bell variation, Google chooses to lose future auctions — and therefore make no money at all in exchange fees — in order to punish publishers that take steps to push back against AdX's anticompetitive advantages.

168.    Google's implementation of Bernanke and its variants was also deceptive.  Google never disclosed Bernanke, Global Bernanke, or Bell to Gannett, and Google's statements about running a second-price auction were false.  In particular, Google deceived both publishers and advertisers by converting second price auctions into third price auctions, and it further deceived publishers — including Gannett — into accepting artificially depressed payments.  The result to Gannett was dramatically decreased revenue, as Google itself has admitted.

169.    Google has manipulated auctions using Bernanke and its variants billions of times over nearly a decade.

### 5.    Dynamic Revenue Share (2014 – Present)

170.    Much like Last Look and Bernanke allow Google to rig AdX's *bids* to beat rivals by a penny, Google also has developed a program to manipulate AdX's *revenue share* to the same effect.  In 2014, Google introduced "Dynamic Revenue Share" (also called "Average Revenue Share"), which permits Google to reduce its revenue share when necessary to win an

impression, only to increase its fee for less competitive impressions.  Google continues to charge

its contracted revenue share (typically 20%) on average over the billing period.

171.    Dynamic Revenue Share, like Last Look and Bernanke, operates by trading on

rivals' bid information.  For example, if header bidding returns a bid of $4.00, and the highest

available bid in AdX (net of Google's fees) is $3.57, AdX can forgo its revenue share (20%) and

bid up to $4.46.  However, because AdX knows the floor is $4.00, it charges a fee of 10% and

wins the auction at $4.01.  Conversely, for the next auction, if AdX clears at $4.20 (net of

Google's fees) and the highest bid from header bidding is $3.67, Google can increase its revenue

share to 30% and win the impression for $3.68.  Google thus wins both impressions and makes

$2.02 ($0.45 + $1.57).  The publisher, meanwhile, makes $7.69 ($4.01 + $3.68).

172.    Google can tailor its revenue share to win impressions only if it can access

information from DFP about rivals' bidding behavior.  Internally, Google recognized that

Dynamic Revenue Share "makes the auction untruthful as we determine the AdX revshare after

seeing buyers' bids."

173.    Without access to rivals' bids, Google could not selectively modify its revenue

share, and would either charge a flat 20% fee or reduce its fee across the board in order to win

both impressions.  Either way, there is more revenue available for publishers.  To take the prior

example, if Google keeps its 20% revenue share, it wins only the second impression and makes

$1.05.  The publisher makes $8.20 ($4.00 + $4.20).  Alternatively, if Google reduces its revenue

share to 10% for both transactions, it wins both impressions and makes $0.98 ($0.45 + $0.53).

The publisher, meanwhile, makes $8.74 ($4.01 + $4.73).  In short, by trading on inside

information with Dynamic Revenue Share, Google can at least double its money at publishers'

expense.

174.    Dynamic Revenue Share also insulates AdX from price competition and entrenches Google's monopoly in the exchange market.  Even if a rival lowers its revenue share across the board, AdX need not respond in kind because it can lower its fee on any particular impression, only to make up for lost revenue by charging a higher fee for less competitive impressions.  The result is that AdX can preserve an average 20% revenue share *and* process a greater share of impressions.  By contrast, without access to rivals' bids, Google would have to make a choice:  compete by lowering its fee overall or preserve the higher fee and lose out to rivals.  Either way, the competitive process would work, because impressions would be routed to the most efficient exchange.  Dynamic Revenue Share thwarts that market-based allocation.

175.    Google hid Dynamic Revenue Share from publishers for the first two years of its operation.  Google began rolling out Dynamic Revenue Share without discussion in 2014.  By the fall of 2015, Google had expanded the program to all publishers, but still told publishers nothing about it.  When Google finally announced Dynamic Revenue Share publicly in 2016, it did so with little explanation.

176.    Both at the time and later, Google's publicly available website threatened that disabling Dynamic Revenue Share would "reduce Ad Exchange yield."  For reasons discussed above, however, Google's representations appear to be false.  That is because the upside to the publisher from Google winning the first impression over a rival ($0.01) pales in comparison to the downside of Google raising its revenue share on the second impression it would have won anyway (-$0.52).  To this day, though, Gannett still has no visibility regarding how often Google can capitalize on Dynamic Revenue Share to the detriment of publishers.  Google does not disclose its per-impression revenue share in the bid-level data available in DFP.  Google documents also reveal that the program did not increase publishers' yield.

177. Google continues to make misrepresentations about Dynamic Revenue Share to this day. Google's publicly available website now states that "revenue share optimizations" were "paused" in September 2019. That statement is false or at best misleading, as Dynamic Revenue Share remained operative in DFP's user interface until at least 2021. While today it appears that Google quietly has removed Dynamic Revenue Share from DFP's user interface, and any mention of Dynamic Revenue Share from its help pages, there is no indication that Google actually has disabled that functionality. In sum, as best any publisher could tell, Google continues to enforce Dynamic Revenue Share and now has disabled any way for a publisher to shut it off. The result to Gannett is substantial financial injury, repeated over billions of auctions.

### 6. Exchange Bidding (2018 – Present)

178. As mentioned above, in 2018, Google publicly launched a server-side alternative to client-side header bidding called "Exchange Bidding," later re-named "Open Bidding." Exchange Bidding purportedly permits certain non-Google exchanges (and certain DSPs) to bid against AdX in real-time. Google charges publishers a 10% fee for video ad space sold through Exchange Bidding, and a 5% fee for other kinds of impressions (*e.g.*, text, banners). Either way, that fee is *additional* to Google's ordinary 20% revenue share for AdX.

179. Exchange Bidding is designed to maintain AdX's ad-server and ad-exchange monopolies. Because Exchange Bidding operates on Google's servers, only AdX has complete insight into the identity of the reader. Other exchanges, meanwhile, are hampered by "user sync" issues that make it far more difficult to understand who the reader is — and therefore submit competitive bids. Rivals are further hindered by Google's hashing of user IDs. *See supra* § III.B.1. Client-side header bidding, by contrast, does not present the same user sync concerns because the header-bidding auction is hosted on the reader's browser, not third-party servers.

180.    Because client-side header bidding remains a more favorable environment for publishers and rival exchanges, and because Google does not want AdX to compete against header-bidding exchanges (even if aided by Last Look and other bid-rigging schemes), Google has set out to "kill" client-side header bidding.  Indeed, Google measures Exchange Bidding's success not by the revenue it generates, but by the degree to which it slows the growth of client-side header bidding.  A Google executive cautioned the company's employees:  "I would suggest being very careful here what we say to publishers.  Remember, [Exchange Bidding] negatively impacting header bidding is a Google desired outcome.  Publishers are likely fine with header bidding, they make more money with it."

