UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION** | No. 1:21-md-3010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| **GANNETT CO., INC.** | |
| *Plaintiff,* | |
| - against - | No. 1:23-cv-05177 |
| **GOOGLE LLC AND ALPHABET INC.,** | |
| *Defendants.* | |

**DEFENDANTS GOOGLE LLC AND ALPHABET INC.'S MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION TO DISMISS GANNETT CO. INC.'S COMPLAINT**

FRESHFIELDS BRUCKHAUS
DERINGER US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
Fax: (650) 461-8276

AXINN, VELTROP & HARKRIDER LLP
114 West 47th Street
New York, NY 10036
Telephone: (212) 728-2200
Fax: (212) 728-2201

*Counsel for Defendants Google LLC and Alphabet Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ....................................................................................................................... 5

    I.    The Court Should Dismiss Gannett's Section 2 Claims That Have Already Been
Dismissed In The States' Case. ....................................................................................... 5

        A.   The Court has ruled that Google's introduction of Exchange Bidding did not coerce
publishers to abandon header bidding. ......................................................................... 5

        B.   The Court has ruled that Google's encrypting of user IDs is not anticompetitive........... 8

        C.    The Court has ruled that Accelerated Mobile Pages (AMP) do not amount to
exclusionary conduct. ................................................................................................... 9

    II.   Gannett's Repackaged Claims That Enhanced Dynamic Allocation And Minimum Bid To
Win Are Anticompetitive Also Warrant Dismissal.................................................... 11

        A.   Gannett fails to allege that EDA harms competition by allowing AdX to compete
against publishers' directly sold inventory................................................................. 11

        B.   Gannett fails to allege that Google's Minimum Bid to Win service harms competition.
12

    III.   Gannett's Claims Regarding Enhanced Dynamic Allocation And Line-Item Caps Are
Barred By The Sherman Act's Four-Year Statute Of Limitations............................ 14

        A.   Gannett's claims accrued more than four years before the lawsuit................................ 14

        B.   Gannett's claims cannot be saved by tolling. ............................................................... 16

    IV.   The Court Should Dismiss Gannett's Claims With Prejudice. ..................................... 19

CONCLUSION................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................... 4

*Cangemi v. United States*, 13 F.4th 115 (2d Cir. 2021) ..................................... 14

*City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416 (S.D.N.Y. 2020) . 12

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) ....................................... 14

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23 (2d Cir. 2006) ................................ 11

*Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ........................................ 12

*Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL 6110565 (S.D.N.Y. Aug. 4, 2016)........ 4

*Higgins v. New York Stock Exch., Inc.*, 942 F.2d 829 (2d Cir. 1991).......................................... 14

*In re Adderall XR Antitrust Litig.*, 754 F.3d 128 (2d Cir. 2014) .................................................. 13

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007).......................................................... 13

*Kearse v. Kaplan*, 692 F. Supp. 2d 398 (S.D.N.Y. 2010) .......................................................... 16

*Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398 (S.D.N.Y. 2021)........................................ 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)............................ 13, 15

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988) .......................................... 16

*Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186 (2d Cir. 1992) ................................ 10

*Unijax, Inc. v. Champion Int'l*, 683 F.2d 678 (2d Cir. 1982) ....................................................... 10

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695 (2d Cir. 2009) ........................ 14

**Statutes**

15 U.S.C. § 15b.............................................................................................................................. 14

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................... 1

Federal Rule of Civil Procedure Rule 9(b) .................................................................................... 16

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Google LLC and Alphabet Inc. (collectively, "Google") move for an order dismissing the federal antitrust claims in the Complaint, Case No. 23-cv-05177, ECF No. 1 (June 20, 2023), filed by Plaintiff Gannett Co., Inc. ("Gannett") that are relevant to the alleged conduct discussed herein.  Consistent with the stay of state law claims ordered on November 18, 2022, ECF No. 392, ¶¶ 4-5, Google does not move to dismiss Gannett's state law claims at this time and reserves all rights with respect to them.

## INTRODUCTION

Gannett's Complaint comes almost two years after the formation of this MDL and more than three years since the filing of the first now-centralized ad tech lawsuit.  Having slept on its claims—including for purported injuries Gannett admits to discovering over nine years ago— Gannett now challenges the same Google practices that are the subject of the State Plaintiffs' Third Amended Complaint (ECF No. 195) ("States TAC"); the Daily Mail's Amended Complaint (ECF No. 400) ("Daily Mail AC"), the Publishers' Amended Complaint (ECF No. 408) ("Publishers AC"), and the Newspapers' Amended Complaint (ECF No. 401) ("Newspapers AC").[1]  Despite having the benefit of the extensive briefing and rulings in this MDL, moreover, Gannett makes little effort to distinguish its allegations from those the Court has already dismissed in the States' case, *see* Opinion and Order, ECF No. 308 ("MTD Op."), or to address the deficiencies Google identified in its pending motions to dismiss in the private cases.  In fact, any differences between

