UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

IN RE: GOOGLE DIGITAL ADVERTISING  21-md-3010 (PKC)
ANTITRUST LITIGATION

          OPINION AND ORDER

-------------------------------------------------------x

SUNNY SINGH,

       Plaintiff,     23-cv-3651 (PKC)

  -against-

GOOGLE LLC, ALPHABET INC., and META
PLATFORMS INC.,

       Defendants.

-------------------------------------------------------x

ORGANIC PANACEAS, LLC,

       Plaintiff,     21-cv-7001 (PKC)

  -against-

GOOGLE LLC, ALPHABET INC., and META
PLATFORMS INC.,

       Defendants.

-------------------------------------------------------x

SPX TOTAL BODY FITNESS, et al.,

       Plaintiffs,     21-cv-6870 (PKC)

  -against-

GOOGLE LLC,

       Defendant.

-------------------------------------------------------x

IN RE: GOOGLE DIGITAL PUBLISHER  21-cv-7034 (PKC)
LITIGATION

-------------------------------------------------------x

------------------------------------------------------------x

AIM MEDIA IND. OPERATING, LLC, et al.,

      Plaintiffs,      21-cv-6912 (PKC)

 -against-

GOOGLE LLC and FACEBOOK INC.,

------------------------------------------------------------x

ASSOCIATED NEWSPAPERS LTD., et al.,

      Plaintiffs,      21-cv-3446 (PKC)

 -against-

GOOGLE LLC and ALPHABET INC.,

------------------------------------------------------------x

GANNETT CO., INC., et al.,

      Plaintiffs,      23-cv-5177 (PKC)

 -against-

GOOGLE LLC and ALPHABET INC.,

------------------------------------------------------------x

CASTEL, SENIOR DISTRICT JUDGE:

    This Opinion and Order decides all pending motions to dismiss in the above-captioned multidistrict litigation, with the exception of a motion filed in Inform Inc. v. Alphabet Inc., et al., 23 Civ. 1530 (PKC), which will be addressed in a forthcoming Opinion and Order.

    On September 13, 2022, the Court issued an 88-page Opinion and Order that decided Google's motion to dismiss the Sherman Act claims brought by the attorneys general of 16 states and the Commonwealth of Puerto Rico (the "States").  In re Google Digital Advertising

Antitrust Litig., 627 F. Supp. 3d 346 (S.D.N.Y. 2022) (the "2022 Opinion").[1]  The Court then granted leave to the private-party plaintiffs to amend their pleadings, and set a briefing schedule for defendants' motions to dismiss.  (ECF 309, 311, 392.)[2]

The Court incorporates by reference all legal standards set forth in the 2022 Opinion, including the well-understood obligation of a plaintiff to allege facts plausibly stating a claim for relief and the extensive discussion of precedent controlling claims under sections 1 and 2 of the Sherman Act.  The Court also incorporates the terminology and definitions in the 2022 Opinion, including those relating to relevant markets and facts at issue, e.g., the Network Bidding Agreement ("NBA"), header bidding, and Enhanced Dynamic Allocation ("EDA").  To the extent that certain plaintiffs have tailored or expanded upon allegations discussed the 2022 Opinion, those new allegations are discussed and addressed below.

For the reasons that will be detailed below, this Opinion and Order concludes as follows:

- No plaintiff has plausibly stated a claim for relief premised upon on the terms of the NBA.
- The Advertisers (as defined below) have not plausibly alleged antitrust standing in the markets for ad-buying tools used by large advertisers, but they plausibly allege antitrust standing as to injuries they purportedly suffered from anticompetitive practices in the ad-exchange market and the market for small advertisers' buying tools.  The Advertisers do not plausibly allege a section 1 claim based on the implementation of UPR and header-bidding caps.
- Google's assertion that all but one advertising plaintiff agreed to an arbitration provision turns on the testimonial affidavit of a legal assistant, which only vaguely describes Google's records of these plaintiffs' consents to arbitration and does not annex any supporting records of their consent.  Google's motion to dismiss, or, alternatively, to compel arbitration, is premature at this juncture, and requires a more developed factual record as to the advertisers' purported consents to arbitrate.
- The unopposed motion to dismiss the Organic Panaceas Complaint will be granted because it does not identify a relevant product market and because Google's

[1] The JPML has since remanded the action brought by the States to the transferor Court.  See In re Google Digital Advert. Antitrust Litig., 2023 WL 3828612 (U.S. Jud. Pan. Mult. Lit. June 5, 2023).
[2] Unless otherwise specified, all citations to the docket reference the MDL docket in this case and not to any of the individual actions.

purportedly arbitrary enforcement of rules against paid advertisements for cannabidiol oil does not amount to anticompetitive conduct.

- The claims of the SPX Plaintiffs will be dismissed in their entirety because they have not plausibly alleged antitrust standing or stated a claim for relief as to the NBA.

- The Publishers (as defined below) have plausibly alleged a section 2 claim based on Minimum Bid to Win ("MBW") but not as to Google's policing of code or Search+. The Publishers' factual allegations about the use of encrypted ID differ from those brought by the states because it is one of several practices alleged to reinforce a tying arrangement, and not its own proposed basis for section 2 liability; the motion to dismiss this portion of the tying claim will be denied.

- Because all Newspaper Plaintiffs have filed notices of voluntary dismissal, the motions to dismiss their claims will be terminated as moot.

- The motion to partially dismiss the claims of Daily Mail will be granted.

- Gannett plausibly alleges section 2 claims based on EDA's effects on direct sales and on implementation of MBW and has plausibly alleged that Google fraudulently concealed the anticompetitive effects of EDA.  The remainder of Google's motion will be granted.

## BACKGROUND.

Consistent with <u>Twombly</u> and <u>Iqbal</u>, the plaintiffs' well-pleaded factual allegations are assumed to be true.  This brief overview recounts some of the principal allegations made at the pleading stage and is not intended to suggest any findings of fact or legal conclusions about the conduct alleged.

Quoting from the States' Complaint, the 2022 Opinion gave the following summary of how digital ad tech operates:

> When a user [i.e. consumer] visits a publisher's website, the publisher's ad server sends a "bid request" to the ad buying tools who have a "seat" to bid in the exchange and purchase on behalf of their advertiser clients.  This bid request announces the publisher's available impressions to exchanges, along with information about the impression, including the user's ID, the ad slot's parameters, and any rules about pricing.  These bid requests also contain information about the impression at issue and convey a "timeout," which is the amount of time prospective buyers are allotted to respond with their "bid response."  Within this timeframe, which is typically a mere fraction of a second, each ad buying tool must unpack the information contained in the bid request, gather and deploy personal

information about the user, determine the appropriate price to bid on behalf of the prospective advertiser, and return a bid response to the exchange.  When time expires, each exchange closes its auction, excludes any late bids, and passes its highest bid to the ad server.  The publisher's ad server then selects which ad to display and effectuates the display of the ad to the user.

627 F. Supp. 3d at 361 (quoting State Compl't ¶ 74).

The distinguishing trait of digital ad tech is that an advertiser can target its ads to the most relevant consumers, as opposed to traditional print ads that run to a general audience. Defendants Google, LLC and its parent company Alphabet, Inc. (collectively, "Google") play a pivotal role in every step of the auctions for digital display ads.

Publishers rely on ad servers to manage the placement and sale of digital display ad space.  Some of these ad spaces are directly sold to advertisers by a publisher's in-house sales team, which negotiates price and the target viewer's characteristics (e.g., a female site visitor of a certain age and location who is in the market for a new automobile).  Frequently, however, ad space is transacted in online auctions that take place in milliseconds.  Google's ad server is often referred to as DoubleClick for Publishers ("DFP"), though it has been rebranded as Google Ad Manager ("GAM").  Google has monopoly power in the market for ad servers.

Digital advertising auctions take place on ad exchanges – real time marketplaces that match publishers to advertisers.  The auctions occur during the time that a user's page loads and displays a successful bidder's ad.  Google's AdX exchange has monopoly power in the ad-exchange market and processes approximately 11 billion display ads each day.  Ad exchanges function as the go-between for publishers selling ad space and advertisers seeking to place an ad. Ad exchanges are typically used by large publishers, which are charged a take rate by the ad exchange if a transaction clears.  The various plaintiffs frequently assert that Google exploits its

monopoly in ad servers and ad-buying tools to route transactions through AdX, thereby entrenching AdX's monopoly power.  A common theme throughout the pleadings is that Google has sought to coercively thwart header bidding because it is a competitive threat to AdX.

Advertisers participate in ad auctions by using ad-buying tools.  There are two separate markets for ad-buying tools: one for large advertisers and one for small advertisers.  The ad-buying tools for large advertisers are costly and permit advertisers to fine-tune aspects of their purchasing strategies.  No plaintiff asserts that it has used the tools of large advertisers, including Google's DV360 product.  The Advertisers instead were customers of Google's buying tool for small advertisers.  Google has monopoly power in the market for small-buyer advertising tools, and Google Ads buys approximately 50% of all display ads sold on AdX.

Some publishers sell their inventory of web display ads through ad networks instead of using a publisher ad server.  Ad networks differ from ad servers because they pool publisher inventory for sale to advertisers affiliated with the network.  Publishers have less control over inventory sold over ad networks, which is why larger and well-resourced publishers, such as plaintiff Gannett, generally do not sell impressions through ad networks.  Ad networks are typically used by smaller advertisers and publishers.  Some portion of the networks' ad inventory may be purchased over an ad exchange.  Because of their more limited range of function, ad networks are not considered interchangeable with ad servers, and they are treated as separate markets.

Mobile apps have their own ad-tech mechanisms that are separate and distinct from web display ads.  Mobile app developers sell ad inventory through an in-app mediation tool.  The in-app mediation tool manages the app's inventory of impressions, lets the developer identify certain user information, and is a vehicle for conducting ad auctions.  Google's products

6

in the in-app mediation market include Google Ad Manager for apps of large developers and AdMob for smaller developers.

Advertisers typically do not have direct dealings with the in-app mediation tool. Rather, they buy app impressions using an in-app network.  An in-app network purchases display impressions from developers and re-sells them to advertisers.  For example, an in-app network may buy impressions at auction on a per-impression basis, then sell them to advertisers on a per-click or per-action basis, or through the sale of large blocks of impressions.  In-app ad networks are separate and distinct from the ad networks for web display ads.

In September 2018, Google and Facebook entered into the NBA.[3]  The 2022 Opinion dismissed the States' section 1 claim asserting that the NBA effected a combination or conspiracy to restrain trade wherein Facebook agreed to curb or forego its participation in header bidding in exchange for gaining purportedly unfair advantages in AdX auctions, and separately, the claim that Google and Facebook agreed or colluded to limit their competition on in-app ad inventory.  See 627 F. Supp. 3d at 370-77.  On the latter issue, the Court concluded that neither the NBA nor any associated understanding overtly or covertly assured did not provide that Facebook would win a set percentage of auctions; rather, the alleged understandings were consistent with Google's efforts to win the business of a large client whose participation would increase competition within Google's in-app network.  See id. at 375-77.

Some of the private plaintiffs also bring claims that relate to Google's monopoly powers in general internet search and search advertising.  Through the ubiquitous Google search engine, Google shows ads that appear alongside search results, which advertise products

---

[3] Facebook, Inc. is now known as Meta Platforms, Inc. ("Meta").  The pleadings and memoranda differ in whether they identify the company's historic actions as being done by Facebook or Meta.  For the sake of consistency, and because the company was known as Facebook at the time the parties entered into the NBA, this Opinion and Order will refer to it as Facebook.

intended to match the user's search interest.  This valuable space is highly sought by advertisers.

The Publishers assert that Google unlawfully tied the sale of search ads to the sale of display ads

transacted on AdX.  Some publisher plaintiffs have also asserted that Google manipulates search

rankings to punish or reward participation in purportedly anticompetitive ad-server initiatives,

particularly as they relate to header bidding.

GOOGLE'S MOTION TO PARTIALLY DISMISS THE ADVERTISERS' COMPLAINT
WILL BE GRANTED IN PART AND DENIED IN PART.[4]

> I.    Overview of the Advertiser Complaint.

Six advertiser plaintiffs have filed a consolidated complaint that brings claims on

behalf of a putative class of advertisers that placed a display ad on a website or mobile app

through Google (the "Advertiser Complaint").  (ECF 399.)  Those plaintiff are Christopher

Hanson, d/b/a Hanson Law Office ("Hanson"), Vitor Lindo, Cliffy Care Landscaping, Inc.

("Cliffy Care"), Kinin, Inc. ("Kinin"), Raintree Medical and Chiropractic Center, LLC

("Raintree") and Rodrock Chiropractic PA ("Rodrock") (collectively, the "Advertisers").  (Adv.

Compl't ¶¶ 14-32.)  Cliffy Care, Kinin, Raintree and Rodrock all allege that they purchased

display and in-app ads using Google Ads, which is the ad-buying tool used by small advertisers.

(See id.) Hanson and Lindo allege that they paid Google to directly broker display ads on third-

party websites and also bought search ads from Google.  (See id.)  None of these plaintiffs

alleges that it used an ad-buying tool intended for use by large advertisers, specifically including

Google's DV360 product.

Counts One asserts a claim of monopolization in the markets for ad exchanges

and ad-buying tools for small advertisers under section 2 of the Sherman Act, 15 U.S.C. § 2.