181.    Killing client-side header bidding also serves another Google goal:  making sure that client-side header bidding never could be developed into a competing ad server.

182.    In order to eliminate client-side header bidding, Google has taken steps to coerce publishers to abandon it for Exchange Bidding.  As discussed at length below, Google outright eliminated client-side header bidding on mobile web pages that appear at the top of Google search results.  See *infra* § III.C.  Thus, for publishers' most important source of referral traffic — and for many publishers, the most important source of traffic, period — publishers have few options other than to use Exchange Bidding.  Additionally, by limiting DFP's ability to accept bids from client-side header bidding, see *infra* § III.B.10, and by redacting datasets so that publishers could not fully compare the performance of client-side header bidding against Exchange Bidding, see *infra* § III.B.9, Google has manufactured a fait accompli:  take Exchange Bidding or use a now-degraded client-side alternative.

183.    Finally, Google has attempted to cajole publishers into abandoning client-side header bidding in favor of Exchange Bidding.  For example, Google repeatedly represented to

Gannett that Exchange Bidding would lead to higher revenue because ads would load more quickly. For years, Gannett enabled Exchange Bidding based in part on that representation.

184. Google's Exchange Bidding promise was false. In May 2023, Gannett discovered that Google secretly enforced an "alpha" program called "Multi-Ad for Video" across 100% of Gannett's inventory. The program reduced AdX's bids for video inventory by 30% or more, yet permitted AdX to *increase* its share of Gannett's video inventory. The share of video inventory sold through rival exchanges in header bidding decreased by nearly 40%.

185. In response, Gannett demanded to be removed from the alpha and has proceeded to shut down Exchange Bidding across its inventory. After years of Google's misrepresentations and efforts to coerce Gannett to use Exchange Bidding, Gannett simply could not afford to leave its video inventory completely exposed to Google's machinations.

186. The results of disabling Exchange Bidding have been favorable. On video inventory, Gannett has seen a substantial increase in CPMs since disabling Exchange Bidding. Exchanges perform substantially better when they bid through other header-bidding solutions, including client-side header bidding. Google engaged in repeated acts of coercion and misrepresentations to conceal that fact. In so doing, Google protected its exchange from competition and inflicted substantial financial harm on Gannett.

### 7.   Minimum Bid to Win (2018 – Present)

187. Apart from its false promises about revenue, Google also has represented that AdX, as a participant in Exchange Bidding, no longer benefits from Last Look. But, in actuality, Exchange Bidding is still plagued by many of the auction manipulations described above (*e.g.*, Bernanke and Dynamic Revenue Share) that are functionally identical to Last Look. And, in 2019, Google gave itself a new Last Look advantage.

48

188.    In 2019, Google introduced a so-called "Unified Auction."  Google represented

that AdX would move to a first-price auction and assured that no buyer would access inside

bidding information.  Google further represented that it would run a "fair and transparent market

for everyone," in which "[a]n advertising buyer's bid will not be shared with another buyer

before the auction."  Google's contracts also continued to promise — as they do today — that

Google would not inform its bids using publisher-inputted data "that is not generally shared with

buyers."

189.    But, as part of the Unified Auction, Google simultaneously introduced a feature

called "Minimum Bid to Win."  After an auction concludes, Google now tells the winning

bidder, if it is an "Authorized Bidder," *i.e.*, an exchange or DSP participant in Google AdX or

Exchange Bidding, what the minimum price to win the impression would have been.  This is *not*

merely the price at which the impression sold; rather, Google tells the winning bidder the second

highest price that was placed in the auction, *i.e.*, the cheapest price at which the winning DSP

could have won the impression.  Minimum Bid to Win thus provides functionally the same

information as Last Look:  the next highest price to beat.

190.    The only difference from Last Look is that Google now knows the minimum

winning price immediately *after*, rather than *before*, an auction closes.  But that difference is

immaterial.  DSPs buy impressions by the thousands.  The minimum price at which a prior

auction could have cleared is an incisive predictor into the minimum clearing price of the next,

similar auction.  Once an auction closes, authorized bidders can use the next-highest price to

inform their bids on thousands of immediately following, highly similar auctions.  For instance,

Google can use the Minimum Bid to Win from one auction to bid on the next impression *for the*

*same user on the same page.*  It is thus immaterial that the buyer does not know a rival's bid before the auction.  The effect on competition is functionally the same as Last Look.

191.    Since introducing Minimum Bid to Win, Google has continued to develop the program and enhance its anticompetitive effect.  By exploiting Google's access to publishers' user IDs and rivals' historical bids, AdX nearly has perfected its ability to use Minimum Bid to Win to outbid rivals by a penny.  As one Google planning document states:  "If we knew our competitor's bid exactly, we can simply bid a cent above that[.]  But we don't have this information before the auction, so we need to predict [the] competitor's bid."

192.    At bottom, Exchange Bidding and Minimum Bid to Win were built on Google's core business model:  misuse rival bidding information to defeat competition among exchanges.

### 8.    Projects Poirot and Elmo (2018 – Present)

193.    In yet another move to kill client-side header bidding, Google designed two secret programs to ensure that its DSP for large advertisers, DV360, offered depressed bids on non-Google exchanges when they participated in header bidding.  If the exchange was not participating in client-side header bidding, by contrast, DV360 returned higher prices.  In that way, Google coerced exchanges to forgo header bidding, and it coerced publishers to sell inventory either to AdX or the preferred non-Google exchanges participating in Exchange Bidding.  Google named its two"[a]uction [d]efenses" "Poirot" and "Elmo."

194.    Poirot worked by detecting whether the exchange requesting a bid from DV360 was running a second-price auction.  Because header-bidding exchanges were running first-price auctions, Poirot deduced that bids from first-price exchanges were destined for client-side header bidding.  Thus, Poirot instructed DV360 to return competitive bids only for second-price auctions.

195.    Poirot lost Google revenue in the short run, because DSPs charge a revenue share much like exchanges.  So, no profit-minded DSP would want to deflate its bids.  But Google was willing to sacrifice short-term profits because Poirot harmed header-bidding exchanges even more.  According to Google, Poirot caused a "revenue drop in the range of 20-30%" for header-bidding exchanges, while DV360 lost 1.9% of its revenue.  Ultimately, Poirot accomplished its evident goal, as DV360 spent "7% more on AdX and reduc[ed] spend on most other exchanges."