---

[1] Due to the substantial (and occasionally verbatim) overlap between Gannett's Complaint and others, Google sought permission from the Court to incorporate by reference arguments from its pending Motion to Dismiss the Daily Mail's Amended Complaint, ECF No. 454 ("MTD Daily Mail AC"), as well as its Motion to Dismiss Newspapers' Amended Complaint, ECF No. 452 ("MTD Newspapers AC"), and its Motion to Dismiss Publishers' Amended Complaint, ECF No. 450 ("MTD Publishers AC").  *See* Letter Motion for Leave to File Motion to Dismiss the Gannett Co. Inc. Complaint, ECF No. 585, at 1-2.  Because the Court only granted Google permission to incorporate by reference its MTD Daily Mail AC, *see* ECF No. 596, Google has limited its incorporation accordingly and included all other arguments in full.  Exhibit A identifies where Gannett's allegations are substantively identical to (i) claims the Court previously ruled to be inadequately pleaded; or (ii) the Daily Mail claims that are subject to Google's pending motion to dismiss.

Gannett's allegations and those that have been already dismissed or briefed are either irrelevant or only serve to establish that some of Gannett's claims are time-barred.

Plaintiff Gannett is the "largest news publisher in the United States" and owns over 500 news and digital media brands.  Case No. 23-cv-05177, ECF No. 1 ("Compl.") ¶¶ 1, 18.  It sells impressions on its various properties for display ads—images, text, and videos alongside publisher content—to generate revenue.  *Id*. ¶¶ 30, 31.  Gannett has chosen to use Google's DFP as its ad server and claims to use AdX as its "primary exchange."  *Id*. ¶ 49.

Penned by the same counsel as the Daily Mail AC, Gannett's Complaint asserts nearly identical allegations.  As with the Daily Mail AC, many of Gannett's claims focus on Google's alleged campaign to "kill" header bidding.  In particular, Gannett alleges that Google should have agreed to participate in header bidding and faults Google for trying to compete with header bidding.  And like the Daily Mail, Gannett also goes so far as to say that Google "defeated" header bidding.  *Id*. ¶ 123.  But Gannett's own allegations underscore that header bidding is alive and well—Gannett admits in its Complaint that it has used client-side header bidding since 2016, and continues to use it to this day.  *Id*.  ¶¶ 61, 186.

Gannett's main complaint concerning header bidding, like the Daily Mail's, is that Google introduced a new alternative product, Exchange Bidding.  *Id*. ¶¶ 178-86.  Gannett also complains about hashed (*i.e.*, encrypted) user IDs, *id*. ¶¶ 129-35, and asserts that through Accelerated Mobile Pages ("AMP"), Google "leveraged" an alleged monopoly in a general search market to bolster its ad exchange, *id*. ¶¶ 223-35.  According to Gannett, Google engaged in all of this conduct to impede header bidding.  But the Court already dismissed comparable claims from the States' case regarding Exchange Bidding, hashed user IDs, and AMP.  *See* MTD Op. at 61-66, 40-44, 70-72.

And because Gannett's Complaint does not add anything to the States' dismissed claims, Gannett's parallel claims should also be dismissed.

Gannett's Complaint also liberally borrows from the complaints of the Newspaper Plaintiffs and Publisher Plaintiffs, making similar conclusory allegations that Enhanced Dynamic Allocation ("EDA") allowed AdX to bypass direct deals and that Google's Minimum Bid to Win ("MBW") service is anticompetitive. But this Court has already ruled that the States' substantively identical allegations failed to plausibly allege that EDA caused competitive harm in the markets for publisher ad servers and ad-buying tools. *See id.* at 49. And, as Google stated in its motion to dismiss the Publishers AC, Google's MBW service is not exclusionary—rather, it makes Authorized Buyers (buyers in AdX, including non-Google buyers) better informed.

Further, it is plain from the face of Gannett's Complaint that the Sherman Act's four-year statute of limitations bars Gannett's antitrust claims regarding EDA and line-item capping. To be within the permissible period to bring suit, Gannett would have had to allege injury from this conduct dating no earlier than June 2019 (*i.e.*, four years before the filing of Gannett's Complaint). Instead, Gannett pleads injuries dating back to 2014 (from EDA) and 2017 (from line-item capping). Gannett's facially untimely claims cannot be saved by tolling, as Gannett has failed to allege any basis for fraudulent concealment—let alone pleading allegations that rise to Rule 9(b)'s heightened pleading standard for allegations of fraud—or continuing violations.

Google now moves to dismiss those allegations the Court previously ruled do not support a claim: (1) Google's introduction of Exchange Bidding; (2) encrypting user IDs; (3) and AMP. Google also moves to dismiss those allegations that are the subject of pending motions to dismiss: (4) EDA harms competition by allowing AdX to compete against publishers' directly sold

inventory and (5) Google's MBW service harms competition.[2]  *See* MTD Newspapers AC at 11; MTD Publishers AC at 4-7.   Finally, Google also moves to dismiss Gannett's EDA and line-item capping claims as time-barred.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To do so, the complaint must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that would "allow[] the court to draw the reasonable inference that the defendant is liable."  *Iqbal*, 556 U.S. 678.   It is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration in original) (citations omitted).   "In assessing the sufficiency of the complaint, a court must disregard legal conclusions, because they are not entitled to the presumption of truth." *Gucci Am., Inc. v. Alibaba Grp. Holding Ltd.*, 2016 WL 6110565, at *4 (S.D.N.Y. Aug. 4, 2016) (Castel, J.).  Rather, "the Court must examine the well-pleaded factual allegations 'and then determine whether they plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

---

[2] For the purposes of this motion, Google assumes the truth of the well-pleaded allegations in the Complaint.  Google expects to contest many of those allegations in the future.