(Compl't ¶¶ 350-57.)  Count Two asserts a claim of attempted monopolization in the markets for

---

[4] In re: Google Digital Antitrust Advertising, 21 Civ. 7001 (PKC).

ad exchanges, ad-buying tools for small advertisers and ad-buying tools for large advertisers, also under section 2.  (Compl't ¶¶ 358-64.)  Count Three asserts contract or combination in restraint of trade under section 1 of the Sherman Act, 15 U.S.C. § 1, based on the NBA entered into by Google and Facebook.  (Compl't ¶¶ 365-72.)  Count Five asserts a contract or combination in restraint of trade under section 1, and asserts that the Unified Pricing Rules that Google allegedly imposed on publishers resulted in artificially inflated prices paid by plaintiffs.  (Compl't ¶¶ 378-90.)  Counts One through Three broadly parallel claims brought by the States, while Count Four advances a claim for relief not previously considered by the Court.  Facebook separately moves to dismiss Count Three.  (ECF 460.)

II.     Google's Motion to Dismiss the Advertisers' Claim on Grounds of
        <u>Antitrust Standing Will Be Granted in Part and Denied in Part.</u>

A.  <u>The Requirement to Plausibly Allege Antitrust Standing.</u>

The Clayton Act provides a right of action to seek treble money damages from "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ."  15 U.S.C.A. § 15(a).  "[H]owever, 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'"  <u>Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.</u>, 711 F.3d 68, 75 (2d Cir. 2013) (quoting <u>Associated General Contractors of Cal., Inc. v. California State Council of Carpenters</u>, 459 U.S. 519, 534 (1983)).  "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law."  <u>Gatt</u>, 711 F.3d at 75 (quotation marks omitted).

"In determining antitrust standing, [courts] 'assume[ ] the existence' of an antitrust violation.  [They] then ask two questions: (1) 'have [plaintiffs] suffered antitrust injury?' and (2) 'are [plaintiffs] efficient enforcers of the antitrust laws?'"  <u>Harry v. Total Gas &</u>

Power N. Am., Inc., 889 F.3d 104, 115 (2d Cir. 2018) (quoting Gelboim v. Bank of Am. Corp.,

823 F.3d 759, 770 (2d Cir. 2016)).  Identification of an antitrust injury "involves a 'three-step

process' in which, first the plaintiff must 'identify the practice complained of and the reasons

such a practice is or might be anticompetitive'; then the court must 'identify the actual injury the

plaintiff alleges' by 'look[ing] to the ways in which the plaintiff claims it is in a worse position

as a consequence of defendant's conduct'; and finally, the court must 'compare the

anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.'"

Harry, 889 F.3d at 115 (quoting Gatt, 711 F.3d at 76).  On step one, "the bar for such a showing

is a low one," and a plaintiff "need allege only that the Defendants have engaged in unlawful

anticompetitive conduct."  IQ Dental Supply, Inc. v. Henry Schein, Inc., 924 F.3d 57, 63 (2d Cir.

2019).  The second step requires courts "to isolate and identify [plaintiff's] 'actual injury' or the

'ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's

conduct.'"  Id. (quoting Gatt, 711 F.3d at 76).  On the third step, the plaintiff "must demonstrate

that the Defendants' anticompetitive behavior caused its actual injury."  Id. at 64-65.

   "Competitors and consumers in the market where trade is allegedly restrained are

presumptively the proper plaintiffs to allege antitrust injury."  In re Aluminum Warehousing

Antitrust Litig., 833 F.3d 151, 158 (2d Cir. 2016) (quotation marks omitted).  However,"[t]he

universe of potential plaintiffs is not strictly limited to participants in the defendants' market"

because there is "'a narrow exception . . . for parties whose injuries are "inextricably

intertwined" with the injuries of market participants.'"  Id. (quoting Am. Ad Mgmt., Inc. v. Gen.

Tel. Co. of California, 190 F.3d 1051, 1057 n.5 (9th Cir. 1999)).  "[M]ost of the time when a

putative plaintiff has suffered antitrust injury that is 'inextricably intertwined' with the injury the

conspirators ultimately intended to inflict, it is because the conspirators used the plaintiff's injury

as the 'means,' 'fulcrum,' 'conduit,' or 'market force' to realize their illegal ends."  Id. at 160-61.  "Therefore, to assess the plausibility of a putative plaintiff's claim to antitrust injury as being 'inextricably intertwined' with the injury the defendants ultimately sought to inflict, courts ask whether the plaintiff was "manipulated or utilized by [defendant] as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets."  Id. at 161.

A plaintiff that has plausibly alleged antitrust injury must also plausibly allege that it is an efficient enforcer of the antitrust laws.  Gelboim, 823 F.3d at 772.  The Second Circuit has explained:

> The efficient enforcer inquiry turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury.  Built into the analysis is an assessment of the "chain of causation" between the violation and the injury.

Id. (internal citations omitted).  "These four factors need not be given equal weight: the relative significance of each factor will depend on the circumstances of the particular case."  IQ Dental Supply, 924 F.3d at 65.

     B.  The Advertiser Complaint Does Not Allege Plaintiffs' Antitrust Injury
         in the Market for Ad-Buying Tools for Large Advertisers.

The Advertiser Complaint identifies three relevant product markets: ad exchanges, including Google's AdX product; buying tools for small advertisers, including the Google Ads product; and buying tools for large advertisers, including Google's DV360 product. (Adv. Compl't ¶¶ 54.)  It asserts that Google's anticompetitive conduct in these markets caused

the Advertisers to "pay[ ] more to place ads through AdX, causing antitrust injury and giving rise to antitrust standing."  (Adv. Compl't ¶ 55.)

The Advertiser Complaint asserts that the Hanson and Lindo "paid Google directly to broker the placement of . . . display advertisements on third-party websites."  (Adv. Compl't ¶¶ 14, 20.)  It asserts that plaintiffs Cliffy Care, Kinin, Raintree and Rodrock "purchased display and in-app advertising through Google Ads . . . ."  (Adv. Compl't ¶¶ 26, 28, 30, 32.)

Though the Advertiser Complaint describes the functions of Google's DV360 product and identifies a market for ad-buying tools used by large advertisers, it does not assert that any of the six plaintiffs were customers of DV360: Four of the six plaintiffs are customers of Google Ads, and the other two plaintiffs contracted with Google to directly broker ad placements.  (Adv. Compl't ¶¶ 26, 28, 30, 32, 14, 20.)  It repeatedly distinguishes the markets for Google Ads and DV360: "Google recognizes that the set of customers served by buying tools for small advertisers (Google Ads) is unique and distinct from the set of customers served by buying tools for large advertisers (DV360) . . . ."  (Adv. Compl't ¶ 98; see also Adv. Compl't ¶¶ 91, 109 ("Google participates in the two markets by offering two distinct products: Google Ads is for small advertisers, and DV360 is for large advertisers."), 137 (DV360 is "a standalone product market.").)  DV360 has "unique entry and usage requirements" which includes "at least $10 million" in customer spending per year.  (Adv. Compl't ¶ 128.)

The 2022 Opinion Concluded that the States had plausibly alleged that Google engaged in anticompetitive conduct in the market for ad-buying tools of large advertisers through its Project Poirot and Project Elmo initiatives.  627 F. Supp. 3d at 397-98.  The Advertiser Complaint parallels the States' allegations and plausibly alleges why this conduct was

anticompetitive, thereby satisfying step one of the antitrust injury requirement.  (Adv. Compl't ¶¶ 267-74.)  But the Advertisers do not describe how they were harmed as a result of Project Poirot or Project Elmo.  The Advertiser Complaint alleges that Google manipulated ad auctions by directing customers of its DV360 product to Google's own AdX exchange "without competing on the merits of price or quality."  (Adv. Compl't ¶¶ 267-74.)  Plaintiffs' theory of injury is that large advertisers using DV360 were deprived of lower-priced, higher-quality ads available on Google's rival exchanges and were channeled to transactions on AdX.  (See id.) The Complaint does not allege facts that would tend to show that any of the six plaintiffs used the DV360 ad-buying tool or that their bids were manipulated through Project Poirot or Project Elmo.  It also does not allege that plaintiff suffered an injury that is "inextricably intertwined" with any alleged scheme related to DV360.  See In re Aluminum Warehousing, 833 F.3d at 160-61.

Because the Complaint does not plausibly allege that any plaintiff suffered an antitrust injury based on the bidding practices used in Project Poirot or Project Elmo, the Advertisers have not alleged antitrust standing.  Their claims directed toward Google's alleged anticompetitive conduct in the market for ad-buying tools used by large advertisers will be dismissed.

C.   The Advertiser Complaint Plausibly Alleges Antitrust Standing as to Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke, Dynamic Revenue Sharing and Unified Pricing Rules.

The Advertiser Complaint includes extensive allegations about Google's alleged anticompetitive conduct related to ad exchanges that compete with the Google AdX exchange and the ad-buying tools for small advertisers.  It describes schemes that Google allegedly implemented to coercively channel advertising transactions to AdX instead of rival exchanges,

13

thus giving Google an unfair competitive advantage in the ad-exchange market. (See, e.g., Adv. Compl't ¶¶ 199-266, 275-84.)

The Advertiser Complaint plausibly alleges that the Advertisers suffered antitrust injury based on these alleged schemes. It alleges that Google's practices in the ad-exchange market "forced" advertisers "to transact more on Google's exchange with a higher take rate," whereas in a competitive market, advertisers would benefit from exchange competition on take rates and placement quality. (Adv. Compl't ¶ 314.) "Advertisers would pay less to purchase ad space, permitting them to re-invest those cost savings into providing consumers with higher-quality and lower-priced goods and services." (Adv. Compl't ¶ 314.) The Complaint alleges that AdX charges a supra-competitive take rate of 19 to 22 percent on gross transactions while providing lower-quality, sub-competitive products. (Adv. Compl't ¶ 314.)

Dynamic Allocation is alleged to manipulate bidding outcomes by channeling transactions to AdX when the AdX-based bid was worth more to the publisher (and therefore caused the advertiser to pay more) than a bid on a rival exchange. (Adv. Compl't ¶¶ 201-08.) Enhanced Dynamic Allocation allegedly pooled publishers' most valuable impressions at higher prices than would have been available if impressions had been available for bidding on multiple exchanges. (Adv. Compl't ¶¶ 209-13.) Project Bernanke allegedly inflated advertisers' prices and routed their bids to publishers that were less likely to reach relevant audiences if that helped AdX complete the transaction instead of a rival exchange. (Adv. Compl't ¶ 226.) Dynamic Revenue Sharing allegedly caused advertisers to pay artificially inflated fees to increase AdX's take rate. (Adv. Compl't ¶ 232.) Unified Pricing Rules required publishers to name a single, fixed price floor across multiple exchanges, thereby preventing publishers from adjusting floors to account for Google's higher fees and restraining advertisers' choices across ad-buying tools

14

and ad exchanges, including their option to bid for inventory on rival exchanges at potentially lower prices.  (Adv. Compl't ¶¶ 259, 266.)

The Complaint plausibly alleges that advertisers paid supra-competitive prices for transactions that occurred on AdX when the advertisers may have obtained the same or better ad placements on rival exchanges for lower prices.  The Court therefore concludes that the Advertisers have plausibly alleged antitrust injury based on Google's alleged anticompetitive practices in the ad-exchange market.

In addition to alleging antitrust injury, a plaintiff must also be an efficient enforcer of the antitrust laws in order to have antitrust standing.  Gelboim, 823 F.3d at 772.  The Complaint plausibly alleges how Google's practices would have directly injured the Advertisers and why such injuries are not speculative.  See id.  There are other classes of persons (including publishers) whose self-interest had led them to bring claims against Google, but at this stage of the litigation, it appears plausible if not likely that their injuries are sufficiently distinct.  This is not an instance, as in Gelboim, where plaintiffs with no direct role in the underlying conduct sought treble damages based on losses in third-party derivative transactions due to defendants' alleged rate-fixing conspiracy.  See id. at 778-79.

The Court therefore concludes that plaintiffs have plausibly alleged antitrust standing for section 2 claims directed to Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke, Dynamic Revenue Sharing and Uniform Pricing Rules.

III.     Count Five Will Be Dismissed.

Count Five brings a claim under section 1 and asserts that "[t]hrough a series of agreements imposed on publishers, Google has unreasonably restrained trade and foreclosed competition" in the markets for ad exchanges and ad-buying tools for large and small advertisers.

(Adv. Compl't ¶¶ 378-90.)  It asserts that the Unified Pricing Rules ("UPR") adopted by Google prevented publishers from setting different prices floors for different ad exchanges and ad-buying tools, and instead required publishers to use a single price across different exchanges. (Id. ¶¶ 383-84.)

Count Five of the Advertiser Complaint will be dismissed because it does not allege a contract or combination in restraint of trade under 15 U.S.C. § 1.  "A § 1 agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'"  Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771 (1984) (quoting American Tobacco Co. v. United States, 328 U.S. 781, 810 (1946)).  "In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 183 (2d Cir. 2012).

Count Five asserts an unlawful contract or combination between Google and the publishers it required to participate in UPR.  Count Five states that by implementing UPR, Google "impose[d]" a series of agreements on publishers that required them to adopt uniform price floors across different exchanges.  (Adv. Compl't ¶¶ 378-90, 383 ("Google imposes these price-fixing terms on publishers as a condition on their continued use of Google's monopoly ad server and by exercising its discretion under its agreements with publishers.  Participating publishers agreed and assented to the change by continuing to use DFP.").)  The factual allegations characterize UPR as a unilateral requirement "impose[d]" upon publishers to their detriment, not a unity of purpose, common design and understanding, or a meeting of the minds. Copperweld, 467 U.S. at 771.  Count Five of the Advertiser Complaint will be dismissed because

it fails to plausibly allege a contract or combination between Google and the publishers that allegedly coerced them into participating in UPR.[5]

### IV.   The Advertisers' Claims Directed to Reserve Price Optimization Will Be Dismissed.

The Advertiser Complaint's allegations about RPO parallel the States' claims and describe purportedly false or misleading statements by Google but not anticompetitive conduct that harmed the users of the small advertisers' ad-buying tools.  The Advertisers' claim directed to Google implementation of RPO will be dismissed for the reasons explained in the 2022 Opinion.  See 627 F. Supp. 3d at 391-93.