196.    Similarly, Elmo worked by detecting when a single impression was being routed to multiple exchanges at the same time.  Because client-side header bidding solicited bids from multiple exchanges simultaneously, Elmo was able to identify when an impression was being routed through header bidding.  With Elmo, DV360 reduced its spending on exchanges that were suspected of meaningfully engaging in header bidding.

197.    The program was hugely successful.  For example, Elmo reduced DV360 spending on the largest header-bidding exchange by 25%, while increasing DV360 spend on AdX by 7.8%.  An internal Google document revealed that, by July 2018, Elmo had reduced DV360 spend across all of Google's major exchange rivals by 44%.

198.    Together, Google estimates that Poirot and Elmo cost rival exchanges 21% of their revenue.  That made rival exchanges less viable options for publishers and kept client-side header bidding from developing into a competitive threat to Google's ad-server monopoly.

**9.    Google Redacts Datasets (2018 – Present)**

199.    Google also cements its market power and obfuscates its anticompetitive conduct by redacting key data from the auction records it provides to publishers, including Gannett.

200.    For example, when the winner of the client-side header bidding ultimately won an impression, Google used to allow publishers to compare the winning bid to losing bids from other exchanges, including AdX.  That information allowed publishers to assess the incremental

benefit from an exchange's performance in header bidding, which helped them decide how to manage the header-bidding auction — including which exchanges to invite, how many to invite, and how long to let the auction proceed.

201.    In 2018, however, Google redacted two DFP data fields (known as "KeyPart" and "TimeUsec2") so that publishers no longer can compare impression-level and bid-level data between header-bidding exchanges and Exchange Bidding exchanges, including AdX.  The upshot is that publishers now have substantially less insight into client-side header bidding's comparative advantage, and therefore have greater difficulty designing client-side header bidding to maximize revenue.

202.    In fact, Google's decision to erect a wall between bid-level and impression-level data means that publishers cannot even be sure whether the demand source that ultimately wins an impression was the highest bidder.  In that way, Google makes it substantially more difficult for publishers to catch and react to its anticompetitive conduct.

203.    Google's redacting of DFP data is irrational but for its anticompetitive effect, because no publisher ad server in a competitive market would reduce the amount of information available to publishers.  Ad-server data is an important source of truth for publishers' operations, and almost all revenue-related advertising decisions rely on this data.  Accordingly, data redactions, hashing, and similar conduct make the ad server less valuable to publishers.

### 10.    Google Manipulates DFP to Artificially Deflate Bids from Rival Exchanges (2017 – Present)

204.    Apart from rigging its own bids, Google also deflates *rivals'* bids to keep them from winning impressions for which Google otherwise would not be competitive.  Google implements this scheme by manipulating the auction rules in DFP.

205.    When a rival exchange bids on publisher inventory through client-side header bidding, DFP does not allow the exchange to compete on the actual price it bid.  Rather, publishers must input "line items" corresponding to potential bids for inventory, and rival bids are rounded *down* to the nearest line item.  So, if a publisher receives a header-bidding exchange bid of $4.29, but only has a pre-existing line item with a price of $4.20, then the ad server rounds down the bid to $4.20.  To counteract this inefficiency, the publisher must create a large number of line items (*e.g.*, line items with corresponding prices of $4.20, $4.21, $4.22, $4.23, $4.24, etc.) to capture a live, competitive bid coming from a rival exchange.

206.    To make rival bids less competitive, in 2017, Google purposefully started to limit the number of line items available to publishers.  Google documents make it clear that Google's intent was to keep artificial line item caps in place as a "tool we have to fight [header bidding]."

207.    Google also limited the number of line items to pressure publishers to switch to Exchange Bidding, where Google allows exchanges to submit live bids.  As one employee explained to others:  "We need to push these pubs to using Jedi [*i.e.*, Exchange Bidding] – if imposing more limits pushes them more to Jedi – then we should keep those limits in place."

208.    There is no technological reason for Google's caps on line items.  DFP would allow for more line items but for Google's artificial caps.

209.    Google's limits on line items are also irrational but for their destruction of competition from rival exchanges.  In a competitive market, an ad server would maximize the value of bids that a publisher receives for its inventory.  That would make publishers more money and therefore make the ad server more valuable.  Recognizing as much, the now-defunct OpenX ad server incorporated client-side header bidding through a single line item, removing altogether the need for the multiple line-item setup.  But because publishers cannot leave DFP

for the reasons already discussed, OpenX's ad server had limited opportunity to gain share against Google's monopoly and exited the market in 2019.

### 11.   Google Eliminates Prices Floors and Imposes Unified Pricing Rules (2018 – Present)

210.   For several years, publishers did have one tool (albeit an imprecise one) to attempt to correct for AdX's Last Look, Dynamic Revenue Share, and related advantages. Publishers could set unique price floors for each exchange (including AdX), each DSP participating in that exchange (including Google Ads), and each advertiser participating in that DSP (*e.g.*, Coca Cola).  By setting a unique price floor, a publisher could establish a new minimum price (other than the next best price) that the buyer would have to meet in order to win an impression.  With higher price floors, publishers could force buyers to submit bids that were substantially higher, rather than just one penny higher, than the next highest available bid.

211.   For example, if the highest bid from the DSPs participating in AdX was $6.00, but AdX bid $4.01 in light of Last Look, that meant there was $1.99 on the table that AdX took from the publisher.  If the publisher set a $6.00 price floor, though, AdX could win the impression only if it met that floor — *i.e.*, only if it paid the full $6.00, which a participating DSP already had decided was the value of the impression.  Likewise, with a $6.00 floor, AdX could not increase its revenue share yet continue to win the impression.

212.   Differential price floors were not a panacea and never could have substituted for a fair auction in the ad server.  That is because a publisher could not know, when setting a floor, what the maximum available bid from the buyer would prove to be.  The floor was simply the publisher's best *guess* about what the buyer would be willing to pay if it had to compete without access to inside bid information.  Thus, any floor risked not being high enough and leaving

money on the table, or being too high and pricing the buyer out of the auction. Nonetheless, publishers used price floors because that was the only plausible tool at their disposal.

213.    For years, until early 2018, Gannett employed differential price floors to maximize revenue. Before Google acquired it, AdMeld offered publishers a "Bid Landscape Report." The report informed publishers (among other things) what price advertisers were bidding for impressions, how often they won impressions, and what they ultimately paid when they won the impression. For example, Gannett regularly observed that advertisers submitted bids at least two or three times higher than the ultimate price they paid for an impression. Further, advertisers were better positioned to pay far below an impression's value if they traded through AdX and so were aided by Last Look.