**ARGUMENT**

**I.   The Court Should Dismiss Gannett's Section 2 Claims That Have Already Been Dismissed In The States' Case.**

Gannett asserts three Section 2 claims that this Court has already dismissed in the States' case and should dismiss here too.  Specifically, this Court has already ruled that the States *did not plausibly allege that*: (A) "Exchange Bidding harmed competition in any market," MTD Op. at 66; (B) "Google's refusal to share unencrypted user IDs amounted to anticompetitive conduct," *id*. at 44; or (C) AMP is "an anticompetitive strategy," *id.* at 71.

Gannett copied its Exchange Bidding, user ID, and AMP allegations nearly verbatim from the Daily Mail AC, which Google has moved to dismiss.  *See* MTD Daily Mail AC; *see also* Ex. A.  The Daily Mail and Gannett seek to differentiate their allegations from those dismissed from the States TAC in near-identical ways.  But in its pending motion to dismiss, Google explained how the Daily Mail's allegations are materially indistinguishable from the States' dismissed allegations.  As set forth below, the Court should dismiss the parallel allegations in Gannett's Complaint because they likewise are substantively similar to those in the States TAC.  And in the narrow instances in which Gannett attempts to differentiate its claims from the Daily Mail's, those claims still fail.

> **A.   The Court has ruled that Google's introduction of Exchange Bidding did not coerce publishers to abandon header bidding.**

Gannett alleges that Google violated Section 2 when it sought to "kill" header bidding, *e.g.* Compl. ¶ 180, through the launch of Exchange Bidding.  This is substantially the same allegation that the States advanced and the Daily Mail adopted.  *Compare id.* ¶¶ 178-86, *with* States TAC ¶¶ 366-75, 385-86, *and* Daily Mail AC ¶¶ 158-63.

The Court has already determined that the core of this claim does not pass muster under Rule 12(b)(6).  *See* MTD Op. at 65-66.  Specifically, the Court ruled that the States failed to allege

that "any participant was improperly compelled to participate in Exchange Bidding," *id.* at 64, and failed to "describe the anticompetitive effect, if any, that Exchange Bidding has had on the popularity or profitability of header bidding," *id.* at 65. Gannett's Exchange Bidding allegations suffer from the same defects. *Compare* Compl. ¶¶ 178-86, *with* States TAC ¶¶ 366-75, 385-86, *and* Daily Mail AC ¶¶ 158-63. Accordingly, the Court should dismiss Gannett's Exchange Bidding claim on the same basis. *See* MTD Daily Mail AC at 3-6 (addressing the same arguments made by the Daily Mail).

Gannett has bootstrapped a few supplemental allegations to those advanced by the States and the Daily Mail. But none of these alterations can resuscitate Gannett's Exchange Bidding claims, which fail under the Court's prior analysis and on their own terms.

*First*, Gannett's supplemental allegations undermine any argument that Exchange Bidding was coercive. *See, e.g.*, Compl. ¶¶ 61, 183-86. As this Court explained, there must be an allegation that Google "improperly compelled [a participant] to participate in Exchange Bidding." MTD Op. at 64. Gannett makes no such allegations. Like the Daily Mail, Gannett admits that "[a]fter setting up client-side header bidding, between 2016 and 2019," it observed "a substantial increase in CPMs [*i.e.*, Cost-Per Mille], for its inventory," including *after* Google's launch of Exchange Bidding in 2018. Compl. ¶¶ 60, 61. Gannett continued to use client-side header bidding, and does so to this day, even acknowledging that its use of client-side header bidding alone has "substantial[ly] increase[d]" its CPMs. *Id*. ¶ 186; *see also id.* ¶¶ 184-85. This confirms not only the continued existence of header bidding, but also Gannett's own ability and *choice* to use header bidding over Exchange Bidding. *See, e.g.*, MTD Daily Mail AC at 4-5; *see also* Ex. A. The Court has already determined that participation in Exchange Bidding was in fact a "voluntary venture"

for publishers, who could choose whether to use Exchange Bidding or header bidding.  MTD Op. at 63.  Gannett's header-bidding allegations further confirm the Court's conclusion.