### V.   The Advertisers' Claim Directed to the NBA Will Be Dismissed.

Count Three of the Advertiser Complaint alleges a contract or combination in restraint of trade under section 1.  It asserts that Google and Facebook conspired to restrain trade in the auction market for web and in-app display ads by exclusively giving Facebook certain anticompetitive advantages, including access to "enhanced proprietary data" known only to Google.  (Adv. Compl't ¶¶ 286-94, 365-72.)  It asserts that the NBA injured the Advertisers by forcing them to make supra-competitive bids to win auctions against Meta's advertising customers.  (Adv. Compl't ¶¶ 369-70.)  It does not allege that the NBA's terms are a per se violation of the Sherman Act.  See 627 F. Supp. 3d at 374-75 (concluding that NBA is properly reviewed under the rule of reason).

Facebook previously offered ad-buying tools to small advertisers through a buying tool known as the Facebook Audience Network ("FAN"), later known as the Meta Audience Network ("MAN"), to purchase display ads.  (Adv. Compl't ¶ 118.)  Beginning in

---

[5] To the extent that Count Five includes similar allegations about Google's implementation of artificial caps on the number of line items used in header bidding, it will be dismissed for the same reason.

2020, it stopped offering ad-buying tools for web display ads, and began to offer only mediation services for in-app display advertising.  (Adv. Compl't ¶ 118.)

According to the Advertisers, the NBA restrained trade in the horizontal competition between the FAN (or MAN) buying tools and competing advertiser intermediaries that also bid in in-app display auctions.  (Adv. Compl't ¶ 290.)  They allege that Facebook has its own "enormous" database of customer information, and that its unique access to Google's match information and other information gives Facebook an unfair horizontal advantage in the market for open display and in-app ad inventory.  (Adv. Compl't ¶¶ 290-92.)  The Advertiser Complaint asserts that the competitive benefits to Facebook necessarily come at the expense of rival bidders and "are not similar or analogous to discounts or allowances a seller might provide to a favored customer . . . ."  (Adv. Compl't ¶ 291.)

The Advertiser Complaint asserts that through the NBA, Google agreed to use "reasonable efforts" to ensure that Facebook would be able to identify the user on a minimum of 80% of bid requests sent by Google to Facebook from mobile apps and at least 60% of bid requests from web browsers that allowed cookies.  (Adv. Compl't ¶ 287.)  Facebook, in turn, agreed to bid on 90% of bid requests in which the end user was identified, and to commit to a minimum annual ad spend and auction win rate.  (Adv. Compl't ¶ 287.)  Google also provided Facebook an "enlarged timeout allowance" that gave it additional time to evaluate a bid request and to submit a bid, the effect of which allegedly placed advertisers bidding against Facebook at a competitive disadvantage.  (Adv. Compl't ¶¶ 289.)

The 2022 Opinion dismissed the States' section 1 claim directed to these same provisions of the NBA.  627 F. Supp. 3d at 373-77.  It concluded that the States had described a vertical restraint properly reviewed under the rule of reason, that the NBA did not predetermine

the outcomes of ad auctions but instead sought to ensure that Facebook would submit competitive bids, and that the States had not plausibly alleged that the NBA harmed rather than encouraged competition in the in-app ad market.  Id. at 374-76.

The Advertisers urge that their claims are brought through a different lens that focuses on the horizontal injuries that they suffered as clients of Google's own ad-buying tools. (Pl. Opp. Mem. at 2, 5.)  They assert that "[t]he competition-distorting benefits enjoyed by [Facebook] can only be granted by disadvantaging [Facebook] rival bidders in Google's auctions relative to [Facebook]," and that Google "extracts" benefits "from [Facebook's] competing bidders by impairing their position relative to [Facebook]."  (Adv. Compl't ¶ 291.)  Unlike the States, the Advertisers do not contend that the NBA was intended to thwart header bidding.

The 2022 Opinion reviewed similar theories offered by the States and concluded that they did not plausibly allege a restraint of trade under the rule of reason.  It described the NBA as "principally a vertical agreement, with potential horizontal consequences."  627 F. Supp. 3d at 374.  It observed that "[t]he NBA does not dictate which impressions Facebook may bid on or at what price.  Rather than insulate Google's in-app network from competition, it promotes competition with Google's in-app network by bringing in a new competing bidder."  Id. at 376. It examined the States' theory that the NBA created a "hard limit" to auction outcomes and "effectively excluded rival bidders" through unfairly favorable terms given to Facebook but concluded that the NBA encouraged Facebook to submit competitive bids rather than "throwaway ones."  Id. at 373, 376.  It concluded that "[t]he States do not adequately explain why inducing Facebook to actively participate in the Google-run auctions – and endeavor to win a designated percentage of auctions – does not promote rather than harm competition in the in-app network market."  Id. at 376.

The Court has considered the Advertiser Complaint's allegations separately from the States' claims and concludes that the Advertisers have failed to plausibly allege a section 1 violation. The Advertisers have not plausibly alleged an unreasonable restraint of trade, and, to some extent, seem to assert that they suffered from increased competition in the auction market for web and in-app display ads as opposed to an anticompetitive restraint of trade. (Adv. Compl't ¶ 291.) Like the States, the Advertisers ultimately describe a vertical arrangement between Google in its role as auctioneer and Facebook as auction participant.

Additionally, the advertisers have not pointed to data or actual instances of harm indicating that competing in-app networks or bidders were placed at anticompetitive disadvantage due to implementation of the NBA. See Spinelli v. Nat'l Football League, 903 F.3d 185, 212 (2d Cir. 2018) (plaintiffs did not satisfy Twombly's plausibility threshold because they "cite no examples, data, or other facts to support their assertion, and a conclusory allegation that prices have increased will not suffice to state anticompetitive effect."). Facebook notes that plaintiffs have had access to more than 2 million documents produced in this case. (Facebook Mem. at 22.)

The Advertiser Complaint also asserts that the information given to Facebook by Google made bid requests "more valuable to advertisers" because they allowed for more accurate targeting. (Adv. Compl't ¶ 287.) It asserts that by helping Facebook identify an ad's viewer, Google shared information that was "valuable to advertisers because identifying the user allows for more accurate targeting and reduces the chances of serving an ad to a 'bot.'" (Id.) But this allegation describes a sharing of information that benefited consumers and competition by facilitating better outcomes for Facebook's advertisers, arguably giving a competitive edge to Facebook over the users of Google's own buying tools. It has long been understood that the

antitrust laws are "concern[ed] with the protection of competition, not competitors . . . ."  Brown

Shoe Co. v. United States, 370 U.S. 294, 320 (1962).

   The Court therefore concludes that the Advertiser Complaint does not allege a

section 1 violation arising out of the NBA entered into by Google and Meta.

   VI. Google's Motion to Dismiss Certain Allegations
      Describing Background Facts Will Be Denied.

   Google moves to dismiss certain allegations that purportedly describe "the

groundwork" for Google's alleged "monopolization scheme," including descriptions of Google's

corporate acquisitions and aspects of its search business.  (Google Mem. at 19-23; Adv. Compl't

¶¶ 166-67, 171, 184-85.)  The Advertisers respond that these allegations merely provide

"relevant background" and do not go to the elements of any claim, and are not redundant,

scandalous or immaterial in nature.  (Adv. Mem. 16-17.)

   Because these allegations only go toward the context of the claims and the

Advertisers have expressly stated that they do not purport to go toward the elements of any claim

for relief, Google's motion to dismiss these allegations will be denied.

   VII. Plaintiff Hanson Lacks Standing to Pursue any Claim
      Premised on Conduct that Occurred after September 6, 2016.

   Google urges that Hanson lacks "standing" to pursue any claim that is premised

upon conduct that occurred after September 6, 2016.  It does not specify whether its standing

arguments are directed to Article III standing or antitrust standing.  Under either framework,

Hanson has not alleged any injury for conduct by Google that post-dates his use of Google's

services.  According to the Advertiser Complaint, Hanson paid $487.78 between June 1, 2016

and September 6, 2016 for Google's intermediation services in brokering the placement of

display ads.  (Compl't ¶¶ 14-16.)  Hanson does not assert that he used any Google ad-buying tools or services after September 6, 2016.

Google notes that the Advertiser Complaint describes certain ad-auction practices that post-date Hanson's use of Google's ad-buying products, including line item caps, auction data redaction and UPR.  It does not include any allegations that describe how Hanson could have been injured by these practices, and therefore does not plausibly allege his antitrust standing to pursue any claim directed to these practices.  Harry, 889 F.3d at 115.  It also does not plausibly allege an injury in fact sufficient to confer Article III standing for any claim directed to these practices.  See, e.g., Sonterra Cap. Master Fund Ltd. v. UBS AG, 954 F.3d 529, 534 (2d Cir. 2020) ("To satisfy Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.") (quotation marks omitted).  Because Hanson does not allege that he has used any Google ad-buying product since 2016, he also does not have standing to pursue injunctive relief.  See, e.g., Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016) ("Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way.").

Google's motion to dismiss Hanson's claims directed to conduct that post-dates September 6, 2016 will be granted.

VIII.   Google's Motion to Dismiss, or, Alternatively, to Compel Arbitration Based on the Arbitration Provision in Google's Program Terms Is Denied Without Prejudice.

Google separately moves to dismiss the claims of five of the six Advertisers on the basis of an arbitration provision contained in Section 13(A) of the "Google LLC Advertising

Program Terms" (the "Program Terms"), which "govern Customer's participation in Google's advertising programs and services . . . ."  (See, e.g., Shadd Dec. Exs. A, D (ECF 448-1, -4).)  The arbitration provision is broad and applies to "claims brought under any legal theory . . . ."  (See id.)

Google's motion turns largely on the testimonial declaration of Courtney Shadd, who describes herself as "a legal assistant on the Ads legal team" at Google.  (ECF 448.)  Her declaration asserts that advertisers were required to accept the Program Terms when they enrolled in Google's advertising platforms and states that Google keeps records of advertisers who opted out of the arbitration provision.  (Shadd Dec. ¶¶ 3-4, 13.)  As to all Advertisers except Hanson, Shadd states that, "[a]ccording to Google's records," the plaintiff accepted the Program Terms, and Google's records do not reflect any attempt by the plaintiff to opt out of the arbitration provision.  (Shadd Dec. ¶¶ 15-20.)  She states: "As of this date, I have not been able to locate any indication that Hanson Law Office accepted the September 2017, April 2018, or November 2019 Terms."  (Shadd Dec. ¶ 21.)  Her declaration annexes various iterations of the Program Terms adopted by Google during the relevant period, which appear to contain a substantially identical arbitration provision.  (ECF 448.)

The statements in the Shadd Declaration go beyond the materials properly considered on a Rule 12(b)(6) motion, which is limited to the contents of the complaint, any documents that are annexed to the complaint or integral to the allegations contained therein, or matters of which a court may take judicial notice.  See, e.g., Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 305 (2d Cir. 2021).  Shadd makes factual assertions about plaintiffs' consent to arbitration based on her own review of Google's records.  She does not annex supporting documentation of plaintiffs' acceptance of the Program Terms or explain how

Google's records are maintained and indexed.  These unsupported factual assertions are not

appropriately considered at the pleading stage.  See generally Meyer v. Uber Techs., Inc., 868

F.3d 66, 76 (2d Cir. 2017) ("Insofar as it turns on the reasonableness of notice, the enforceability

of a web-based agreement is clearly a fact-intensive inquiry.").

Google urges that, in the alternative, its motion should be construed as a motion

to dismiss for improper venue pursuant to Rule 12(b)(3) or a motion to compel arbitration under

the Federal Arbitration Act.  A Rule 12(b)(3) motion is scrutinized under the same standard as a

motion under Rule 12(b)(2), and, when brought on the pleadings, the Court must draw all

reasonable inferences in favor of the plaintiff.  See, e.g., Water Quality Ins. Syndicate v. Nat'l

Pollution Funds Ctr., 2020 WL 417653, at *4 (S.D.N.Y. Jan. 27, 2020) (Engelmayer, J.).  A

court may hold an evidentiary hearing on venue, in which case the plaintiff must demonstrate

venue by a preponderance of the evidence.  Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 355 (2d

Cir. 2005).[6]  "Courts deciding motions to compel [arbitration] apply a standard similar to that

applicable for a motion for summary judgment."  Meyer, 868 F.3d at 74 (quotation marks

omitted).  "[T]he court considers all relevant, admissible evidence submitted by the parties and

contained in pleadings, depositions, answers to interrogatories, and admissions on file, together

with affidavits, and draws all reasonable inferences in favor of the non-moving party."  Id.

(quotation marks, alterations and internal citation omitted).  If an issue of fact exists concerning

the formation of an arbitration agreement, a trial is necessary.  Id.

In response to the motion, plaintiffs state that Google has not produced discovery

relevant to arbitration and instead relies "on the self-serving declaration of an employee . . . ."

---

[6] While some courts have considered the enforcement of an arbitration clause under a Rule 12(b)(3) venue motion, the parties' agreement to arbitrate is more frequently enforced as part of a Rule 12(b)(6) motion or a motion to compel arbitration.

(Opp. Mem. at 24.)  Plaintiffs acknowledge that "certain claims . . . may be arbitrable" but that a more developed record is necessary to resolve arbitrability.  (Id.)

The Court concludes that it is premature to determine arbitrability on the basis of the Shadd Declaration, which is testimonial in nature, does not annex records reflecting any specific plaintiff's consent to arbitration, and makes broad factual averments about Google's implementation and enforcement of the Program Terms.  A more developed factual record is required to adjudicate any plaintiff's consent to arbitration.