214.    To capture the lost value from depressed bids, Gannett would set per-advertiser price floors as a multiple of the individual advertiser's average winning price, if that advertiser won at least 30% of the time it submitted a bid. So, for example, an advertiser that valued Gannett's inventory at $15 CPM, but regularly won impressions at $5 CPM, would have to pay a price closer to the full value that the advertiser ascribed to the impression.

215.    Gannett found that setting higher prices floors for advertisers caused them to return higher bids and ultimately led to higher revenue. That advertisers bid more vigorously in response to price floors indicated that, absent the floors, advertisers were likely benefitting from Google's many advantages, including Last Look and Dynamic Revenue Share. Floors would not impact a buyer's bidding behavior if it already offered its most competitive bid.

216.    After the AdMeld acquisition, Google set out to eliminate advertiser-specific price floors. For a time, Google permitted advertisers to opt out of the Bid Landscape Report. Eventually, though, Google decided that partially disabling the report did not go far enough. It

did not want to afford advertisers even the *choice* whether to communicate bid information to publishers. So, in 2018, Google eliminated the Bid Landscape Report entirely. That made it effectively impossible for Gannett to employ meaningful differential floors. To this day, Gannett must accept depressed prices from advertisers that ascribe the highest value to Gannett inventory.

217. In 2019, Google again set out to disable differential price floors — this time at the exchange- and DSP-level. As part of the Unified Auction, Google introduced "Unified Pricing Rules" ("UPR"). Google asserted that, because it was moving AdX to a first-price auction, "floor prices no longer serve the purpose of closing the gap between the highest bid and the second bid." So, with UPR, Google disabled publishers' ability to set different price floors among *and* within exchanges. Now, if a publisher sets a price floor, it must apply equally to all exchanges and buyers in the market for the publisher's inventory. The result for many publishers is a price floor several times lower for AdX than what AdX had to clear previously.

218. Google's justification of UPR was disingenuous. First, if differential price floors truly made no difference to Google, there would have been no reason to eliminate them. But they *did* make a difference. As the U.K. Competition & Markets Authority found in its investigation of Google's ad-tech dominance, Google enforced UPR because it was dissatisfied with publishers setting unique price floors that made AdX compete. Second, without floors, Google still does not offer its best price for inventory. For example, Google *further* can exploit Dynamic Revenue Share because AdX now faces a much lower risk of falling below the publisher's floor if it increases its revenue share. And Google's Minimum Bid to Win permits AdX to win impressions for less than the price the advertisers it represents would be willing to pay. Differential floors remain valuable because they would allow publishers to counteract that conduct and force AdX to compete more vigorously for impressions.

219.     Higher price floors against Google Ads, specifically, also served a second purpose that Google never addressed:  policing unpleasant or unsuitable advertisements.  While Google Ads is far and away Gannett's most important DSP, it is also the primary source of low-quality advertising.  For years, Gannett used differential price floors to weed out unsuitable ads that its readers did not want to see.  Eliminating DSP-level price floors has left Gannett exposed to a greater threat of improper (or even malicious) advertisements appearing on its pages.

220.     Google also made misrepresentations to publishers to enforce UPR.  For example, in the May 2019 "Best Practices" guide, Google represented that applying multipliers to non-Google bids — one potential workaround to the unified floors — would not "maximize yield." Further, in the "Best Practices" guide, Google actually *proposed* a different workaround to the unified floors (using "house line items" in DFP), only to kill it weeks later once publishers started to use it.

221.     Apart from shutting down publishers' last path of resistance against Last Look and its analogs, UPR also puts many rival exchanges at a price disadvantage.  For example, if differential floors were available, publishers could adjust floors for non-Google exchanges downward by 5% to account for the 5% Exchange Bidding fee.  That could be in a publisher's interest for any number of reasons, including to diversify its demand partners or to secure what it believes is a higher quality ad from a different exchange.  But now, with UPR, publishers cannot account for the Exchange Bidding fee.  That means rival buyers in Exchange Bidding must offer Google not only their best price for inventory, but rather their best price *plus* a 5% surcharge. While publishers and rival exchanges could avoid that tax by transacting in client-side header bidding, as discussed above, Google has taken numerous steps to disable that service.

222.    Ultimately, UPR is irrational but for its destruction of competition.  In a competitive market, no ad server would limit a publisher's ability to set prices — particularly based on the promise that bidders for inventory are competing fairly.  Publishers value maximum flexibility to secure the highest prices for inventory.

### C.    Google Abuses its Search Monopoly to Monopolize Ad Exchanges (2016 – 2021)

223.    Google also has wielded its monopoly in general search services to force publishers to sell growing shares of their ad inventory through AdX.  Manipulating search traffic is Google's most powerful tool to coerce publishers, because more traffic — and therefore more page views and impressions — is typically more valuable to a publisher than even substantial improvements in the price a publisher can obtain for existing inventory.

224.    Over the past several years, internet users have consumed a growing share of news content on mobile devices.  Today, mobile browsing accounts for 76% of all Gannett traffic.  And, among those mobile visitors, nearly half arrive at Gannett content from a Google page.  As a result, Google has been Gannett's largest source of mobile referral traffic.  Google's mobile search monopoly gives Google power — Google can punish publishers with its search results because losing traffic from Google users significantly harms their business.

225.    In 2016, Google introduced a "News Carousel" to the top of its mobile search results page.  The Carousel is a rolling banner at the top of the page that features news stories in response to a user's search.  Because the Carousel is placed at the top of the page, it has displaced the traditional "organic" links that once appeared in the viewport on a smartphone.  To reach those links, a user must now scroll past the Carousel and other content on the page.  Few users do so.  Because Gannett cannot forgo the significant slice of Google-referred readers, Gannett must accede to whatever terms Google requires to appear in the News Carousel.

226. The News Carousel comes with strings attached.  Until mid-2021, Google permitted content to appear in the News Carousel only if publishers adopt the "Accelerated Mobile Pages" ("AMP") page format.  Google since has required AMP for other Google products that drive traffic to Gannett, such as Google Discover.  While Google billed AMP as an open-source project, it was and remains controlled by Google.  Google registered and still owns AMP's domain (ampproject.org), and it controls the foundation currently in charge of AMP.  While AMP was being developed, Google had all decision-making authority.

227. There is no significant technological benefit to AMP — it is simply an HTML webpage that has been stripped of any third-party script (including JavaScript).  Instead, AMP limits a publisher's expressive creativity and degrades the user experience.  AMP pages are not compatible with infographics and other interactive features, resulting in less user engagement.

228. Nonetheless, from the outset, Google represented to Gannett that AMP pages would not result in less revenue on Gannett's pages.  In March 2016, Google represented that monetization on AMP pages "has been similar or better than ads on mobile sites."