*Second*, like the Daily Mail and the States, Gannett alleges that Google tried to "cajole" publishers into abandoning header bidding.  Gannett claims that Google said that "Exchange Bidding would lead to higher revenue because ads would load more quickly."  Compl. ¶ 183; *compare with* Daily Mail AC ¶ 163 (alleging that Google represented to "at least one publisher" that limiting participation in client-side header bidding would "solve a 'strain on' the ad server and improve the publisher's inventory yield"); *see also* States TAC ¶ 385 (same).  But like the Daily Mail's "cajoling" example, such encouragement is not coercive, and Google incorporates here the argument it made in its motion to dismiss the Daily Mail AC with respect to "cajoling."  *See* MTD Daily Mail AC at 5; *see also* Ex. A.  That Gannett has allegedly seen an "increase in CPMs since disabling Exchange Bidding," Compl. ¶ 186, does not contradict Google's alleged statement, nor does it transform a sales pitch into coercion.  Indeed, Gannett was not coerced—or even cajoled—since it continues to use header bidding to this day.

*Third*, Gannett introduces a new allegation that Google's recent introduction of a "Multi-Ad for Video" program caused the share of Gannett's "video inventory sold through rival exchanges in header bidding" to decrease.  *Id.* at ¶ 184.  Even accepting those allegations as true, Gannett fails to explain how this program is related to the 2016 introduction or design of Exchange Bidding or to any of the alleged antitrust markets, and therefore this allegation adds nothing to the States' already-dismissed Exchange Bidding claim.  *Cf.* MTD Daily Mail AC at 5-6 (the Daily Mail's allegations about DFP's acceptance of header bidding bids and redacted datasets concern DFP, not Exchange Bidding).

**B. The Court has ruled that Google's encrypting of user IDs is not anticompetitive.**

Gannett alleges that Google violated Section 2 by refusing to share unencrypted user IDs with publisher-customers. *See* Compl. ¶ 131. Once again, Gannett repeats in a slightly different guise the same allegation that the States unsuccessfully advanced and the Daily Mail adopted. *See* MTD Op. at 40-44; *see also* States TAC ¶¶ 254-66; Daily Mail AC ¶¶ 108-13.

The Court has already determined that Google's alleged encryption of user IDs did not amount to anticompetitive conduct. MTD Op. at 41-44. The Court held that (1) nothing in the States TAC plausibly alleged that encrypting user IDs was a pretext for gaining monopoly profits; (2) there is no duty to deal with rivals, and the States failed to allege that Google foreclosed competition; and (3) the States failed to allege that Google's decision to encrypt user IDs was anything more than a "profitable business strategy that also presented the perception or reality of enhanced consumer privacy." *Id*. Gannett's allegations fare no better.

With the exception of one paragraph, *see* Compl. ¶ 134, Gannett's Complaint is a carbon copy of the Daily Mail AC regarding the user ID allegations.[3] *Compare id.* ¶¶ 129-35, *with* Daily Mail AC ¶¶ 108-13. Therefore, Google incorporates by reference the arguments made in its motion to dismiss the Daily Mail AC with respect to the encryption of user IDs. *See* MTD Daily Mail AC at 6-9; *see also* Ex. A. Gannett, like the Daily Mail: (1) fails to offer any new or different allegations that would impose on Google a duty to share its data with rivals; (2) fails to establish that the user IDs that Google's ad server generates and encrypts are somehow the publisher's or that Google must share them despite its privacy concerns; and (3) fails to allege that encrypting

---

[3] The Gannett Complaint otherwise differs in only two respects: (1) the word "promised" has been swapped out for "represented to" in paragraph 129; and (2) references to the "Daily Mail" have been deleted or swapped out for "Gannett."

user IDs involves profit sacrifice by Google or is otherwise not a rational business strategy absent anticompetitive objectives.   MTD Daily Mail AC at 7-9.

The sole new addition in Gannett's Complaint is conclusory, alleging that Google's desire to protect user privacy by not sharing user IDs with its rivals is "not procompetitive" because (1) all ad tech product customers allegedly want greater insight into user data and (2) users "do not need protection from their ad sources."  Compl. ¶ 134.  This is merely an extension of the Daily Mail's assertion that Google's stated desire to protect users' privacy is pretextual.  *See* Daily Mail AC ¶ 112; *see also* Compl. ¶ 133 (using the same language).  Gannett's Complaint "does not seriously contend with Google's plausible aim to protect user information by not sharing it outside the company or with unknown third parties," MTD Daily Mail AC at 7, and, like the Daily Mail AC, fails to establish that the alleged encryption of user IDs is "irrational but for its anticompetitive effect."  *See* MTD Daily Mail AC at 8-9 (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075, 1078 n.4 (10th Cir. 2013) (Gorsuch, J.)).  Gannett's disagreement with Google's privacy rationale does not render it exclusionary.

### C.  The Court has ruled that Accelerated Mobile Pages (AMP) do not amount to exclusionary conduct.

Gannett claims that Google leveraged its supposed "Search monopoly" to force publishers to adopt AMP, which were incompatible with client-side header bidding and, thus, insulated AdX from header-bidding competition.  Compl. ¶¶ 223-35.  Google's alleged design of its search engine results and the technical specifications of AMP do not amount to anticompetitive conduct and should be dismissed just as the Court dismissed the States' near-identical claim.  *See* MTD Op. at 70-72 (holding that States TAC did not "plausibly allege AMP to be an anticompetitive strategy").