Google's motion to dismiss the Advertiser Complaint on the basis of the arbitration clause, or, alternatively, to compel arbitration will be denied without prejudice.

BASED ON THE PARTIES' STIPULATION, THE COURT'S CONCLUSIONS AS TO THE ADVERTISER COMPLAINT ALSO GOVERN THE CLAIMS OF SUNNY SINGH.[7]

Plaintiff Sunny Singh has filed a putative class action complaint that essentially mirrors the claims and theories of liability set forth in the Advertiser Complaint.  (23 Civ. 3651, ECF 1.)  Facebook, Google and Singh filed a Stipulation and Proposed Order agreeing in relevant part that "[a]ny ruling by the Court on the pending motions to dismiss the Advertisers' [complaint], except a ruling regarding issues of individual named plaintiffs' obligations to arbitrate claims against Defendants Google and Alphabet, would be deemed to apply to the Singh Complaint."  (ECF 588-1.)

The Court's reasoning and conclusions as to the Advertiser Complaint apply to Singh's complaint, and the motions to dismiss by Facebook and Google will be granted in part and denied in part.  (ECF 625, 628.)  The Stipulation and Proposed Order will be entered as an Order of this Court.

---

[7] Singh v. Google LLC, et al., 23 Civ. 3651 (PKC).

THE ORGANIC PANACEAS COMPLAINT WILL BE DISMISSED.[8]

   Google moves to dismiss the putative class action complaint filed by Organic Panaceas, LLC, which brings a single claim asserting monopolization of "digital display advertising."  (See 5:21 Civ. 2629 (N.D. Cal.) ECF 1 (Org. Compl't); 21 MD 3010, ECF 457 (motion to dismiss).)[9]  Organic Panaceas did not file a response to Google's motion to dismiss. Because Organic Panaceas has not alleged a relevant product market, antitrust injury or anticompetitive conduct, the motion to dismiss will be granted.

   Organic Panaceas is an online-only business that principally sells hemp-oil products containing CBD, or cannabidiol.  (Org. Compl't ¶ 43.)  It asserts that it attempted to market its business using AdWords, which is Google's buying platform for search-based ads. (Org. Compl't ¶¶ 44, 86.)  AdWords results typically appear in the search results page on the Google search engine, and are intended to connect advertisers with users searching for relevant services.  (Compl't ¶¶ 91, 93.)

   Organic Panaceas experienced an initial boost in traffic after it began to use AdWords, but Google then suspended its ads for violating a policy prohibiting paid ads for CBD products.  (Org. Compl't ¶ 44.)  Organic Panaceas then complained to Google that the suspension seemed arbitrary and capricious because other CBD vendors advertised through Google.  (Org. Compl't ¶ 45.)  The Complaint "specifically acknowledges that, arguably, there are/were potential issues associated with the marketing and sale of products containing CBD." (Org. Compl't ¶ 43.)  It asserts, however, that advertisers who pay for ads on the "Google Shopping" comparative-shopping service, which is featured prominently on Google's search

---

[8] Organic Panaceas v. Google LLC, 21 Civ. 7001 (PKC).

[9] The Organic Panaceas action was filed in the Northern District of California and thereafter administratively consolidated by that court to the docket of the Advertisers' case.  (5:21 Civ. 2629 (N.D. Cal.) ECF 16; 21 Civ. 7001 ECF 142.)

engine results page, are allowed to advertise CBD products  (Org. Compl't ¶¶ 23, 46-49.)  It

asserts that Google relied on a "purported 'policy'" to exclude Organic Panaceas from running

advertisements while permitting other sellers to run ads for the same or similar products, and

"was all but put out of business because of Google's monopolistic use of its 'policies.'"

(Compl't ¶¶ 49, 139.)

Organic Panaceas brings a single claim under section 2, asserting that Google

has "monopoly power in the market for digital display advertising and its component subparts

and services in the United States."  (Org. Compl't ¶ 145.)  It asserts that Google has "abused"

and "leveraged its market dominance in general internet search" to promote its own comparison-

shopping service, and asserts that the markets for "general search services" and "comparison

shopping services" are also two relevant markets to its claim.  (Org. Compl't ¶¶ 88-128.)  It

asserts that Google is "using/implementing its 'policies' in a predatory and exclusionary manner

and rigging auctions that it controlled to its own advantage."  (Org. Compl't ¶ 146.)[10]

The Complaint will be dismissed because it does not plausibly allege a relevant

product market.  "A relevant product market consists of 'products that have reasonable

interchangeability for the purposes for which they are produced – price, use and qualities

considered.'"  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (per curiam)

(quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956)); see also

Chapman v. New York State Div. for Youth, 546 F.3d 230, 237 (2d Cir. 2008) ("For a monopoly

claim '[t]o survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a

rational relation to the methodology courts prescribe to define a market for antitrust purposes –

---

[10] Google urges that the Organic Panaceas Complaint should be dismissed because it agreed to the arbitration clause
contained in the Program Terms.  This argument suffers from the same deficiencies previously discussed in relation
to the Advertisers, and the motion to dismiss or compel arbitration based on the arbitration provision will be denied.

analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible.'") (quoting <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 200 (2d Cir. 2001)).

The sole claim for relief alleges Google's monopoly power "in the market for display digital advertising and its component subparts and services . . . ." (Org. Compl't ¶ 146.) It describes display digital advertising as "the placement of advertisements on other companies' websites." (Org. Compl't ¶ 19.) It does not explain what is entailed by the phrase "component subparts and services . . . ." Unlike the States and other plaintiffs, Organic Panaceas does not premise its claim on defined markets for ad-buying tools for small advertisers and large advertisers, publisher servers or advertising exchanges, and appears to lump these products into the single, catch-all term of "display digital advertising." (<u>See</u>, <u>e.g.</u>, Org. Compl't ¶¶ 2-18.) Elsewhere, Organic Panaceas asserts that the "[r]elevant product markets, for the purposes of this case, are, *inter alia*, the market for general search services and the market for comparative purchasing services." (Org. Compl't ¶ 34.) Organic Panaceas goes into greater detail when describing the "general search services" and "comparative purchasing services" markets (Org. Compl't ¶¶ 88-128), but those markets are not components of the display advertising market that Google purportedly monopolizes. The Complaint's factual allegations have, at most, a tenuous connection to the thinly-alleged product market for display digital advertising and its sole claim for relief. Because Organic Panaceas does not plausibly allege a product market, its complaint will be dismissed.

As a separate grounds for dismissal, the Complaint does not allege an antitrust injury or anticompetitive conduct. Organic Panaceas does not allege that it bought display advertising products and instead alleges that it bought ads through AdWords in an effort to market its business to users of Google's search engine. This product is distinct from buying ads

that were displayed on the site of a third-party publisher or an app.  Because Organic Panaceas does not allege that it was a consumer in the market for display ads, was injured by any alleged anticompetitive conduct related to ad auctions or ad-buying tools, or that its claimed injuries are inextricably intertwined with conduct in such markets, its complaint will be dismissed.  See In re Aluminum Warehousing Antitrust Litig., 833 F.3d at 158.

Further, the claim of Organic Panaceas amounts to little more than the assertion that Google selectively enforced its policy against advertisements for CBD products.  The plaintiff itself has "specifically acknowledge[d] that, arguably, there are/were potential issues associated with the marketing and sale of products containing CBD."  (Org. Compl't ¶ 43.)  Such selective enforcement is not anticompetitive conduct.  See, e.g., Dreamstime.com, LLC v. Google LLC, 54 F.4th 1130, 141 (9th Cir. 2022) ("selective enforcement" of policies in Google Ads "is not enough to state a claim under Section 2.").

The motion to dismiss the Organic Panaceas Complaint will be granted.

THE SPX COMPLAINT WILL BE DISMISSED IN ITS ENTIRETY.[11]

Three advertiser plaintiffs bring a putative class action complaint asserting that the NBA violated section 1.  (ECF 433.)  Mint Rose Day Spa LLC, SkinnySchool LLC d/b/a Maria Marques Fitness SkinnySchool and SPX Total Body Fitness LLC d/b/a The Studio Empower (collectively, "SPX Plaintiffs") assert that Google gave Facebook unfair anticompetitive advantages through the NBA in exchange for Facebook halting its participation in header bidding, which Google viewed as a threat to its dominance in the markets for publisher ad servers and ad exchanges.  (SPX Compl't ¶¶ 118-321.)

---

[11] SPX Total Body Fitness LLC v. Google LLC, 21 Civ. 6870 (PKC); SkinnySchool LLC, et al. v Google LLC, 21 Civ. 7045 (PKC).

The three plaintiffs allege that they "purchased display advertisements on Facebook . . . ."  (SPX Compl't ¶¶ 23-25.)  They do not allege that they used Google's ad-buying tools to purchase display ads or that they bought in-app display ads using the networks of Facebook or Google.  Thus, their participation in the market for online digital ads is limited to purchasing display ads on Facebook.  Facebook is not named as a defendant in the SPX Complaint.

The claims of the SPX Plaintiffs parallel those of the States and the Advertisers, and, like the Advertisers, they emphasizes the horizontal characteristics of the NBA.  SPX Plaintiffs assert that Google granted Facebook "special advantages" in auctions a quid pro quo to abandon header bidding, including a discount on exchange fees, a speed advantage, and unique user information to limit spam impressions.  (SPX Compl't ¶¶ 227-72.)  They assert that Google and Facebook manipulate the auction process for in-app inventory and operated like "a traditional buying cartel" that artificially depressed the prices paid to app developers through Google's in-app mediation tool.  (SPX Compl't ¶¶ 273-313.)  The SPX Complaint alleges that the NBA was a contract, combination and conspiracy that unreasonably restrained trade and harmed competition in violation of section 1.  (SPX Compl't ¶¶ 357-63.)

The Complaint will be dismissed because the SPX Plaintiffs do not plausibly allege antitrust standing.  Assuming arguendo that the SPX Complaint alleges a harm to competition, it primarily describes injuries to app developers who sold ad inventories through the Google and Facebook networks and advertisers who purchased impressions through ad networks.  It does not plausibly allege an antitrust injury to the SPX Plaintiffs.  The gist of the SPX Plaintiffs' claim is that in exchange for abandoning its participating in header bidding, Facebook agreed to accept unique auction advantages given by Google to the FAN.  (SPX Compl't ¶¶ 209-

321.)  Beginning in 2020, the FAN "effectively left the market for web display advertising" and primarily participated in the auctions for in-app ad inventory.  (SPX Compl't ¶¶ 273-74.)  The SPX Complaint describes purported competitive harm in the auctions for in-app ad inventory.  (SPX Compl't ¶¶ 273-321.)  "The expected effect of a side-deal like this between rival buyers is to depress the prices paid to [app] developers" while giving Google and Facebook "the power to exclude rival networks and raise the prices at which Google and Facebook resold in-app impressions to advertisers."  (SPX Compl't ¶¶ 288, 303.)  Because the NBA "applies only to third-party developer inventory" it has the effect of "excluding any impressions that would be displayed on Google or Facebook's own properties."  (SPX Compl't ¶ 296.)

The SPX Plaintiffs assert that they purchased display advertisements on Facebook – not that they bought display ads or in-app ads through a Facebook network-buying tool, or any other buying tool.  (See SPX Compl't ¶¶ 23-25.)  The SPX Plaintiffs make the conclusory allegation that they suffered antitrust injury because Google's conduct "increased advertisers' costs to advertise and reduced the effectiveness of their advertising . . . ."  (SPX Compl't ¶ 342.)  But the Complaint includes no allegations that explain why that would be the case.  The SPX Complaint expressly states that the NBA "applies only to third-party developer inventory" (SPX Compl't ¶ 296), which would seemingly exclude directly-sold impressions on Google and Facebook's own properties.  The SPX Plaintiffs do not assert that they participated in ad-exchange auctions or placed ads through header bidding.  They do not describe any relationship between the ads bought on Facebook and the effects of the NBA.  The SPX Plaintiffs therefore have not alleged facts that would identify how they are in a worse position as a consequence of the NBA, and therefore fail to allege antitrust injury.  See IQ Dental Supply, 924 F.3d at 63.

The SPX Complaint also does not plausibly allege why these plaintiffs are efficient enforcers of the antitrust laws.  Assuming that the SPX plaintiffs suffered a downstream harm by paying artificially inflated prices for display ads that ran on Facebook, other parties are far better suited to pursue such plaintiffs' claim, including government plaintiffs, app developers, publishers, and advertisers who used ad-buying tools and in-app networks.  See Gelboim, 823 F.3d at 772, 778-80.  Any injury caused to the SPX plaintiffs when they purportedly overpaid Facebook directly for ads that ran on Facebook itself are also remote, speculative and difficult to allocate.  See id.

The SPX Complaint is separately dismissed because it does not plausibly allege a section 1 claim.  The SPX Complaint does not advance a theory of section 1 liability that varies in any meaningful way from the States' unsuccessful claim directed to the NBA.  The SPX Plaintiffs' reliance on Klein v. Meta Platforms, Inc., 2022 WL 17477101 (N.D. Cal. Dec. 6, 2022), is unavailing, as that decision involved a "market for social advertising" not at issue here, and denied a motion to dismiss based on timeliness.  For the reasons discussed in the 2022 Opinion, as well as the reasons set forth for dismissing the Advertisers' claim directed to the NBA, the SPX Complaint fails to plausibly allege a section 1 claim.

The SPX Complaint will therefore be dismissed.