229. That representation was false.  Google's control over ad sales on AMP causes substantial financial injury to Gannett.  Google bans many exchanges from competing for Gannet's inventory, which means Gannett generates less revenue from AMP than traditional mobile pages.  Google was aware that AMP pages were significantly underpaying publishers, including Gannett, but decided to lie in its effort to enforce the AMP page format.

230. The most immediate competitive significance of Google's banning third-party script is that AMP pages are incompatible with client-side header bidding.  The result was, initially, that only AdX could bid in real time for Gannett's AMP inventory.  AdX won virtually all programmatic impressions on Gannett's AMP pages, and it paid significantly less when

compared to the same content appearing on Gannett's non-AMP mobile pages. Gannett had no recourse, though, because it had to adopt AMP lest it lose critical search traffic. That left Gannett with two bad options: (1) forgo AMP and lose search traffic, or (2) adopt AMP, reject client-side header bidding, and sell effectively all AMP ad space through AdX at reduced prices.

231.    After months selling inventory almost exclusively through AdX at depressed prices, certain publishers developed a workaround to introduce "remote.html" client-side header bidding on AMP pages. The results of more competition were favorable — AdX's share of publisher inventory plummeted and revenue increased correspondingly.

232.    Yet, less than a year after publishers introduced remote.html client-side header bidding, Google disabled it. In its place, Google introduced a server-side substitute called "Real Time Config" ("RTC"). Google also imposed a second server-side solution at the time called "Exchange Bidding," described above. *See supra* § III.B.6. Google was aware that publishers were seeing large revenue increases using a rival's header-bidding solution, and Google disabled remote.html to address this competitive threat.

233.    Both RTC and Exchange Bidding are designed to insulate AdX from competition. They permit fewer than half as many exchanges to compete compared to client-side header bidding. And, because RTC and Exchange Bidding operate on server-side connections, rival exchanges (but not AdX) are hampered by "user sync" difficulties that make it harder for their advertisers to identify the reader. That often means significantly depressed bids from non-Google exchanges. AdX, by contrast, is the only exchange that operates at full capacity.

234.    To this day, AMP remains completely incompatible with client-side header bidding, meaning that publishers can sell inventory only in environments that favor Google and limit the number of exchanges available to bid. In that way, AMP is even worse than Google's

capping of line items.  See *supra* § III.B.9.  While Google's line-item caps depress rival bids, Google's abuse of the AMP platform eliminates them entirely.  Google thus has eliminated exchange rivals on AMP pages not by building a better exchange, but rather by using its dominant position in general search services to force publishers to adopt a webpage format that limits competition.

235.    Google offers one justification for AMP's format:  faster page load speeds.  But that justification is pretextual.  AMP pages load faster on a Google search results page only because Google *pre-loads* them once a user runs a search.  Indeed, Gannett has designed its webpages to be *faster* than AMP and yet remain compatible with client-side header bidding.  But Google offers pre-loading only to AMP, so that Google can continue to enforce the AMP format. The result is that AdX does not have to compete as vigorously for publishers' ad inventory.

## IV.    ANTICOMPETITIVE EFFECTS

236.    Google's unlawful conduct has resulted in significant anticompetitive effects in the markets for publisher ad serving and ad exchanges.  By thwarting competition for publisher inventory, Google has reduced the value of publishers' ad space and thereby undermined investment in online content.  That chronic underinvestment has led to less online content, fewer impressions generated, and therefore reduced output in the ad-serving and exchange markets. Additionally, advertisers are deprived of more and higher quality ad space to place ads, and users miss out on higher quality news content and more relevant advertisements.

237.    Gannett, as a direct customer of DFP and AdX, has suffered substantial economic harm as a direct and proximate result of Google's unlawful conduct.  AdX has capitalized on Last Look, Minimum Bid to Win, Unified Pricing Rules, and other advantages to obtain subcompetitive prices for Gannett's inventory.  The result is less Gannett content and fewer, lower quality impressions for advertisers to purchase on Gannett's webpages.

A.      **Publisher Ad Servers**

238.     Google substantially has increased barriers to entry in the market for publisher ad servers, in large part by tying AdX to DFP.  Any entrant into the publisher-ad-serving market now must be able to offer an equally powerful ad exchange in order to encourage publishers to switch publisher ad servers.  Such two-level market entry is all but impossible, especially for an entrant that lacks search-derived demand that it can lock into its ad exchange.

239.     The anticompetitive effect of Google's conduct on the publisher-ad-server market is evident from the exit of competitors and limited entry over the past decade.  Several large ad-tech firms used to offer publisher ad serves, including substantial competitive offerings from Yahoo!, AppNexus, and OpenX.  Today, few competitors to Google remain in the market for publisher ad servers.  The Yahoo! and OpenX ad servers were shuttered in 2019, and AppNexus (since rebranded as Xandr) faces an uncertain future.  Although Xandr was acquired by Microsoft in June 2022, few publishers have adopted Xandr's ad server, in large measure because switching would require forgoing AdX demand.  Meanwhile, there have been no new entrants into the publisher-ad-serving market for many years.

240.     Google's monopoly control over ad serving permits Google to depress prices for publisher inventory below competitive levels.  Google systematically routes publisher inventory to its own exchange at the expense of publisher revenue, and publishers have little to no recourse.  Publishers have no power to negotiate the terms of their ad-serving agreements, and they have little ability to change the auction rules in DFP.  Indeed, each time publishers find a way to work around Google's newest anticompetitive move — *e.g.*, price floors for AdX post-UPR, client-side header bidding on AMP pages — Google quickly finds a way to kill it.

241.     Gannett, as a user of DFP, has suffered directly as a result of Google's anticompetitive conduct.  DFP thwarts competition for Gannett's inventory and preferentially

routes that inventory to AdX, even though a fair, real-time auction would produce higher publisher revenue, greater investment in content, more impressions for sale, and ultimately more and better content for Gannett's millions of readers.

242.    Google's conduct was intended to cause, and did cause, a direct, substantial, and reasonably foreseeable effect on the United States market for publisher ad servers, which in turn damaged Gannett's domestic operations.  Google's unlawful tie of its advertising exchange to its publisher ad server excludes numerous United States rivals from the ad-server market.  *See supra* § III.A.  Absent Google's unlawful tie, Gannett could have licensed one of these now-defunct publisher ad servers to serve both its United States and foreign inventory.  Instead, Gannett is forced to license DFP as its publisher ad server for its inventory nationwide.