With two minor changes, Gannett's Complaint repeats the Daily Mail's AMP allegations. *Compare* Compl. ¶¶ 224-35 *with* Daily Mail AC ¶¶ 202-12; *see also* Ex. A.  Accordingly, Google

incorporates by reference the arguments it made in its motion to dismiss the Daily Mail AC with respect to AMP.  *See* MTD Daily Mail AC at 10-12; *see also* Ex. A.  In that motion to dismiss, Google argued that: (1) it has no obligation to make AMP compatible with rival products; (2) any claim of tying fails because the Daily Mail does not allege coercion; (3) Google's alleged AMP conduct constitutes legitimate, rational business decisions; and (4) the Daily Mail fails to allege a dangerous probability of monopolization because it does not allege the magnitude of AMP's alleged effect on an exchange market.  MTD Daily Mail AC at 10-12.

Neither of Gannett's immaterial alterations helps it plead a claim.  Gannett's first minor change is its allegation that "Google represented that monetization on AMP pages 'has been similar or better than ads on mobile sites.'"  *Compare* Compl. ¶ 228, *with* Daily Mail AC ¶ 211.  To establish an antitrust violation, Gannett must allege "actual coercion" which "is present only if the manufacturer goes beyond persuasion[.]"  MTD Op. at 18 (quoting *Unijax, Inc. v. Champion Int'l*, 683 F.2d 678, 685 (2d Cir. 1982)).  But Gannett's allegations come nowhere close to meeting this high bar because it fails to allege that this statement amounts to anything more than mere persuasion or salesmanship, which is "protected and encouraged by the antitrust laws."  *Unijax*, 683 F.2d at 685 n.15 (noting that even "aggressive salesmanship" has protection under the antitrust laws, and that "'strong persuasion, encouragement, or cajolery to the point of obnoxiousness'. . . does not . . . amount to actual coercion" (quoting *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981))); *see also Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 192 (2d Cir. 1992) (finding no evidence that dealers "felt compelled" or "deliberately force[d]" to purchase certain products).

The second minor change that Gannett makes is to allege that Gannett has actually "designed its webpages to be *faster* than AMP," whereas the Daily Mail had alleged that it "could"

design such a thing.  *Compare* Compl. ¶ 235, *with* Daily Mail AC ¶ 212.  Gannett's assertion that it might have come up with a format it likes more than AMP is irrelevant, devoid of any detail, and does nothing to help Gannett state an AMP-related claim.

## II.   Gannett's Repackaged Claims That Enhanced Dynamic Allocation And Minimum Bid To Win Are Anticompetitive Also Warrant Dismissal.

Gannett also asserts Section 2 allegations relating to EDA, *see* Compl. ¶¶ 147-56, and MBW, *see id.* ¶¶ 187-92, which Google has already moved to dismiss in related litigation before this Court.  *See* MTD Newspapers AC at 11 (moving to dismiss substantially identical EDA allegation); MTD Publishers AC at 4-7 (moving to dismiss substantially identical MBW allegation).  Pursuant to the Court's instructions, *see* note 1, *supra*, Google does not incorporate these prior motions by reference, but nevertheless moves to dismiss Gannett's allegations on the same grounds.

### A.   Gannett fails to allege that EDA harms competition by allowing AdX to compete against publishers' directly sold inventory.

Gannett alleges that, in violation of Section 2, EDA allowed AdX to obtain "exclusive access to publishers' direct-deal inventory," which "depressed Gannett's revenue and created a new incentive for advertisers to bid through AdX."  Compl. ¶¶ 148.

But Gannett's claim fails because it alleges no harm to competition in any relevant market. *See E & L Consulting, Ltd. v. Doman Indus. Ltd*., 472 F.3d 23, 31 (2d Cir. 2006) (Section 2 claims must be predicated upon harm to competition).  Gannett does not even attempt to explain how this alleged practice has excluded rivals or otherwise had any adverse effect on competition whatsoever.  Creating an "incentive" for advertisers to bid through AdX is quintessential competition on the merits.  No competitor was unlawfully or unfairly excluded by Google providing a new method for AdX to compete for direct-deal inventory when there previously was none.  The most that Gannett alleges—that the purported "bypassing" practice depressed its

revenue—is harm to Gannett itself as a customer.  That is insufficient as a matter of law to plead

a violation of Section 2.  *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir.

2020) (economic harm to customers is not anticompetitive when it does not involve unreasonable

restraints on trade or exclusionary conduct).

### B. Gannett fails to allege that Google's Minimum Bid to Win service harms competition.

Gannett also claims that Google's MBW service was anticompetitive, but fails to allege

how MBW harmed competition.  *See* Compl. ¶¶ 65-66, 189.  According to Gannett, Google's DFP

"tells the winning bidder [of an auction] the second highest price that was placed in the auction,"

which allegedly allows recipients to "use the minimum clearing price from one auction to inform

its bid on the next impression for the *same* user on the *same* page."  *Id*. ¶¶ 65-66 (emphasis in

original).  These allegations essentially repeat claims from the Publishers AC.  *Compare* Compl.