THE MOTION TO DISMISS PORTIONS OF THE PUBLISHERS' CONSOLIDATED COMPLAINT WILL BE GRANTED IN PART AND DENIED IN PART.[12]

## I.        Overview of the Publisher Complaint.

Six online publishers (the "Publishers") have filed a putative class action complaint that includes two claims under the Sherman Act.  (21 Civ. 7034, ECF 131 (the "Publisher Complaint").)  All Publishers assert that they used Google's publisher ad server

---

[12] In re: Google Digital Publishing Litigation, 21 Civ. 7034 (PKC).

products to sell display advertising on their websites and paid artificially inflated fees and received artificially depressed ad revenues as a result of Google's alleged anticompetitive conduct.  (Pub. Compl't ¶¶ 46-51.)  Five of the Publishers also assert that they received bids from Google's ad network, known as the Google Display Network.  (Pub. Compl't ¶¶ 47-51.)  In addition to bringing claims against Google and Alphabet, YouTube, LLC ("YouTube") is a defendant in this case.  (Pub. Compl't ¶ 54.)  The Publishers allege that the three defendants are operated and controlled as a single entity.  (Pub. Compl't ¶¶ 52, 55.)  The Publishers make no allegations that are unique to YouTube and its video platform.

The Publisher Complaint largely tracks claims that the Court upheld in the 2022 Opinion, but it alleges three new initiatives that the Publishers urge violated section 2.  (Compl't ¶¶ 332-56.)  It also brings a claim directed to Google's use of encrypted user IDs, which contains some overlap with an unsuccessful theory of section 2 liability previously asserted by the States.

Count 1 brings a tying claim under sections 1 and 2, and asserts that Google unlawfully tied its AdX ad exchange to the DFP ad server.  (Pub. Compl't ¶¶ 392-401.)  Count Two brings a claim under section 2, and asserts that Google unlawfully maintained and enhanced monopoly power in the markets for publisher ad servers, ad exchanges, ad-buying tools, advertiser networks and search-advertising tools.  (Pub. Compl't ¶¶ 402-07.)  Count Two incudes nine categories of alleged monopolistic practices that the Court considered and upheld in the 2022 Opinion.  (Pub. Compl't ¶¶ 248-331.)  It also alleges that Google engaged in three additional categories of misconduct that unlawfully abused its monopoly power in the markets for ad servers, ad networks and search advertising for the sole purpose of damaging competition.  (Pub. Compl't ¶¶ 332-356.)

I.       Overview of Certain Market Definitions.

The Publishers assert that Google has monopoly power in seven product

markets: publisher ad servers, ad exchanges, ad networks, ad-buying tools for large advertisers,

ad-buying tools for small advertisers, and online search advertising.  (Pub. Compl't ¶¶ 113-93.)

The Publisher Complaint uses market definitions that are broadly consistent with those alleged in

the State Complaint and other pleadings.  The Court will summarize the Publishers' allegations

of the markets for ad networks and online search advertising.

The Publisher Complaint uses the broad label "publisher tool markets" to

describe the markets for ad servers, ad exchanges and ad networks.  (Pub. Compl't ¶¶ 112-20.)

Ad networks are described as performing a function that is somewhat similar to ad exchanges.

(Pub. Compl't ¶¶ 119-20.)  Ad networks are used by small and medium-sized publishers that

cannot satisfy the impression requirements of ad exchanges.  (Pub. Compl't ¶¶ 119.)  Some ad

networks focus on specialized inventory, such as ads for cars or fashion, or video ads.  (Pub.

Compl't ¶ 179.)  Instead of using the targeting and bidding features of ad exchanges, ad network

placements are based on a pool of advertising inventory; publisher ad servers may look to ad

networks to fill inventory, separate from transacting on ad exchanges.  (Pub. Compl't ¶ 120.)

The Publishers assert that ad networks are not substitutable for ad exchanges, ad servers or ad-

buying tools, because they do not provide reasonably comparable services.  (Pub. Compl't ¶

120.)  They assert that Google has monopoly power in the ad network market, and transacts

approximately 70 to 80 percent of impressions sold through ad networks.  (Pub. Compl't ¶¶ 175-

80.)

The Publishers describe online search advertising as an "adjacent relevant

market."  (Pub. Compl't ¶¶ 153-57.)  It consists of ads generated in response to online search

queries, including ads that appear on generalized search engines like Bing and Google, and specialized ads that appear on sites like Amazon, Expedia or Yelp.  (Pub. Compl't ¶ 153.) Search ads respond to consumer inquiries as they explore a subject or product, and are considered valuable because they align with a consumer's interests.  (Pub. Compl't ¶ 154.)  The Publishers assert that other forms of advertising are not substitutable because they do not target consumers in response to their specific, relevant inquiries, and are more remote from the consumer's point of purchase.  (Pub. Compl't ¶ 155.)  They assert that Google has monopoly power in the market for search advertising, with a market share of at least 70 percent.  (Pub. Compl't ¶¶ 191-93.)

## II.    The Publishers' New Theories of Section 2 Liability.

### A.   The Complaint Plausibly Alleges that "Minimum Bid to Win" Violated Section 2.

The Publishers assert that Google used its monopoly power in the market for publisher ad servers to compile bidding data submitted by advertisers.  (Pub. Compl't ¶¶ 343, 346.)  Google used this information to enable advertisers to win ad impressions "with the lowest bid possible" if advertisers placed their bids on AdX under an initiative called "Minimum Bid to Win" or "MBW."  (Pub. Compl't ¶ 343.)  MBW required the cooperation of advertisers, who supplied their bids knowing that Google would use them to develop the MBW algorithm.  (Pub. Compl't ¶ 343.)  MBW was intended to "starve" header bidding and enhance Google's monopoly power in the markets for ad exchanges and ad-buying tools.  (Pub. Compl't ¶ 343.)

Google implemented MBW as it transitioned from running a second-price auction to a first-price auction.  (Pub. Compl't ¶¶ 344-45.)  The Publishers describe MBW as "a bid shading algorithm that allows advertisers to bid confidently knowing that their bid will be no higher than needed to win a first-price auction."  (Pub. Compl't ¶ 345.)  As described by the

Publishers, Google was able to use its monopoly power in the market for publisher ad servers to amass bidding data across all ad exchanges, then calculate the minimum price that advertisers using its ad-buying tools should pay in order to win a first-price auction on AdX.  (Pub. Compl't ¶¶ 346-47.)  This information allegedly drove advertisers to use AdX and Google's ad-buying tools while curbing participation in header bidding.  (Pub. Compl't ¶ 348.)  This depressed publisher revenues and competition between ad exchanges and ad-buying tools, while allowing Google to increase its margins by charging advertisers more to access its ad-buying tools.  (Pub. Compl't ¶ 349.)

        The Publishers assert that MBW worked in tandem with Google's enforcement of uniform price floors, thus preventing publishers from receiving a fair market price when selling their impressions.  (Pub. Compl't ¶¶ 350-52.)  In a competitive market, a publisher would impose a higher price floor on an ad exchange that participated in bid shading through a practice like MBW.  (Pub. Compl't ¶¶ 350-51.)  But because Google required publishers to set uniform price floors across exchanges, publishers were unable to adjust their price floors to AdX in order to force an advertiser to bid the full market value for an impression.  (Pub. Compl't ¶¶ 351-52.)  MBW had the effect of leveraging information gained from publisher ad servers to depress revenues paid to those same publishers for ad impressions.  (Pub. Compl't ¶ 346.)

        Google urges that the Publishers have not alleged a plausible section 2 claim because their complaint describes ways that MBW enhanced competition and benefited consumers.  According to Google, the Publishers' own complaint states that advertisers volunteered to use their bids to develop the MBW algorithm, and that the informational advantages provided through MBW "drove" advertisers to use AdX and Google's ad-buying tools instead of participating in header bidding.  (Def. Mem. at 4.)  The Publishers alleged a

36

superior result for advertiser clients, who could win an impression through the lowest possible price, instead of placing an unnecessarily inflated bid against a rival advertiser.  (Id. at 4-5.) Google urges that MBW gained sales from header bidding through a superior product.  (Id. at 4-5.)

The Court concludes that the Publishers have plausibly alleged a violation of section 2.  The Complaint plausibly alleges that, using bid data obtained through the publisher ad servers and the historical bids of advertisers, MBW worked in combination with uniform price floors to artificially depress the bids for publisher impressions.  It is true that, as Google argues, the Publisher Complaint describes product enhancements that benefited *advertisers*.  But Google also had monopoly power in the market for publisher ad servers, and the Publisher Complaint plausibly describes how Google used its power in that market – as well as the market for ad exchanges – to prevent *publishers* from competing across ad exchanges to sell impressions at a more advantageous price set by the market.  In a competitive market for publisher ad servers, Google would be incentivized to obtain the best possible price for publisher ad impressions in order to benefit itself and its publisher clients, and not depress prices for the benefit of its market position in ad exchanges and ad-buying tools.  The Publishers have plausibly explained how Google used its market dominance to benefit consumers of its ad-buying tools at the expense of consumers of its publisher ad servers.

Google's motion to dismiss the section 2 claim directed to MBW will therefore be denied.

B.  The Publishers' Section 2 Claim Directed to Google's Detection of
    "Problematic Code" Will Be Dismissed.

The Publishers assert that Google unlawfully used its monopoly power in publisher ad servers to block the attempts of non-Google ad networks to place bids on publisher

inventory.  Accepting the Publishers' factual allegations as true, they describe incidents where non-Google ad networks were unable to bid on impressions through Google's ad servers, but they do not allege facts to support the assertion that Google flagged "malicious code" as an anticompetitive pretext or that Google's conduct otherwise rose to the level of a section 2 violation.

According to the Publishers, the Google ad server sometimes thwarts the bids of rival, non-Google ad networks by alerting a publisher of "a problem" with the code of the non-Google network.  (Pub. Compl't ¶ 355.)  Google's ad server will then remove the code of that rival network, precluding the network from competing for the publisher's impressions.  (Pub. Compl't ¶ 355.)  The affected publisher and rival ad network required "hours of labor" and "extensive work" to resubmit the purportedly defective code.  (Pub. Compl't ¶ 355.)  This strained the publisher's business relationship with the rival network and prevented that network from bidding on publisher impressions.  (Pub. Compl't ¶ 355.)

The Publishers assert that this was a "recurring practice" of Google's ad server.  (Pub. Compl't ¶ 356.)  They assert that rival ad networks were harmed because they incurred needless costs to access Google's ad server, and that publishers were harmed because they were unable to access ad networks that may have outbid the Google ad network.  (Pub. Compl't ¶ 356.)  They assert that Google used its monopoly power in the market for publisher ad servers to enhance and maintain monopoly power in the market for ad networks.  (Pub. Compl't ¶ 356.)

The Publishers include no facts to support the conclusory assertion that Google acted "[u]nder the false pretext of controlling problematic code . . . ."  (Pub. Compl't ¶ 355.)  They do not allege facts that support an inference that Google was not monitoring and controlling for actual, bona fide technical concerns.  The complaint states the Publishers and

non-Google ad networks "required extensive work and hours of labor" to address Google's concerns (Pub. Compl't ¶ 355), but they do not allege facts showing that the underlying issues flagged by Google involved harmless or routine lines of code. It does not describe any facts to support the inference that Google's concerns about code were baseless or pretextual, or that it enforced a policy about "problematic code" in a selective or unpredictable way.

The Publisher Complaint also does not allege facts that raise an inference that "problematic code" was flagged in a way that disrupted competition between ad networks, as opposed to isolated or limited incidents. It does not allege whether Google flagged such code on isolated occasions or whether it affected a wide array of Publishers on a frequent basis. While the repair of problematic code was time consuming and may have had collateral consequences to the Publishers, they have not plausibly alleged facts showing that the codes were not, in fact, problematic. Drawing every reasonable factual inference in favor of the Publishers, they do not plausibly allege a course of conduct that caused harm to competition. See, e.g., Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993) ("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.") (collecting cases).

The Publishers' claim directed toward Google's monitoring of "problematic code" will be dismissed.

### C. The Publishers Do Not Plausibly Allege a Tying Claim Based on the "Search+" Product and Related Products.

The Publishers bring a section 2 claim on the theory that Google acquired and maintained monopoly power in publisher ad servers and ad networks by channeling unspent search-advertising dollars to the purchase of display ads via the Google Display Network

("GDN").  (Pub. Compl't ¶¶ 334-42.)  Their complaint does not expressly label the practice as a "tie," but states that Google "funnel[ed]" and "bundled" search advertising dollars to GDN.  (¶¶ 335-36.)  In its motion to dismiss, Google urges that the Publishers have not plausibly alleged a tying claim, and the Publishers' response describes Google's practices concerning search advertising and GDN as "an unlawful tie."  (Pub. Resp. at 15.)  The Court accordingly construes the Publishers allegations as an attempt to allege an unlawful tying arrangement.

Because the Publishers do not plausibly allege that Google coercively tied its search advertising product to its ad network, Google's motion to dismiss will be granted.  "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 461 (1992) (quoting Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5-6 (1958)). "To state a valid tying claim under the Sherman Act, a plaintiff must allege facts plausibly showing that: (i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market." Kaufman v. Time Warner, 836 F.3d 137, 141 (2d Cir. 2016); accord E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 31 (2d Cir. 2006).

The Publishers' claim is premised on Google's dominance in the market for search advertising and advertisers' strong demand for a limited number of search ads.  According to the Publishers, Google controls more than 70% of the market in online search advertising.