243.    As a result of Google's monopolization of the ad-server market in the United States, Gannett's entire ad inventory has been sold at depressed prices.  This reduces Gannett's domestic revenues, which in turn reduces Gannett's investment in content for readers and, ultimately, Gannett's output of advertising impressions.

### B.    Ad Exchanges

244.    Google likewise has harmed competition in the market for ad exchanges.  Most notably, by rigging the auction rules in DFP, Google has insulated AdX from competition with other exchanges.  Google's conduct is even more egregious on AMP, where it has eliminated rival exchanges entirely by requiring publishers to reject client-side header bidding.

245.    As Google excludes rivals from competition, it has increased its share of the exchange market.  Google's increasing share gives it access to bid and win data at a scale that it can use to develop and enforce features that benefit AdX over rival exchanges, to the detriment of publishers and their readers.  For example, Google has recast its Last Look advantage as Minimum Bid to Win.  That, in combination with UPR, allows Google to intermediate an even

greater share of publishers' impressions in AdX at significantly lower prices, which only exacerbates a negative feedback loop to the detriment of rivals and consumers.

246.    Competing exchanges consequently have exited the market and new entrants are unable to compete.  Over a decade ago, Microsoft, Yahoo!, and top Silicon Valley venture funds competed in the exchange market, with the AdECN, AdBrite, and ASDAQ exchanges.  All three of these exchanges since have ceased operations.  Meanwhile, competition from new entrants is weak because Google has obstructed competition among exchanges.  Competitors have lowered their revenue shares to half and even a quarter of Google's, yet Google's share of the exchange market continues to increase.  That is because, *inter alia*, Google can capitalize on Last Look and its variations and selectively modify its revenue share when needed to take impressions from rivals, only to charge even higher fees on less competitive impressions.  Google thus has power to raise prices without losing (indeed, it is gaining) market share.

247.    While exchanges are two-sided markets between publishers and ultimately advertisers, neither publishers nor advertisers are a source of competitive discipline for Google. Publishers cannot withhold their inventory from DFP because they need access to AdX, and almost all rivals for publisher ad serving have exited the market.  As to advertisers, because Google can trade on inside information to win impressions more cheaply than rivals, DSPs that optimize their campaigns necessarily will increase their ad spending in AdX at the expense of other exchanges.  Google's ability to underpay publishers increases the amount of advertiser demand it can control.

248.    Like the bar in Anchorage that has a sign saying, "we cheat the other guy and pass the savings on to you," Google's business model is classically monopsonistic — it seeks to

intermediate a growing share of impressions at lower underlying values, despite the fact that underinvestment in publishers' inventory leads to fewer impressions (*i.e.*, lower output).

249.    Gannett has suffered substantial economic injury as a direct and proximate result of Google's unlawful conduct.  Google's Last Look, Dynamic Revenue Share, and related auction mechanisms have resulted in underpayment for Gannett's inventory.  When Gannett tried to counteract Google's advantages with differential price floors, Google disabled that practice by eliminating the Bid Landscape Report and imposing UPR.  The result is less investment in Gannett content and fewer impressions for sale through ad exchanges — Google or otherwise.

250.    Google's conduct was intended to cause, and did cause, a direct, substantial, and reasonably foreseeable effect on the United States market for ad exchanges, which in turn damaged Gannett's domestic operations.  Google's anticompetitive auction mechanisms and related conduct exclude numerous United States rivals from the market for ad exchanges.  *See supra* § III.B.  Absent Google's unlawful monopolization, Gannett would have traded substantial volumes of impressions over these excluded exchanges, with the result of greater revenue.  Moreover, Google's myriad auction manipulations significantly reduce competition in the exchange market and drastically reduce Gannett's ability to sell impressions through United States exchanges that remain in business.

251.    As a result of Google's monopolization of the ad-exchange market in the United States, Gannett's entire inventory has been sold at depressed prices.  Google is also able to rig its bids and protect a supracompetitive revenue share.  By employing those tactics, Google reduces Gannett's revenues, which in turn reduces Gannett's investment in content for readers and, ultimately, Gannett's output of advertising impressions.

## CLAIMS

### I.    COUNT 1 — MONOPOLIZATION OF THE MARKET FOR PUBLISHER AD SERVERS IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2

252.    Gannett repeats and incorporates by reference each of the foregoing allegations of this Complaint.

253.    Google unlawfully acquired and now unlawfully maintains a monopoly in the market for publisher ad serving by, *inter alia*, tying its ad exchange (AdX) to its publisher ad server (DFP).  Google has forced publishers to use DFP and erected barriers to entry in the ad serving market.  Most ad-serving rivals have exited the market, and any new entrant simultaneously would have to provide a similarly powerful ad exchange.

254.    Google has enacted an unlawful tying arrangement:  (1) AdX and DFP are separate products in separate markets; (2) AdX has market power in the relevant exchange market; (3) Google has coerced publishers to use DFP in order to access AdX, even though they otherwise would not do so in a competitive market; and (4) as a result of the tie, Google has monopolized, and maintains a monopoly in, the market for publisher ad serving.  The effect of the tie has been to reduce investment in publishers' content and depress the output of impressions available for sale.

255.    Google's various anticompetitive tactics to undermine client-side header bidding also have stymied investment in and entry from a potential ad-serving competitor.

256.    As a result of Google's unlawful conduct, Gannett has suffered, and continues to suffer, monetary harm in an amount to be proved at trial.

### II.    COUNT 2 — MONOPOLIZATION OF THE MARKET FOR AD EXCHANGES IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2

257.    Gannett repeats and incorporates by reference each of the foregoing allegations of this Complaint.

258.     Google unlawfully acquired and now unlawfully maintains a monopoly in the market for ad exchanges.  By exploiting its monopolies in publisher ad serving and general search services, Google has, *inter alia*, (1) restricted publishers from routing inventory to multiple exchanges; (2) forcibly routed publisher inventory to Google's exchange (*e.g.*, Dynamic Allocation, Dynamic Revenue Share, Project Bernanke) even though a fair and transparent auction would yield higher revenues for publishers; (3) traded on inside information (*e.g.*, Last Look, Minimum Bid to Win); (4) disabled publishers' efforts to introduce more competition for their inventory; (5) siphoned revenue from publishers that did not adequately favor Google products to publishers who did; and (6) abused its search monopoly in an effort to force publishers to use its dominant exchange.

259.     With these tactics, Google has acquired monopoly power in the exchange market, depressed prices for publisher inventory below competitive levels, and ultimately reduced the output of impressions available for exchanges to intermediate and advertisers to buy.  Of the impressions that remain, Google now controls a greater and growing share.

260.     As a result of Google's unlawful conduct, Gannett has suffered, and continues to suffer, monetary harm in an amount to be proved at trial.