¶¶ 65-66, 189 (alleging that MBW depresses the prices an advertiser pays for impressions by

ensuring they can "use the minimum clearing price from one auction to inform its bid on the next

impression for the same user on the same page" and win impressions with the lowest bid possible),

*with* Publishers AC ¶¶ 343-48 (criticizing MBW for allegedly allowing advertisers to bid through

Google's ad exchange to win impressions with the lowest bid possible).

As Google previously argued in its pending motion to dismiss, this alleged conduct—that

Google better informs Authorized Buyers—describes legitimate competition, not anticompetitive

exclusion, and therefore cannot sustain a Section 2 claim.  *See* MTD Publishers AC at 4-7; *see*

*also City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 446 (S.D.N.Y.

2020) ("Section 2 is not intended to punish 'the proverbial inventor of the better mousetrap' or one

who succeeds by virtue of a superior product or business acumen.  If it were, the statute would

stifle legitimate business competition – the opposite of its goal."), *aff'd*, 2021 WL 5754295 (2d Cir. Dec. 3, 2021).

Gannett complains that Google shared MBW data only with "'Authorized Buyers' in the Unified Auction"—in other words, with "exchange[s] or DSP participant[s] in Google AdX or Exchange Bidding." Compl. ¶¶ 65, 189. Since MBW is a Google service, that is hardly surprising, much less anticompetitive. To the extent Gannett means to suggest that Google violated Section 2 by sharing MBW data with AdX participants but not with header bidding rivals, it has failed to allege any facts that would support a refusal-to-deal claim—*i.e.*, terminating a voluntary and profitable course of dealing. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) ("[B]ecause plaintiffs do not allege that defendants terminated any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors—the allegations are insufficient to state a unilateral-monopolization claim."); *see also In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) (affirming dismissal where plaintiff failed to allege facts suggesting defendant sacrificed short-term profits). Gannett alleges no such facts, and does not even attempt to explain how Google's development of MBW has excluded rivals or otherwise had any adverse effect on competition whatsoever.

Gannett instead asserts that Google benefits from MBW because its advertiser customers "can buy an inflated share of Gannett's ad inventory at artificially depressed prices." Compl. ¶ 67. Even if true, that allegation is simply beside the point. First, Google provides MBW data to non-Google buyers participating in AdX (including companies like the Trade Desk and Amazon). Second, that Google allegedly profited by enticing advertisers with a superior product that improves their return on ad spend only serves to show that Google engages in legitimate competition. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)

("[C]utting prices in order to increase business often is the very essence of competition"); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) ("[A]n efficient firm may capture unsatisfied customers from an inefficient rival. . . . This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster.").

### III. Gannett's Claims Regarding Enhanced Dynamic Allocation And Line-Item Caps Are Barred By The Sherman Act's Four-Year Statute Of Limitations.

#### A. Gannett's claims accrued more than four years before the lawsuit.

Sherman Act claims are barred "unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b.  Antitrust claims accrue and the statute of limitations begins to run "when the defendant commits an act that injures a plaintiff's business."  *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 698 (2d Cir. 2009) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971)); *see also Higgins v. New York Stock Exch., Inc.*, 942 F.2d 829, 833 (2d Cir. 1991) (statute of limitations for an antitrust claim began to run no later than the date of injury "based on the allegations in the complaint").

It is clear from the face of the Complaint that Gannett's claims as to EDA and line-item caps accrued more than four years before the Complaint was filed on June 20, 2023, *i.e.*, before June 20, 2019.  Accordingly, these claims should be dismissed.  *See World Wrestling Ent.*, 328 F. App'x at 698 (finding antitrust claims time-barred based on the dates of the conduct alleged in the complaint); *Cangemi v. United States*, 13 F.4th 115, 134–35 (2d Cir. 2021) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a motion to dismiss based on the statute of limitations is properly treated as one under Rule 12(b)(6)") (internal quotations

omitted)).[4]

Gannett's EDA claims accrued—and the limitations period ran—well before Gannett filed its lawsuit.  Gannett alleges that it enabled, and complained to Google about, EDA in 2014.  *See* Compl. ¶¶ 151-54.  Gannett also alleges that, in 2018, it learned of an adverse effect of EDA on its "sponsorship deals."  *Id.* ¶ 155.  Accordingly, Gannett claims to have felt an injury or "adverse impact of an antitrust" violation at the earliest, *nine* years before the filing of the Complaint, and at the latest, *five* years before the filing of the Complaint.  *Zenith Radio Corp.*, 401 U.S. at 339.  In other words, Gannett's claim accrued at the latest in 2018, and the statute of limitations thus expired in 2022—one year before Gannett filed its Complaint.