(Pub. Compl't ¶ 334.)  The demand for search ads has historically exceeded available ad space, leaving some search-only advertisers with unspent ad budgets.  (Pub. Compl't ¶ 338.)  The Publishers assert that Google has used that demand "to funnel search advertising dollars into display advertising on its own Ad Network," which damaged competition in the markets for publisher ad servers and ad networks.  (Pub. Compl't ¶ 335.)  They assert that via certain initiatives, Google redirected the unspent budgets of search-only advertisers to automatically buy display ads on the GDN, which effectively "bundled its monopoly-controlled online search advertising with display advertising on the [GDN]."  (Pub. Compl't ¶ 336.)  The GDN is described as a "significant" purchaser on AdX.  (Pub. Compl't ¶ 336.)  According to Publishers, these initiatives primarily affected small and mid-sized advertisers, and created a new pool of display advertising demand that was exclusively controlled by Google through GDN and AdX. (Pub. Compl't ¶ 336.)

        The Publishers assert that Google began to implement this scheme in 2011, when GDN traffic saw a significant decline.  (Pub. Compl't ¶ 337.)  Google implemented a program called "Search+" or "Display Expansion for Search."  (Pub. Compl't ¶ 338.)  Search+ diverted search advertisers' unspent dollars to display ads purchased via GDN.  (Pub. Compl't ¶ 338.)  It was first implemented as an opt-in program for search advertisers, but, by 2018, advertisers were enrolled by default.  (Pub. Compl't ¶¶ 339, 341.)  In 2017, Google introduced "Smart Campaigns" as an extension of Search+ that was implemented on all new accounts.  (Pub. Compl't ¶ 341.)  Enrollment was not mandatory, however, because advertisers could "escape" from enrollment in Smart Campaigns "to see other campaign accounts . . . ."  (Pub. Compl't ¶ 341.)

The Publishers assert that Google's ad server "became a must-have product for publishers" because Google required publishers to use its ad server to sell impressions on GDN. (Pub. Compl't ¶ 342.)  They state that through Google's program of diverting search advertisers' unspent money solely to GDN, it successfully restrained competition in the markets for ad networks, ad exchanges and publisher ad servers.  (Pub. Compl't ¶ 342.)

The Publishers do not plausibly allege a tying claim.  Their complaint does not allege that search advertisers were required to spend their excess ad budgets on GDN products, and expressly acknowledges that when Google's initiatives went from the opt-in condition of Search+ to the automatic-enrollment condition of Smart Campaigns, advertisers could still "escape" from enrollment.  (Pub. Compl't ¶¶ 339, 341.)  While advertisers purchasing online search or display advertising may vary in size and sophistication, they bear little resemblance to ordinary consumers claiming to have been hoodwinked by an opaque and cumbersome opt-out process.  The Publishers do not identify "actual coercion" that required search advertisers to direct extra spend into GDN or Google's ad-buying tools, or plausibly allege that use of any tied product was required to access search advertising.  Kaufman, 836 F.3d at 141.

The Publisher Complaint also does not allege that Google prevented search advertisers from using non-Google ad-buying tools or ad networks.  Based on the Publishers' allegations, an advertiser was free to buy search advertising through Google but buy display impressions through a competitor, or stay out of the display-advertisement space altogether. From the face of the Publisher Complaint, it is not apparent why the eventual success of GDN was not due to customer preference and convenience, and the quality of the product.  The Complaint describes a hypothetical situation where a restaurant in Omaha pays Google for search advertising and its unspent ad money was diverted to display ads on TripAdvisor when a

relevant user later browsed for Omaha hotels.  (Pub. Compl't ¶ 338.)  These allegations do not

describe an unlawful tie, but a convenient and effective complement to Google's search-

advertising business from which an advertiser was permitted to opt out.

The Publishers' claim directed to Search+ will be dismissed.

III.     To the Extent that Google Moves to Dismiss the Publishers' Factual
         Allegations about the Use of Encrypted IDs, the Motion Will Be Denied.

Count 1 of the Publishers' Complaint asserts a tying claim.  (Pub. Compl't ¶¶

392-401.)  Regarding AdX and the DFP ad server, it alleges two ties that are described as

complementary and mutually reinforcing: that Google tied its AdX exchange to the DFP ad

server and also tied to DFP ad server to the AdX exchange.  (Pub. Compl't ¶ 393.)  In the 2022

Opinion, the Court concluded that the States had plausibly alleged that Google used its

monopoly power in the ad-exchange market to coerce publishers into using the DFP ad server,

and therefore alleged an unlawful tie.  627 F. Supp. 3d at 367-70.

The 2022 Opinion separately concluded that the States had failed to plausibly

allege a section 2 claim based on Google's use of encrypted user IDs.  Id. at 381-83.  Google's

DFP ad server assigns unique user IDs to site visitors and it shares those IDs only with Google's

own AdX exchange and ad-buying tools.  See id. at 381-82.  The Court concluded that the States

did not plausibly allege that the Sherman Act required Google to disclose to competitors the

encrypted user IDs generated by its ad server, and that the States' Complaint did not allege

irrational or unprofitable anticompetitive behavior in Google's use of encrypted IDs.  Id. at 382-

83.

In asserting an unlawful tie of the DFP ad server as the tying product to AdX as

the tied product, the Publishers list several different categories of challenged practices, including

Dynamic Allocation, EDA and Dynamic Revenue Sharing.  (Pub. Compl't ¶¶ 205-06.)  It also

asserts that Google's encryption of user IDs generated by the DFP ad server was one aspect of the tying arrangement because it channeled publishers using the DFP server into transactions on AdX, as opposed to competing for bids on third-party exchanges.  (Pub. Compl't ¶¶ 207, 212, 215-17.)

Google moves to dismiss the Publishers' tying claim to the limited extent that it alleges that the encryption of user IDs constituted a tie of the DFP ad server to AdX.  But in contrast to the States, the Publishers do not allege that encryption of user IDs was a violation of section 2 under a refusal-to-deal theory.  The Publishers point to encrypted IDs as one of several practices that reinforced the purported tie between the DFP ad server and AdX.  True, there is some factual overlap between the Publishers' allegations about ID encryption and the section 2 claim unsuccessfully pleaded by the States, but here, the Publishers do not assert that encryption was itself unlawfully anticompetitive.  Google does not urge that the Complaint has failed to allege an unlawful DFP-AdX tie, and essentially moves to strike certain supporting factual allegations going toward the tie.

The Publishers' allegations about the use of encrypted IDs  goes toward the plausibility and functioning of the claimed tie.  Google's motion to dismiss the allegations about encrypted IDs will be denied.

THE MOTIONS TO DISMISS THE NEWSPAPER COMPLAINT WILL BE TERMINATED AS MOOT.

Twenty-five newspapers brought individual actions against Google and Facebook and set forth their claims in a single, consolidated amended complaint (the "Newspaper Complaint").[13]  (ECF 401.)  Google and Facebook moved to dismiss the Newspaper Complaint. (ECF 451, 462.)  While their motions were sub judice, each of the Newspaper Plaintiffs filed a Notice of Voluntary Dismissal Without Prejudice.  (ECF 671-674, 677-679, 699.)  Because the Newspaper Plaintiffs have voluntarily dismissed their claims, defendants' motions to dismiss will be terminated as moot.

THE MOTION TO DISMISS PORTIONS OF THE DAILY MAIL COMPLAINT WILL BE GRANTED.[14]

    I.      Overview of the Daily Mail Complaint.

Plaintiffs Associated Newspapers Ltd. and Mail Media, Inc. publish the online newspaper MailOnline, which is branded as "Daily Mail."  (DM Compl't ¶ 1 (ECF 400).)  The Court will refer to these plaintiffs collectively as Daily Mail.  Daily Mail claims to be the world's most popular English-language news website, with 225 million monthly unique visitors, including 75 million United States visitors.  (DM Compl't ¶¶ 1-2.)  Daily Mail sells display

---

[13] AIM Media Ind. Operating, LLC v. Google LLC, 21 Civ. 6912 (PKC); AIM Media Midwest Operating, LLC v. Google, LLC, 21 Civ. 6884 (PKC); AIM Media Tex. Operating, LLC v. Google, LLC, 21 Civ. 6888 (PKC); Appen Media Group, Inc. v. Google, LLC, 22 Civ. 9810 (PKC); Brown Cnty. Publ'g Co. v. Google, LLC, 21 Civ. 6915 (PKC); Capital Region Indep. Media LLC v. Google LLC, 22 Civ. 6997 (PKC); Clarksburg Publ'g Co. d/b/a WV News v. Google LLC, 21 Civ. 6840 (PKC); Eagle Printing Co. v. Google LLC, 21 Civ. 6817 (PKC); Gale Force Media, LLC v. Google, LLC, 21 Civ. 6909 (PKC); Gould Enters., Inc. v. Google, LLC, 22 Civ. 1705 (PKC); HD Media Co., LLC v. Google, LLC, 22 Civ. 1705 (PKC); Journal Inc. v. Google, LLC, 21 Civ. 6828 (PKC); Neighborhood Newspapers, Inc. v. Google LLC, 21 Civ. 10188 (PKC); Rome News Media LLC v. Google LLC, 21 Civ. 10188 (PKC); Something Extra Publ'g, Inc. v. Google, LLC, 21 Civ. 9523 (PKC); Southern Cmty. Newspapers, Inc. v. Google, LLC, 22 Civ. 1971 (PKC); Times Journal, Inc. v. Google, LLC, 21 Civ. 10187 (PKC); Coastal Point LLC v. Google LLC, 21 Civ. 6824 (PKC); Emmerich Newspapers, Inc. v. Google, LLC, 21 Civ. 6794 (PKC); Flag Publications, Inc. v. Google LLC, 21 Civ. 6871 (PKC); Robinson Communications, Inc. v. Google, LLC, 21 Civ. 8032 (PKC); Savannah Publishing Co. v. Google, LLC, 22 Civ. 1693 (PKC); Union City Daily Messenger, Inc. v. Google, LLC, 22 Civ. 1704 (PKC); Weakley Cnty. Press, Inc. v. Google, LLC, 22 Civ. 1701 (PKC).

[14] Associated Newspapers Ltd., et al. v. Google LLC, et al., 21 Civ. 3446 (PKC);

advertisements using the DFP ad server, and it refers to AdX as its "primary exchange." (DM Compl't ¶ 36.)

Count 2 of Daily Mail's complaint asserts monopolization in the market for ad exchanges. (DM Compl't ¶¶ 246-49.) Google moves to dismiss portions of Count 2, urging that it re-asserts certain theories of liability that the Court dismissed in the 2022 Opinion. Daily Mail also brings two new theories of liability premised on the purported leveraging of Google's power in the general search market.

## II.    Daily Mail Does Not Allege a Section 2 Violation Based on Google's Implementation of Exchange Bidding.

One of Daily Mail's theories of section 2 liability asserts that Google implemented exchange bidding (also known as "open bidding") in an effort to maintain its ad-server and ad-exchange monopolies. (DM Compl't ¶¶ 158-64.) Google launched exchange bidding in 2018 as a response to the popularity of header bidding. (DM Compl't ¶ 158.) Through exchange bidding, multiple ad exchanges could take bids on publisher inventory in competition with AdX, but AdX alone was able to identify the end-user who would see the ad. (DM Compl't ¶ 159.) The win rate for AdX was double the rate of rival exchanges, but, according to Daily Mail, Google's goal was to "kill" header bidding, not to gain revenue through exchange bidding. (DM Compl't ¶¶ 161-62.)

Daily Mail asserts that Google "coerce[d]" publisher clients into abandoning header bidding in favor of exchange bidding, including through the introduction of AMP, thus limiting the DFP server's ability to accept bids through header bidding and redacting information that allowed publishers to compare the results of header bidding versus exchange bidding. (DM Compl't ¶ 163.) It also asserts that Google has attempted to "cajole" publishers into participating in exchange bidding rather than header bidding, citing to "strain" on Google's servers. (DM

Compl't ¶ 163.)  But elsewhere in the complaint, when describing alleged anticompetitive conduct related to Google's general search business, Daily Mail states that it has "continued — and continues to this day — to use client-side header bidding at higher rates than Exchange Bidding, and for an increasing number of non-Google exchanges."  (DM Compl't ¶ 224.)

The 2022 Opinion dismissed the States' similar claim directed to the implementation of exchange bidding:

> [T]he Complaint describes Exchange Bidding as a voluntary venture, one that arose as a response to the popularity and innovation of header bidding. Exchange Bidding allowed non-Google exchanges – and indirectly those advertisers submitting bids through those exchanges – to participate in auctions, a move that tended to increase competition for publisher ad inventory. If a non-Google exchange, which presumably would be sophisticated in the nature and operation of an ad exchanges, chose to participate in Exchange Bidding, this benefitted publishers, the non-Google ad exchange and the users of the non-Google exchange. If Google inadequately or deceptively described its pricing or any part of its Exchange Bidding process, that may be actionable under a State deceptive practice law; without a plausible explanation of how it harmed competition, it is not actionable under section 2.

627 F. Supp. 3d at 394-95.

It appears that Daily Mail is attempting to improve the States' earlier allegations by purporting to identify coercion and cajoling by Google.  (DM Compl't ¶ 163.)  These assertions are belied by Daily Mail's own, conflicting assertion that it continues to use header bidding at higher rates than exchange bidding and for an "increasing" number of non-Google exchanges.  (DM Compl't ¶ 224.)  Daily Mail does not plausibly allege coercion by Google, and has not alleged other additional facts that would distinguish its exchange bidding claim from the one brought by the States.

Daily Mail's section 2 claim directed to Google's exchange bidding initiative will be dismissed.

III.     Daily Mail Does Not Allege a Section 2 Claim Based on Google's Use of Encrypted IDs.

Like the States, Daily Mail asserts that Google's encryption of user IDs was a Sherman Act violation.  (DM Compl't ¶¶ 108-13.)  Daily Mail recounts Google's acquisition of DoubleClick, its subsequent decision to encrypt user IDs generated by the DFP ad server, the fact that user IDs can only be identified by AdX, and asserts that Google's invocation of user privacy is a mere pretext for the abuse of monopoly power.  (DM Compl't ¶¶ 108-13.)