**III.     COUNT 3 — ATTEMPTED MONOPOLIZATION OF THE MARKET FOR AD EXCHANGES IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2**

261.     Gannett repeats and incorporates by reference each of the foregoing allegations of this Complaint.

262.     To the extent that Google contends it does not have a monopoly in the market for ad exchanges, Gannett asserts in the alternative that Google intentionally and unlawfully has attempted to monopolize the market for ad exchanges.

263.    The anticompetitive conduct set forth herein evinces a specific intent to monopolize and a dangerous probability of monopolizing the market for ad exchanges.

264.    Over several years, Google's share of the exchange market has grown substantially while rivals have not made any appreciable gains.

265.    As a result of Google's unlawful conduct, Gannett has suffered, and continues to suffer, monetary harm in an amount to be proved at trial.

## IV.    COUNT 4 — UNLAWFUL TYING IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1

266.    Gannett repeats and incorporates by reference each of the foregoing allegations of this Complaint.

267.    Google tied its AdX exchange to its DFP ad server, thereby coercing publishers to license DFP.

268.    Google's DFP and Google AdX are separate and distinct products in separate product markets.

269.    Google AdX has monopoly power or, in the alternative, sufficient market power in the exchange market to coerce publishers to license DFP, thus restraining competition in the market for publisher ad servers.

270.    Google's tying arrangement affects a substantial volume of commerce in the ad-server market and has substantially foreclosed competition in that market.

271.    Google's tying arrangement has excluded competition in the publisher-ad-server market and caused Gannett substantial harm.  For example, Google's tying arrangement has subjected Gannett to numerous Google schemes that have depressed prices for Gannett's inventory below competitive levels, and ultimately reduced the output of Gannett's impressions.

272.     As a result of Google's unlawful conduct, Gannett has suffered, and continues to suffer, monetary harm in an amount to be proved at trial.

V.     **COUNT 5 — UNLAWFUL DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF NEW YORK GENERAL BUSINESS LAW §§ 349-350**

273.     Gannett repeats and incorporates by reference each of the foregoing allegations of this Complaint.

274.     At all relevant times and for all acts alleged in this Complaint, Google was and is doing business in the State of New York and is subject to New York law.  Google offered and advertised its ad-tech products (*e.g.*, DFP) to consumers operating in the State of New York, including Gannett.  Gannett contracted with Google's New York sales team to license Google's ad-tech products at issue in this Complaint.  Gannett's contracts for DFP and AdX — now merged into a GAM contract — include New York choice-of-law and venue provisions.  On information and belief, other publishers' agreements include similar provisions.

275.     Google employees based or working in New York also planned, enforced, and crafted misleading communications and advertisements about each of the anticompetitive and deceptive acts alleged in this Complaint.  Google has acknowledged that much of its conduct occurred in this District, *see Texas v. Google*, No. 20-cv-00957 (E.D. Tex. Jan. 19, 2021), ECF No. 28, at 4-5, and that the largest share of its witnesses is located in this District, *see* Tr. at 49-50 (E.D. Tex. Mar. 18, 2021), ECF No. 90.

276.     Google's anticompetitive and deceptive conduct has harmed and continues to harm many thousands of publishers throughout the United States, including in New York.  Indeed, given its overwhelming market share, over 90% of publishers that use a publisher ad server have been harmed by Google's deceptive practices.  That includes not only larger publishers like Gannett, but also many thousands of smaller publishers that use the entry-level

version of DFP.  In effect, there is no corner of U.S. publishing that has escaped Google's unlawful conduct, including publishers both large and small.

277.    Gannett's entire publication portfolio has been injured as a result of billions of deceptive transactions that Google has planned and enforced from New York.  Additionally, Gannett has more than a dozen New York-based publications, and New York readers consume millions of pages of content from Gannett's many other publications, including *USA TODAY*. As a result, both Gannett and everyday New Yorkers have been substantially injured by Google's unlawful and deceptive conduct.  Chronic underinvestment in news and the shuttering of newsrooms wreaks obvious financial injury on Gannett and denies New Yorkers access to critically important and highly demanded news content.

278.    As alleged in this Complaint, Google's conduct is doubly deceptive.  First, Google rigs auctions for publishers' advertising inventory without their knowledge and entirely beyond their detection.  For example, with Project Bernanke, Google ran billions of price-depressive, third-price auctions in a manner that was undetectable to publishers.  Google similarly has enforced other auction mechanics (*e.g.*, Dynamic Revenue Share) without publishers' knowledge and consent, and it has manipulated publishers' datasets (*e.g.*, user IDs, bid- and impression-level data files) in order to ensure that publishers could not monitor or counteract Google's conduct.  With each auction that Google has manipulated using one or more of its anticompetitive strategies, it has engaged in an independent, deceptive commercial act.

279.    Second, over many years, Google has made a series of misrepresentations to publishers regarding the operation of its ad-tech products, often in publicly available marketing and advertising materials, and also in publisher-specific communications.  Google has assured publishers that DFP works for their benefit despite knowing that practices like Dynamic

Allocation, Enhanced Dynamic Allocation, Dynamic Revenue Share, Minimum Bid to Win, and Unified Pricing Rules harm publishers and benefit Google.  Google made false representations about each of these practices, and so induced Gannett and others to enable them or trust they were operating appropriately.  Meanwhile, Google knew and discussed internally how those practices led to depressed prices for publishers' ad inventory.  Google also falsely assured publishers that it was not trading on inside information, and that it was running a second-price auction when, in reality, it routinely traded on rivals' bids and even ran third-price auctions for billions of impressions every month.  Publishers have relied on Google's misrepresentations to, *inter alia*, decide which products to adopt and how to design their auction strategies.