The same is true of Gannett's claims regarding line-item caps, from which Gannett also asserts to have experienced injury *six* years ago.  Gannett alleges that Google began limiting the number of line items that publishers could create in Google's ad server in 2017, *see* Compl. ¶ 206—a limitation that would have been evident to Gannett at the time it was implemented, *see id.* ¶ 205 (alleging publishers themselves "must create a large number of line items").  According to Gannett, Google's alleged practice of limiting line-items was a tool to "fight" header bidding and "pressure publishers" like Gannett "to switch to Exchange Bidding."  *Id.* ¶¶ 206-07.  Gannett therefore alleges that it experienced the purported adverse impact of line-item caps in 2017, meaning the limitations period expired in 2021.

---

[4] Although the Court previously declined to adjudicate the issue of laches on the pleadings, *see* MTD Op. at 80-87, Gannett's complaint is clear on its face that its claims are untimely insofar as it specifically alleges that it experienced and learned of certain injuries at precise times.  In addition, unlike in the States' case, Gannett is seeking damages under the Sherman Act, *see* Compl. ¶ 296(e), which are subject to a four-year limitations period.

### B.  Gannett's claims cannot be saved by tolling.

Gannett has not alleged any basis to toll the statute of limitations, and to the extent Gannett's Complaint makes feeble attempts in that direction, its allegations fall far short of pleading either fraudulent concealment or continuing violations by Google.

***Fraudulent Concealment.***  To plead fraudulent concealment, Gannett would need to allege that: (1) Google concealed from Gannett the existence of the cause of action, (2) Gannett remained in ignorance of that cause of action until some point within four years from the date of the filing of the Complaint, and (3) Gannett's continuing ignorance was not attributable to lack of diligence. *See Litovich v. Bank of Am. Corp.*, 568 F. Supp. 3d 398, 434 (S.D.N.Y. 2021) (citing *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988)).  Moreover, Gannett would need to allege those elements with the heightened particularity required by Rule 9(b).  *See Kearse v. Kaplan*, 692 F. Supp. 2d 398, 401 (S.D.N.Y. 2010) (fraudulent concealment claims "are averments of fraud and must be alleged with the particularity required by Federal Rule of Civil Procedure 9(b)").

Gannett does not allege that Google concealed the existence of line-item caps or any alleged injury to Gannett.  Instead, Gannett alleges that Google began limiting the number of line items that publishers could create in the ad server in 2017—an action that Gannett would have observed at the time it occurred.  *See* Compl. ¶¶ 205-06.

Gannett also fails to plead with sufficient particularity that Google fraudulently concealed alleged injuries due to EDA.  Rule 9(b) particularity requires a plaintiff to plead "with particularity" (i) "the time, place, speaker, and content of the alleged misrepresentations," (ii) "how the misrepresentations were fraudulent," and (iii) how "those events . . . give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless

16

disregard for the truth." *Janese v. Fay*, 692 F.3d 221, 228 (2d Cir. 2012) (internal quotations omitted). Gannett alleges none of these details in its claims of alleged misrepresentations related to EDA. *See, e.g.*, Compl. ¶ 151 (failing to allege the speaker, time, or place of alleged misstatements about yield and revenue); *id.* ¶ 152 (failing to allege any details or circumstances of alleged misrepresentations concerning direct deals and sponsorships); ¶ 154 (failing to identify any specific statements by Google, let alone allege which were false). And Gannett's vague suggestions of inadequate visibility into EDA's effects—that it "has limited ability to oversee whether and how AdX continues to compete against sponsorships," *id.* ¶ 155—do not even allege active concealment on Google's part, much less with the particularity required by Rule 9(b). These allegations cannot support tolling on the basis of fraudulent concealment. *See Kearse*, 692 F. Supp. 2d at 401 (finding allegations in antitrust action that conduct was "kept secret" and "concealed" to be conclusory and inadequate to pleading fraudulent concealment).

Gannett also cannot allege the second element of fraudulent concealment—its ignorance of the alleged cause of action until some point within four years of the filing of the Complaint— because Gannett admits in its Complaint that it knew of, and *complained to* Google about, purported injuries due to EDA in 2014—nine years before filing its Complaint in 2023. *See* Compl. ¶ 154 ("For months, in 2014, Gannett complained to Google that DFP was not delivering on direct deals, despite Google's explicit assurances otherwise."). Gannett further alleges that it later "discovered" a more specific effect of EDA on Gannett's "sponsorship deals" in 2018—still five years before filing its complaint in 2023. *Id.* ¶ 155 ("In 2018, Gannett discovered that Enhanced Dynamic Allocation had permitted AdX to steal inventory from Gannett's sponsorship deals–potentially for years."). Thus, Gannett pleads far more knowledge of any alleged injuries from EDA than the minimal level of notice required to preclude any tolling. *See Litovich*, 568 F.

17

Supp. 3d at 434 ("[A]ll that is necessary to cause the tolling period to cease is for there to be reason to suspect the probability of any manner of wrongdoing." (citations omitted)).

Moreover, Gannett offers no allegations as to the third element—whether it undertook any diligence in trying to learn why DFP was purportedly "not delivering on direct deals." As discussed above, Gannett was purportedly on notice that its direct deals were not delivering. Compl. ¶ 154. But after allegedly complaining once in 2014, Gannett does not claim to have done anything further to investigate or follow up. *See LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) ("As we have explained, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." (internal quotations omitted)); *Fire & Police Assoc. of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 704 (S.D.N.Y. 2019) (applying *LC Capital Partners* to the antitrust context). Therefore, Gannett fails to satisfy any of the three elements for EDA, the only claim as to which Gannett attempts to plead fraudulent concealment.