Daily Mail's claim directed to the encryption of user IDs will be dismissed for substantially the same reasons stated in the 2022 Opinion, 627 F. Supp. 3d at 381-83.  Daily Mail's claim differs from the States principally in the assertion that, as a publisher, it has a contractual right to own data acquired through DFP and AdX, and that by preventing Daily Mail from sharing user IDs with non-Google ad servers and ad exchanges, Google engages in anticompetitive conduct.  (DM Compl't ¶ 109.)  This may support a contract-related claim, but it does not go to Google's competitive obligation to share an encrypted ID with rivals and whether Google's privacy justifications were merely pretextual, as Daily Mail and the States have claimed.  See 627 F. Supp. 3d at 381-83.

Daily Mail's claim directed to the encryption of user IDs will be dismissed.

IV.     Daily Mail's Leveraging Claim Will Be Dismissed.

A.     Daily Mail Does Not Plausibly Allege that Google Leveraged Its Search Monopoly to Coerce the Adoption of AMP.

Daily Mail asserts that Google leverages its monopoly power in the market for general search to coerce publishers to post in AMP.  (DM Compl't ¶¶ 202-12.)  Daily Mail

separately asserts that Google has leveraged its power in general search to "punish" it for setting

high price floors on AdX, and dropped its search rankings as more of its impressions cleared on

rival ad exchanges.  (DM Compl't ¶¶ 213-25.)

      "Within the context of § 2 claims, the Supreme Court has recognized the

impropriety of monopoly leveraging, i.e., the use of monopoly power in one market to strengthen

a monopoly share in another market."  Virgin Atlantic Airways Ltd. v. British Airways PLC, 257

F.3d 256, 272 (2d Cir. 2001).  A plaintiff must plausibly allege that the defendant "(1) possessed

monopoly power in one market; (2) used that power to gain a competitive advantage . . . in

another distinct market; and (3) caused injury by such anticompetitive conduct."  Id. at 272.  The

plaintiff must also allege "a 'dangerous probability of success' in monopolizing a second market

. . . ."  Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 415 n. 4

(2004).

      The 2022 Opinion dismissed the States' section 2 claim alleging that Google's

creation of AMP was an anticompetitive measure intended to thwart header bidding and exclude

rival exchanges.  627 F. Supp. 3d at 398-99.  Daily Mail similarly asserts that Google

implemented AMP to drive publishers away from header bidding and give an unfair advantage to

AdX.  (DM Compl't ¶ 206.)  Daily Mail asserts that about 70% of its traffic comes from mobile

views, and that approximately 20% of these mobile views (or 14% overall) comes through a

Google referral, making Google the site's largest traffic source.  (DM Compl't ¶ 202.)  In 2016,

Google unveiled a "news carousel" at the top of its results page.  (DM Compl't ¶ 203.)  The

news carousel drove more mobile search traffic than the links that appeared lower on the user's

screen.  (DM Compl't ¶ 203.)  But a publisher would only be included in the news carousel if it

used AMP.  (DM Compl't ¶¶ 203-04.)  Daily Mail asserts that AMP made for a worse user

experience and forced publishers to transact impressions on AdX, and that the goal of faster page-load times was merely pretextual.  (DM Compl't ¶¶ 205-06, 212.)  According to Daily Mail, it was forced to choose between foregoing AMP and experiencing lower site traffic or adopting AMP and earning less ad revenue.  (DM Compl't ¶ 206.)

Daily Mail adopted AMP, and after 18 months of transacting sales through AdX, it developed a "workaround" to engage in header bidding on AMP pages, leading to higher ad revenue and fewer impressions transacted on AdX.  (DM Compl't ¶ 207.)  But Google then disabled this function and introduced exchange bidding and "Real Time Config," both of which channeled impressions through AdX.  (DM Compl't ¶¶ 208-09.)  Daily Mail asserts that AMP remains incompatible with header bidding, and that it can only sell ad inventory through means that give an unfair advantage to AdX, resulting in artificially depressed revenue and decreased ad-exchange competition.  (DM Compl't ¶¶ 210-11.)

Daily Mail's leveraging claim turns on the effect that Google's news carousel had on referral traffic.  It asserts that the news carousel had such a strong effect on referral traffic that Daily Mail had no choice but to adopt AMP.  But the complaint makes no allegations about the volume of referral traffic from the news carousel versus the volume of search referrals Daily News has when excluded from the news carousel.  It describes a choice between implementing AMP and gaining referral traffic and not implementing AMP and earning higher ad bids through header bidding (DM Compl't ¶ 206), but it does not allege facts about referral traffic gained or lost based on inclusion in the news carousel.  Daily Mail's complaint does not allege facts about the economic consequences of referral traffic from the news carousel and how the news carousel referrals reflected an abuse of monopoly power to gain competitive advantage in the ad exchange

market.  See Virgin Atlantic, 257 F.3d at 272.  The leveraging claim directed to AMP will be dismissed.

>    B.  Daily Mail Does Not Plausibly Allege a Claim Based on Changes to
>        Google's Search Algorithm.

The second leveraging theory asserts that Google uses its monopoly power in general search to punish publishers that participate in header bidding and spurn AdX.  (DM Compl't ¶¶ 213-25.)  Daily Mail asserts that Google alters its search algorithms unannounced and without transparency, sometimes leading to unexpected drops in search referrals.  (DM Compl't ¶¶ 213-14.)  It asserts that Google sometimes "eroded" Daily Mail's referral traffic without explanation or a legitimate business justification, and that in 2019, Google "punished" Daily Mail and many other major publishers when it rolled out a "Core Algorithm Update," resulting in a 50-percent drop in search traffic.  (DM Compl't ¶¶ 214-16.)  Three months later, Google reversed course, and Daily Mail's traffic returned "as quickly as it disappeared . . . ."  (DM Compl't ¶ 217.)

Daily Mail discussed these traffic swings with "Google personnel at the highest level," and was told that Daily Mail had not been targeted.  (DM Compl't ¶¶ 218-19.)  According to Daily Mail, however, this was false: Google had targeted it for setting aggressively high price floors in order to get more valuable bids on AdX.  (DM Compl't ¶ 220.)  These high price floors resulted in fewer Daily Mail impressions transacting on AdX.  (DM Compl't ¶ 220.)  Google complained to Daily Mail about its price-floor strategy.  (DM Compl't ¶ 221.)  With the Core Algorithm Update in June 2019, Google "shut off" Daily Mail's search referral traffic one week before it began enforcing UPR across publishers' inventory.  (DM Compl't ¶ 222.)  Once UPR was implemented, and Daily Mail was selling inventory through AdX "on the cheap," Google restored search referral traffic.  (DM Compl't ¶ 222.)

Daily Mail asserts that under UPR and the Core Algorithm Update, the percentage of its impressions transacted on AdX tripled from 16% to somewhere around 50%. (DM Compl't ¶ 223.)  Daily Mail asserts that it "lives in persistent fear" that Google will alter its search algorithms as punishment for transacting on non-AdX exchanges, noting that it continues to participate in header bidding at a higher volume than Google's exchange bidding.  (DM Compl't ¶¶ 225.)

Daily Mail does not plausibly allege that Google leveraged monopoly power in the general search market to coerce participation in UPR or otherwise channel publishers toward AdX transactions.  Accepting the truth of the facts alleged, Google's changes to its search algorithm were erratic, arbitrary and lacked transparency, but they do not describe coercion. Daily Mail acknowledges that it was confused and startled by the sudden changes in search referral volume.  (DM Compl't ¶¶ 217-19.)  There was no explicit or implicit threat by Google to drop the search rankings of Daily Mail or other publishers in retaliation for transacting on non-AdX exchanges.  There is no allegation that Google conveyed to Daily Mail a carrot-and-stick approach to reward or punish certain decisions via site rankings, and Daily Mail is only able to look back in retrospect and identify a rough correlation between the implementation of UPR and the Core Algorithm Update.  There are no facts alleged that show how the changes to search algorithms were understood as a threat.  Daily Mail has described confusion, not coercion.

Daily Mail has not plausibly alleged a leveraging claim based on changes to Google's search algorithm, and this claim will be dismissed.

GOOGLE'S MOTION TO PARTIALLY DISMISS GANNETT'S CLAIMS WILL BE
GRANTED IN PART AND DENIED IN PART.[15]

I.      Overview of the Gannett Complaint.

Plaintiff Gannett Co., Inc. ("Gannett") owns more than 500 digital news and

media brands, and calls itself "the largest news media publisher in the United States." (Gannett

Compl't ¶ 1 (23 Civ. 5177, ECF 1).)  It states that it sells millions of digital ad impressions each

day. (Gannett Compl't ¶ 4.)  Gannett sells about one-third of its ad impressions directly to

advertisers, and about two-thirds indirectly over ad exchanges. (Gannett Compl't ¶¶ 33-35.)  It

licenses Google's DFP as its ad server and AdX is its "primary exchange." (Gannett Compl't ¶

49.)

Gannett brings four Sherman Act claims: Count 1 and Count 2 respectively

allege monopolization in the markets for ad servers and ad exchanges under section 2, Count 3

alleges attempted monopolization in the market for ad exchanges under section 2, and Count 4

alleges that Google unlawfully tied AdX to the DFP ad server. (Gannett Compl't ¶¶ 252-72.)

Google moves to partially dismiss Gannett's claims.  It urges that Gannett has

not successfully pleaded certain theories of section 2 liability that the Court dismissed in the

2022 Order, and that its claims directed to Dynamic Allocation and line-item caps are time

barred under the Sherman Act.

II.     Gannett's Section 2 Claim Directed to Exchange
        Bidding Will Be Dismissed.

Gannett and Daily Mail are represented by the same counsel, and Gannett's

allegations about exchange bidding include several statements that track Daily Mail's allegations

word for word. (Gannett Compl't ¶¶ 178-86.)  Gannett's complaint differs principally in certain

---

[15] Gannett Co., Inc. v. Google LLC, 23 Civ. 5177 (PKC).

allegations about its May 2023 discovery of a secret "'alpha program' called 'Multi-Ad for Video' across 100% of Gannett's inventory." (Gannett Compl't ¶ 184.) The program allegedly reduced Gannett's bids for video inventory by around 30% and decreased its share of video inventory routed through header bidding by around 40%. (Gannett Compl't ¶ 184.) Gannett states that it has since demanded its removal from the alpha program and fully withdrawn from exchange bidding – "Gannett simply could not afford to leave its video inventory completely exposed to Google's machinations." (Gannett Compl't ¶ 185.) Gannett says that it has experienced "favorable" results, with a substantial increase in the price for impressions. (Gannett Compl't ¶ 186.)

But these allegations did not support any assertion that Google's implementation of exchange bidding was coercive. Gannett asserts that it halted participation in exchange bidding based on its frustration with the alpha program and has earned higher profits with more active participation in header bidding. Gannett describes its ability to opt out of a Google-run initiative and obtain better results from its competition, not coercion.

For this reason, as well as the reasons discussed above in relation to Daily Mail's claim and in the 2022 Opinion, the Court concludes that Gannett has not plausibly alleged a section 2 violation based on Google's implementation of exchange bidding.

III.    Gannett's Section 2 Claim Directed to the
        Encryption of User IDs Will Be Dismissed.

Gannett's claim directed to the encryption of user IDs substantially mirrors the allegations of Daily Mail. (Gannett Compl't ¶¶ 129-35.) For the reasons previously stated, Gannett's section 2 claim directed toward user ID encryption will be dismissed.

IV.    Gannett's Leveraging Claim Directed to AMP Will Be Dismissed.

Gannett's claim that Google leveraged its monopoly power in general search to coerce publishers into using AMP and protect AdX from header-bidding competition is also substantially identical to Daily Mail's same theory of liability.  (Gannett Compl't ¶¶ 223-35.) Gannett supplements its allegations somewhat by asserting that in 2016, "Google represented that monetization on AMP pages 'has been similar or better than ads on mobile sites.'"  (Gannett Compl't ¶ 228.)  This is little more than a sales pitch or boast, and does not strengthen any theory of anticompetitive conduct.  Gannett also alleges that it has designed its pages to run faster than AMP.  (Gannett Compl't ¶ 235.)  This, too, does not strengthen Gannett's theory of anticompetitive conduct on the part of Google.

Gannett's claim directed to Google's leveraging of search power in order to channel publishers toward AMP and frustrate the market for header bidding will be dismissed for the reasons set forth as to Daily Mail's similar claim.

V.    Google's Motion to Dismiss Gannett's Claim Linking Enhanced
       Dynamic Allocation to Direct Ad Sales Will Be Denied.

Google moves to dismiss a portion of Gannett's section 2 claim relating to how Google's implementation of EDA affected Gannett's inventory of directly sold advertisements. Gannett asserts that Google made available for auction on AdX impressions that Gannett had already directly sold to advertisers, thereby undermining Gannett's more lucrative direct sales and favoring AdX in order to accrue transaction fees for Google's own benefits.

The 2022 Opinion concluded that the States had plausibly alleged that EDA injured competition in the ad-exchange market but did not plausibly injury to competition in the markets for ad servers or ad-buying tools.  627 F. Supp. 3d at 386-87.  EDA allegedly channeled publishers' highest-value inventory to AdX and allowed AdX to transact the impression if a bid

was higher than a unilateral Google price floor and the historical average bid on rival exchanges. See id. Publisher clients were automatically enrolled into EDA and encouraged to continue enrollment based on allegedly false promises that it maximized their yields. See id. The 2022 Opinion concluded that the States plausibly identified an anticompetitive measure that starved rival ad exchanges of lucrative impressions, but as to the market for ad servers and ad-buying tools, had primarily identified untruthful statements to publisher clients without identifying harm to competition. See id.