280.    Google made these misrepresentations to Gannett specifically, with the goal and effect of causing Gannett substantial financial injury.  For example:

a.    Google lied that Enhanced Dynamic Allocation did not cause Gannett to under deliver on direct deals.  Gannett enabled Enhanced Dynamic Allocation, in part, based on Google's representations that it would not displace direct deals.  Now it cannot shut off Enhanced Dynamic Allocation.

b.    Google lied that Enhanced Dynamic Allocation did not permit Gannett to compete with sponsorships.  Potentially for years, Google deceived Gannett into believing that its highest value direct deals were safe from Enhanced Dynamic Allocation.

c.    Google lied that monetization on AMP pages was "similar or better than ads on mobile sites."  In fact, Gannett has sustained financial injury because Google has limited competition for inventory on Gannett's AMP pages.

      d.      For years, in its DFP agreements, Google has represented to Gannet that it does not use "data entered by [publishers] . . . that is not generally shared with buyers" — including header-bidding bids entered as line items in DFP — "for purposes of informing bids" made by Google.  That is false for many reasons already discussed:  Google routinely trades on inside information not shared with other buyers.

      e.      Google represented to Gannett that Exchange Bidding leads to higher revenue because, with a server-side connection, publishers can load ads more quickly on their webpages.  But Gannett recently has discovered that Gannett's assurances were false.  For instance, on video inventory, Gannett has seen a substantial increase in CPMs since disabling Exchange Bidding.  For years, Gannett enabled Exchange Bidding based on false promises of greater revenue.

      f.      Google has automatically opted Gannett into "alpha" programs without its knowledge or consent.  Just last month, Gannett discovered that Google secretly enforced a "Multi-Ad for Video" alpha that reduced AdX's bids for video inventory by 30% or more, yet permitted AdX to *increase* its share of Gannett's video inventory.  The share of video inventory sold through rival exchanges in header bidding decreased by nearly 40%.

281.     Google likewise misled federal antitrust enforcers and the U.S. Congress regarding its planned use of publishers' competitive and other sensitive data.  The Federal Trade Commission approved Google's acquisition of DoubleClick in reliance on those and other misrepresentations.

282.     Publishers, large and small, cannot counteract or forestall Google's deceptive and anticompetitive practices.  Because Google controls publisher ad serving, publishers must subject their inventory to the auction manipulations that Google enforces in DFP.  Similarly,

because AdX is far and away Gannett's (and others') largest exchange, publishers have no choice but to sell growing shares of inventory at artificially depressed prices. As proof of its control over U.S. publishing, Google enforces substantially the same terms of dealing across all publishers, and it has enforced the same deceptive practices across all publisher inventory. No publisher has the bargaining power to negotiate around Google's deceptive practices.

283.    Google's misrepresentations and omissions are material and have resulted in a significant loss of revenue for Gannett. Gannett's injury persists today.

284.    Google knowingly and intentionally has engaged in these deceptive practices with the purpose and effect of monopolizing the relevant ad-tech markets, depriving publishers of revenue, and deceiving publishers regarding the true impacts of its unlawful practices.

285.    Likewise, the public's interest in a fair and competitive marketplace for display advertising is harmed by Google's deceptive acts and practices.

## VI.    COUNT 6 — COMMON-LAW FRAUD

286.    Gannett repeats and incorporates by reference each of the foregoing allegations of this Complaint.

287.    Google falsely represented to Gannett that various features of DFP would serve Gannett's interests. Google knew that its representations were false. For example, Google represented that Enhanced Dynamic Allocation increased Gannett's revenue by 19%, when, in fact, it knew that Enhanced Dynamic Allocation harmed Gannett by subjecting its most valuable inventory to a less favorable programmatic environment where AdX was the only buyer.

288.    Google intended to induce Gannett to rely on its misrepresentations.

289.    Gannett in fact reasonably relied on Google's misrepresentations to enact and keep in place various features of DFP. For example, over years, Gannett allowed Google to

compete against directly sold inventory because of its false representations.  Now, Gannett cannot disable Enhanced Dynamic Allocation.

290.    As a result of that reliance, Gannett has sustained and continues to sustain significant revenue loss.

## VII.    COUNT 7 — UNJUST ENRICHMENT

291.    Gannett repeats and incorporates by reference each of the foregoing allegations of this Complaint.

292.    Google was unjustly enriched and benefited by manipulating its online advertising auctions.  For years, Google employed Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke, UPR, and other schemes to monopolize the ad-serving and exchange markets, and to depress prices for publishers' inventory.  In executing these schemes, Google used DFP to prevent publishers from soliciting competitive bids from rival exchanges and rigged AdX's bids by trading on inside information.

293.    The enrichment and benefit to Google came at the expense of Gannett.  Gannett relied on Google to operate honest advertising auctions to facilitate the sale of Gannett's advertising inventory.  By manipulating auctions run by DFP and intermediated through AdX, Google artificially depressed the price of Gannett's display advertising inventory to Google's benefit.  For example, as Google acknowledged in a study on Project Bernanke, the effect of that auction manipulation *alone* resulted in up to a 40% reduction in publishers' revenue.  Gannett, who for years sold billions of impressions through Google's auctions, suffered as a result.

294.    Equity and good conscience require that Google make restitution to Gannett.  For years, Google has represented that its ad serving practices were in Gannett's interests.  Time and again, Google staff have acknowledged internally that these representations were false, that

74

publisher inventory pricing was reduced, and that its auction manipulations, like Last Look, were "inherently unfair." Fairness thus requires that Google make restitution to Gannett.

## PRAYER FOR RELIEF

295. WHEREFORE, Gannett requests the Court to enter judgment in its favor against Defendants, awarding all such relief as the Court deems appropriate and just.

296. Gannett requests the following relief:

a. That the Court enter an order declaring that Defendants' actions, as alleged herein, violate the Sherman Act and New York law;

b. That the Court enjoin Defendants from continuing to violate the Sherman Act and enter relief to restore competition;

c. That the Court enjoin Defendants from continuing to violate New York law and enter relief to protect the public from Defendants' deceptive practices;

d. That the Court enjoin Google taking additional actions that will further harm competition;

e. That the Court award Gannett damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

f. That the Court award Gannett pre- and post-judgment interest;

g. That the Court award Gannett its costs of suit, including reasonable attorneys' fees and expenses; and

h. That the Court award any and all such other relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

297. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Gannett demands a jury trial of all issues so triable.

Dated:  June 20, 2023

Respectfully submitted,

/s/ *John Thorne*

John Thorne (*pro hac vice* pending)
Daniel G. Bird (*pro hac vice* forthcoming)
Bethan R. Jones (*pro hac vice* forthcoming)
Christopher C. Goodnow (*pro hac vice* forthcoming)
Mark P. Hirschboeck (*pro hac vice* forthcoming)
Eliana Margo Pfeffer (SDNY Bar No. 5591789)
Eric J. Maier (*pro hac vice* forthcoming)
Sven E. Henningson (*pro hac vice* forthcoming)
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street NW
Suite 400
Washington, DC 20036
Tel.:  (202) 326-7900
Fax:  (202) 326-7999
Email:  jthorne@kellogghansen.com
        dbird@kellogghansen.com
        bjones@kellogghansen.com
        cgoodnow@kellogghansen.com
        mhirschboeck@kellogghansen.com
        epfeffer@kellogghansen.com
        emaier@kellogghansen.com
        shenningson@kellogghansen.com

*Counsel for Plaintiff Gannett Co., Inc.*