***Continuing Violations.*** Nor can Gannett toll the limitations period with a "continuing violations" argument. To plead a continuing violation that restarts the four-year statute of limitations, Gannett must allege an overt act that is "a new and independent act that is not merely a reaffirmation of a previous act" and which "inflict[s] new and accumulating injury on the plaintiff." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019) (citing *DXS, Inc. v. Siemen Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)). Gannett has failed to do so because Gannett does not allege that it suffered injuries in the form of overcharge damages that continued into the limitations period arising out of Google's alleged conduct related to either EDA or line-item caps, and it offers no distinct acts or injuries in the four years preceding its Complaint. *Cf. Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295-96 (2d Cir. 1979) (contemplating

recovery on a continuing violations theory only where plaintiffs identify and seek to recover for overcharges paid within the previous four years).  Instead, Gannett claims that enabling EDA in 2014 allegedly "reduc[ed] the value of Gannett's current and future direct deals," Compl. ¶ 153, and that Google's alleged practice of limiting line items in 2017 "pressure[d] publishers" like Gannett "to switch to Exchange Bidding," *id.* ¶¶ 206-07.  Accordingly, to the extent Gannett claims to have experienced any ongoing injury from Google's introduction of EDA or line-item caps, that injury was not the result of a new and independent act but was instead the manifestation of product choices Google introduced more than four years ago.  *See US Airways*, 938 F.3d at 69 (holding that sales pursuant to an allegedly anti-competitive contract were not "overt act[s]" restarting the limitations period but rather "a manifestation of the prior overt act of entering into the . . . contract"); *accord Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 741 (3d Cir. 2019) (explaining that even "an injury that is the lingering effect of past unlawful conduct is not a continuing violation and . . . thus not actionable in its own right" (internal citation and quotation omitted)).

## IV.  The Court Should Dismiss Gannett's Claims With Prejudice.

Because Gannett has failed to state a claim upon which relief can be granted as to Exchange Bidding, encrypting user IDs, AMP, MBW, EDA, and line-item capping, despite having the benefit of prior briefing and opinions addressing them, the Court should dismiss these claims with prejudice.  *See Ying Li v. City of New York*, 246 F. Supp. 3d 578, 646 (E.D.N.Y. 2017) (dismissing claims with prejudice where plaintiff did not "make good use of [an] opportunity to prune her complaint of invalid claims or to add useful or relevant factual allegations").  Dismissal with prejudice is especially warranted as to the EDA and line-item capping claims, which are untimely on their face.  *See id.* ("An amendment to a pleading is considered futile if the claim is time-barred due to the expiration of the applicable statute of limitations period.").

**CONCLUSION**

For the foregoing reasons, Google respectfully requests that this Court dismiss in their entirety the portions of the federal antitrust claims related to Exchange Bidding, encrypting user IDs, AMP, MBW, EDA, and line-item capping in full and with prejudice.  These claims are predicated on the fundamentally misguided idea that Google cannot attempt to build better or attractive products and on stale assertions that Gannett waited years too long to bring.


Dated: September 8, 2023                         Respectfully Submitted,


                                                 */s/ Justina Sessions*
                                                 Justina K. Sessions
                                                 FRESHFIELDS BRUCKHAUS
                                                 DERINGER US LLP
                                                 855 Main Street
                                                 Redwood City, CA 94063
                                                 Telephone: (650) 618-9250
                                                 Fax: (650) 461-8276
                                                 justina.sessions@freshfields.com

                                                 Eric Mahr
                                                 Robert J. McCallum
                                                 FRESHFIELDS BRUCKHAUS
                                                 DERINGER US LLP
                                                 700 13th Street NW, 10th Floor
                                                 Washington, DC 20005
                                                 Telephone: (202) 777-4500
                                                 Fax: (202) 777-4555
                                                 eric.mahr@freshfields.com
                                                 rob.mccallum@freshfields.com

                                                 Daniel Bitton
                                                 Denise L. Plunkett
                                                 Craig M. Reiser
                                                 Eva H. Yung
                                                 Claire L. Haws
                                                 AXINN, VELTROP & HARKRIDER LLP
                                                 114 West 47th Street
                                                 New York, New York 10036

Telephone: (212) 728-2200
Fax: (212) 728-2201
dbitton@axinn.com
dplunkett@axinn.com
creiser@axinn.com
eyung@axinn.com
chaws@axinn.com

Bradley Justus (*pro hac vice*)
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
Telephone: (202) 912-4700
Fax: (202) 912-4701
bjustus@axinn.com

Caroline P. Boisvert (*pro hac vice* pending)
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, Connecticut 06103
Telephone: (860) 275-8100
Fax: (860) 275-8101
cboisvert@axinn.com

*Counsel for Defendants Google LLC and
Alphabet Inc.*