Gannett's allegations differ from the States' in its emphasis on the effect of EDA on the ads that it sold directly. Gannet has an in-house ad-sales staff that negotiates direct sales with advertisers. (Gannett Compl't ¶ 32.) Gannett typically reserves its most valuable space for direct sales, and advertisers value direct placement because they can customize the page placement, timing and audience. (Gannett Compl't ¶ 32.) A user who visits a Gannett site and meets the direct advertiser's criteria will be automatically shown the ad. (Gannett Compl't ¶ 32.)

Gannett asserts that through EDA, Google converted publishers' direct sales into impressions available for auction bidding on AdX. (Gannett Compl't ¶ 147.) AdX would then allow advertisers to outbid a publisher's directly-sold inventory if the impression received a bid worth one cent more than the value of the direct sale as calculated by Google. (Gannett Compl't ¶ 147.) Google allegedly used a variation on EDA that lowered the value of the direct-sale inventory and set that new value as a price floor on the auction. (Gannett Compl't ¶ 147.) Gannett asserts that it has been unable to verify whether Google has undervalued a given direct impression, so that AdX could be selling auction impressions at a lower price than Gannett's directly sold inventory. (Gannett Compl't ¶ 149.) Gannett asserts that the DFP ad server allocates to AdX the most valuable publisher impressions, supplanting publishers' direct deals

with advertisers and depressing the prices that publishers receive for their most valuable inventory.  (Gannett Compl't ¶ 150.)

Gannett has plausibly alleged that Google has used its monopoly power in the market for ad servers to channel transactions exclusively to AdX.  This alleges harm to competition in the ad-exchange market.  Gannett has alleged its own injury with the allegation that its revenues were artificially depressed when direct ad sales were bypassed and transacted in AdX auctions at prices lower than what direct purchasers were willing to pay.  (Gannett Compl't ¶ 150.)

Google's motion to dismiss the portion of Gannett's section 2 claim premised on EDA's effect on directly-sold ad impressions will be denied.

VI.   **Google's Motion to Dismiss Gannett's Claim Directed to Minimum Bid to Win Will Be Denied.**

For the reasons previously discussed in connection with the Publishers' claims, Gannett has plausibly alleged a section 2 violation premised on Google's implementation of MBW.  (Gannett Compl't ¶¶ 64-67.)  Gannett's allegations are somewhat sparer than those set forth by the Publishers, but they describe the same underlying conduct and harm to competition: Google used its monopoly power in the market for ad servers to amass bidding information, then transmitted the information to Google's ad-buying tools to inform them of the lowest price required to win impressions at auction.  (Gannett Compl't ¶¶ 65-66.)

For the reasons set forth in connection with the Publishers' claim, Google's motion to dismiss Gannett's section 2 claim directed to MBW will be denied.

VII.    The Motion to Dismiss Gannett's Section 2
        Claim on Timeliness Grounds Will Be Granted
        <u>as to Line-Item Capping but Denied as to EDA.</u>

Google urges that Gannett's section 2 claims directed to implementation of EDA

and line-item capping should be dismissed because they fall outside the Sherman Act's four-year

statute of limitations, 15 U.S.C. § 15b.  "The statute of limitations in a private anti-trust suit is

four years, beginning 'when a defendant commits an act that injures a plaintiff's business.'"

<u>World Wrestling Ent., Inc. v. Jakks Pacific, Inc.</u>, 328 Fed. App'x 695, 698 (2d Cir. 2009)

(internal citation omitted) (quoting <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321,

338 (1971).  A court may dismiss a claim as untimely at the Rule 12(b)(6) stage "when the

complaint shows on its face that the limitations period has run . . . ."  <u>GEOMC Co. v. Calmare</u>

<u>Therapeutics Inc.</u>, 918 F.3d 92, 101 (2d Cir. 2019).

Gannett filed its complaint on June 20, 2023.  (23 Civ. 5177, ECF 1.)  Gannett

asserts that it first complained to Google in 2014 that EDA was not operating as promised.

(Gannett Compl't ¶ 154.)  In 2018, Gannett learned that Google was misrepresenting aspects of

sponsorship deals under EDA, at which point Google claimed to have resolved the issue.

(Gannett Compl't ¶ 155.)  Gannett separately asserts that in 2017, Google began to purposefully

limit the number of line items available to publishers.  (Gannett Compl't ¶ 206.)  Google

therefore urges that the limitations period has expired as to Gannett's claims directed to EDA

and the limit on line items.

Gannett urges that its claims directed to EDA and line item caps are timely

because the statute of limitations has been tolled.  The Court first addresses Gannett's allegations

of Google's fraudulent concealment of the effects and operations of EDA.

58

"[A]n antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." State of N.Y. v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988).  When a plaintiff asserts that its claims were tolled on grounds of fraudulent concealment, it must satisfy the heightened pleading requirement of Rule 9(b), Fed. R. Civ. P.  See, e.g., Four Seasons Solar Prod. Corp. v. Southwall Techs., Inc., 100 Fed. App'x 12, 13 (2d Cir. 2004) (summary order); Kearse v. Kaplan, Inc., 692 F. Supp. 2d 398, 401 & n.17 (S.D.N.Y. 2010) (Kaplan, J.) (collecting cases).  "In the case of fraudulent concealment or omission, where the plaintiff is unable to specify the time and place because no act occurred, the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through fraud." Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC, 842 F. Supp. 2d 502, 513 (S.D.N.Y. 2012) (Swain, J.). "[T]he plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." Hendrickson Bros., 840 F.2d at 1083.  Certain types of unlawful conduct, such as a bid-rigging conspiracy, are self-concealing by their nature. See id. at 1084-85.

The 2022 Opinion observed in its discussion of laches that many of Google's alleged auction-manipulation practices "lacked transparency, occurred out of the public eye, and had effects that were not immediately obvious or well understood."  627 F. Supp. 3d at 406.  It

observed that the States had plausibly alleged that "Google's rollout of EDA was opaque, and accompanied by misrepresentations about its intent and effects."  Id.

Gannett asserts that Google made "false" representations for "many years" about the purpose and effects of EDA, which induced Gannett to enroll in EDA and continue its participation.  (Compl't ¶¶ 151-53.)  In 2014, Google promised that EDA would lead to higher revenue, and "even commissioned a study to assure Gannett that [EDA] increased revenue by 19%."  (Compl't ¶ 151.)  Gannett asserts that Google falsely stated that EDA would not affect its direct deals with advertisers, and that "[f]or months, in 2014, Gannett complained to Google that DFP was not delivering on direct deals, despite Google's assurances otherwise."  (Compl't ¶¶ 152, 154.)  Gannett asserts that Google falsely claimed that it resolved the issue.  (Compl't ¶ 154.)  It asserts that Google "never has made available any data or analytics" that allowed it to understand how EDA affected its sales and that Gannett still "has limited ability to oversee" how AdX competes against direct sales.  (Compl't ¶¶ 154-55.)  Gannett alleges that it only learned the scope and impact of EDA through "investigations from domestic and foreign antitrust enforcers . . . ."  (Compl't ¶ 153.)

As alleged by Gannett, the anticompetitive effects of EDA were not known by affected publishers.  The describes Gannett's awareness that EDA was not operating as promised, but that Google claimed without proof that "under-delivery" had been "resolved," (Compl't ¶ 154) which suggests an implementation problem as opposed to a deliberate anticompetitive measure.  Google's alleged misrepresentations included the 2014 report about increased revenue about EDA.  (Compl't ¶ 151.)  Gannett alleges that, throughout EDA's implementation, Google has never shared data or analytics that were necessary to track how AdX transactions competed with direct sales.  (Compl't ¶¶ 154-55.)  Given the secretive nature of

60

EDA's implementation and the alleged unwillingness of Google to disclose sales data, Gannett has plausibly alleged Google's responsibility for omitting information that could have alerted Gannett to EDA's anticompetitive effects.  See Soroof, 842 F. Supp. 2d at 513.  The complaint plausibly explains how Google's concealments and omissions misled Gannett and what Google gained from its purported conduct.  See id.  Moreover, as described in the Complaint, the nature of EDA's implementation required some degree of secrecy, because no profit-minded publisher would voluntarily opt to sacrifice its lucrative direct sales for less-valuable programmatic advertising.  This too weighs in favor of plausibly alleging that EDA's true nature and effect were fraudulently concealed.  See Hendrickson Bros., 840 F.2d at 1083.  Google's motion to dismiss Gannett's EDA claim as untimely will be denied.

Gannett has not demonstrated that any tolling principle applies to its claim directed to the cap on header bidding line items.  It first asserts that the underlying conduct amounted to continuing violations of the antitrust laws.  "[A]ntitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."  US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 67 (2d Cir. 2019) (quotation marks omitted).  Acts are not part of a continuing violation when they are "the manifestation of the prior overt act," and are continuing violations only when they are "new and independent act[s] . . . ."  Id. at 68-69.  Gannett asserts that the enforcement of line-item caps in header bidding went into effect when "Google purposefully started to limit the number of line items available to publishers" in 2017.  (Gannett Compl't ¶ 206.)  The Gannett Complaint describes a repeated

manifestation of the same overt act – enforcement on a limit on the number of line items permitted in header bidding – and not new and independent acts.  The claim directed to line-item caps does not describe a continuing violation.  See US Airways, 938 F.3d at 67-69.

Gannett next points to the principles of American Pipe tolling.  See American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974).  The American Pipe doctrine stands for the proposition that the limitations period for claims of a putative class member are tolled by the filing of a class action complaint that asserted the same claims.  See In re WorldCom Sec. Litig., 496 F.3d 245, 255 (2d Cir. 2007).  "[T]he initiation of a class action puts the defendants on notice of the claims against them," and "[a] defendant is no less on notice when putative class members file individual suits . . . ."  Id.

Gannett urges that, as a publisher, it was a member of the Publishers' original putative class action complaint, thereby tolling its claim directed to line-item caps.  The Court has been unable to identify any allegation related to line-item caps in the pleading cited by Gannett, In re Google Digital Publisher Antitrust Litigation, 20 Civ. 8984 (N.D. Cal.) (LBF) (ECF 64), nor in a separate putative class action complaint, Genius Media v. Alphabet Inc., 20 Civ. 9092 (N.D. Cal.) (ECF 1).  Because these pleadings make no mention of line-item caps, they did not place Google on notice of any such claim.  In re WorldCom, 496 F.3d at 255.  The American Pipe doctrine does not apply to Gannett's claim directed to line-item caps.

Accordingly, Google's motion to dismiss on timeliness grounds will be denied as to Gannett's section 2 claim directed to EDA but granted as to its claim directed to line-item caps in header bidding.

CONCLUSION.

   The motions to dismiss in <u>In re: Google Digital Antitrust Advertising</u>, 21 Civ.

7001 (PKC) and <u>Singh v. Google LLC, et al.</u>, 23 Civ. 3651 (PKC) are GRANTED as to

plaintiffs' claims directed to Project Elmo, Project Poirot and Reserve Price Optimization.

Count III and Count V are also dismissed.  Plaintiff Hanson's claims directed to conduct that

post-dates September 6, 2016 are dismissed.  The remainder of the motions are DENIED.  The

Clerk is respectfully directed to terminate the motions.  (21 MD 3010, ECF 446, 460, 625, 628;

21 Civ. 7001, ECF 181; 23 Civ. 3651, ECF 22.)  The Court will separately enter as an Order the

Stipulation and Proposed Order in the <u>Singh</u> matter.

   The motion to dismiss in <u>Organic Panaceas v. Google LLC</u>, 21 Civ. 7001 (PKC)

is GRANTED in its entirety.  The Clerk is respectfully directed to terminate the motion.  (21 MD

3010, ECF 457.)

   The motion to dismiss the consolidated complaint in <u>SPX Total Body Fitness</u>

<u>LLC v. Google LLC</u>, 21 Civ. 6870 (PKC) and <u>SkinnySchool LLC, et al. v Google LLC</u>, 21 Civ.

7045 (PKC) is GRANTED in its entirety.  (21 MD 3010, ECF 455; 21 Civ. 6870, ECF 79; 21

Civ. 7045, ECF 43.)  The Clerk is respectfully directed to terminate the motion and to close these

two cases.

   The motion to dismiss in <u>In re: Google Digital Publishing Litigation</u>, 21 Civ. 7034

(PKC) is GRANTED as to plaintiffs' claims directed to Google's detection of "problematic

code" and their tying claim directed to the "Search+" product.  The motions are otherwise

DENIED.  The Clerk is respectfully directed to terminate the motions.  (21 MD 3010, ECF 449;

21 Civ. 7034, ECF 136.)

The motions to dismiss the Newspapers' consolidated complaint are terminated as moot.  (21 MD 3010, ECF 451, 462.)

The motion to partially dismiss in <u>Associated Newspapers Ltd., et al. v. Google LLC, et al.</u>, 21 Civ. 3446 (PKC) is GRANTED in its entirety.  The Clerk is respectfully directed to terminate the motion.  (21 MD 3010, ECF 453; 21 Civ. 3446, ECF 71.)

The motion to dismiss in <u>Gannett Co., Inc. v. Google LLC</u>, 23 Civ. 5177 (PKC) is GRANTED as to Gannett's claims premised on exchange bidding, the encryption of user IDs and line-item capping.  It is also GRANTED as to the leveraging claim directed to AMP.  The motion is otherwise DENIED.  The Clerk is respectfully directed to terminate the motion.  (21 MD 3010, ECF 623; 23 Civ. 5177, ECF 24.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 1, 2024

64