# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

United States of America, *et al.*,

                              Plaintiffs,

v.

Google LLC,

                              Defendant.

Case No. 1:23-cv-00108-LMB-JFA

Hon. Leonie H. M. Brinkema

**EXPERT REPORT OF ROBIN S. LEE, PHD**

**December 22, 2023**

HIGHLY CONFIDENTIAL

Expert Report of Robin S. Lee, PhD

## IV.F. Relevant geographic markets for publisher ad servers, ad exchanges, and advertiser ad networks

(385)   Geographic market definition assists with evaluating monopolization claims by focusing attention on, and explicitly delineating, specific geographic areas where competitive and customer harm can occur.

(386)   The focus of this matter is on third-party ad tech products that can be used to transact open-web display advertising. The customers of these third-party ad tech products are open-web publishers and advertisers, and the suppliers of these products include software companies such as Google and its competitors in the relevant product markets.

(387)   A relevant geographic market can be based on the locations of customers (buyers or sellers of open-web display advertising). In this report, I focus on geographic market definition based on customer location—i.e., where open-web publishers and advertisers are located—and do not place restrictions on the location of suppliers.[549]

(388)   Below, I describe why worldwide (excluding a limited number of regions) is a relevant geographic market for publisher ad servers, ad exchanges, and advertiser ad networks. Customers of ad tech products are located around the world, and transactions between open-web publishers and advertiers occur across country boundaries. Suppliers of ad tech products also have a global presence, and enjoy indirect network effects and scale benefits that are not limited to narrow geographic regions. Moreover, the effects of Google's conduct in the ad tech stack, and restrictions it has placed on the use of its products in the relevant product markets, have been imposed in countries around the world, and are not limited to customers within any single country.

(389)   The ad tech industry and scope of Google's conduct is thus global. Although there may be some differences in competitive conditions within narrower geographic regions, there are compelling benefits to examining the whole world when examining the competitive significance and effects of Google's conduct within the relevant product markets.

(390)   As a general matter, however, there may be multiple relevant geographic markets that are useful for the evaluation of competitive effects.[550] Below, I also describe why the United States is also a relevant geographic market for these product markets.

---

[549] HMG § 4.2 ("The arena of competition […] may be geographically bounded if geography limits some customers' willingness or ability to substitute to some products, or some suppliers' willingness or ability to serve some customers. Both supplier and customer locations can affect this."). The physical location of suppliers is often not relevant for market definition purposes for software products, such as the ones at issue in this case, where customers do not obtain the product at a supplier's location. *See* HMG § 4.2.1 ("Geographic markets based on the locations of suppliers encompass the region from which sales are made. Geographic markets of this type often apply when customers receive goods or services at suppliers' locations.").

[550] HMG § 4.1.1 ("the hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to

(391)   In both cases, geographic restrictions are based on the location of customers (advertisers and open-web publishers) that use publisher ad servers, ad exchanges, and advertiser ad networks; and are not based on the location of suppliers (who may be located worldwide).

### IV.F.1. A relevant geographic market for all product markets is worldwide (with certain exceptions)

(392)   Worldwide, excluding certain countries and regions, is a relevant geographic market, and is appropriate for evaluating Google's market power in each of the relevant product markets and the competitive effects of its conduct. This is for three main reasons.

(393)   First, advertisers and open-web publishers that are customers of ad tech products are located in countries located around the world and transact across country and region boundaries. Spending on open-web display is global, with publishers using ad tech products to sell open-web display inventory to advertisers around the world, and advertisers using ad tech products to purchase open-web display inventory from publishers around the world.[551]

(394)   For example, Google often reports performance metrics surrounding its ad tech products across three regions—Americas, EMEA (Europe, Middle East, and Africa), and APAC (Asia-Pacific). Figure 40 from a 2018 Google presentation illustrates that although advertiser spending from a region often returns to the sell-side in that region (for example, this is the case for 72% of the spend originating in the Americas), there is a significant share of spending that is spent on the sell-side in other regions.

---

a single relevant market. The Agencies may evaluate a merger in any relevant market satisfying the test, guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects.").

[551]   GOOG-DOJ-11890293, (01/2020) (Google "Display Highlights: GDA + DV360" deck); GOOG-DOJ-14436571, (06/2019) (Google "Business Forecast Meeting: Sellside" deck); GOOG-DOJ-AT-01592535, at -553 (2018) ("Welcome to the Sell-Side World!"). Criteo also has reported revenues separately by Americas, EMEA, and APAC regions. *See* CRI-00000003, at -011 (12/2018).

**Figure 40. Google DVAA customer spending is global**



Source: GOOG-DOJ-AT-01592535, at -553 (2018 presentation, "Welcome to the Sell-Side World!")

(395)　Furthermore, as I show in the next Section, Google's market power in the relevant product markets is not limited to a single country or region.

(396)　Second, aspects of "supply-side" competition among ad tech providers is global. The major competitors in each of the relevant product markets have a presence in multiple geographic regions.[552] Moreover, ad tech products benefit from scale effects—arising from both indirect network effects (as advertiser and publisher customers transact with one another across geographic regions) and data— that are not necessarily restricted to country-specific boundaries.[553]

(397)　Third, Google's conduct that I evaluate in this report is not limited to the boundaries of any one country. Google has imposed restrictions on the use of its Google Ads, AdX, and DFP products by open-web publishers and advertisers located worldwide. Hence, the competitive effects of Google's

---

[552]　Data produced by ad tech parties also indicate a significance share of open-web display impressions from publishers located outside of the US. For ad exchanges, over 45% of indirect open-web display impressions transacted by each of AdX, Equativ, Index Exchange, Magnite, and OpenX in 2022 are from non-US publishers (*see* Figure 84 in Appendix C.4). For publisher ad servers, over 65% of open-web display impressions served by each of DFP, Equativ, and Xandr in 2022 are from non-US publishers (*see* Figure 85 in Appendix C.4 ).

　　Moreover, for ad exchanges, over 55% of the impressions transacted by each of Equativ, Index Exchange, Magnite, and OpenX were viewed by non-US users (*see* Figure 84 in Appendix C.4).

[553]　For example, an ad tech product with a worldwide presence can collect data and track users who visit websites operated by publishers that are located in different countries.

Expert Report of Robin S. Lee, PhD

conduct extend beyond any individual country's borders, and a worldwide geographic market accounts for this.

(398)  To help productively focus attention on areas where Google possesses and exercises market power and where competitive effects of its conduct are most likely to occur, I exclude from the worldwide geographic market the following regions:[554]

- **People's Republic of China**: Chinese regulations that prevent Chinese users from accessing foreign websites and restrict the content that advertisers are able to show have limited the penetration of ad tech products from non-Chinese firms.[555] Google's open-web display presence is limited in China relative to its presence in other countries and regions.[556] Combined with Google's ability to engage in price discrimination, this indicates that a hypothetical monopolist would not likely be constrained in its ability to charge prices above competitive levels in regions outside of China by substitution patterns by advertiser and publisher customers within China.

- **Countries and regions where Google is restricted from operating due to US sanctions**: The US government places restrictions on working with customers in countries and regions that are subject to US sanctions.[557] These restricted areas include Iran, North Korea, Syria, Cuba, Crimea, Donetsk People's Republic (DNR), and Luhansk People's Republic (LNR).[558]

---

[554] As I discuss below with regard to a US geographic market, a hypothetical monopolist of any of the relevant product markets would likely be able to engage in price discrimination based on customer locations. Hence, even if I were to include these regions within the worldwide geographic market, it would not change my conclusions regarding a hypothetical monopolist's likelihood of profitably charging quality-adjusted prices above competitive levels for customers located elsewhere. Even so, restricting attention to a narrower geographic market has the advantage of not overstating the competitive significance of potential alternatives located in these excluded regions.

[555] Specifically, the Chinese government restricts Chinese users from accessing non-Chinese web domains (i.e., those domains that do not end in ".cn"). As a result, many websites have to create Chinese-specific variants of their sites and advertising content on those sites must link to and use creatives from Chinese domains (GOOG-AT-MDL-011619755, at -755 (05/14/2021) "With upcoming Chinese regulation, all domains served from within Mainland China must be China-specific…If we want to continue to support Web Display in China, we will need to invest in migrating domains, and publishers will need to retag"). *See also* ADOBE-CID30473-0000070266, at -268 (11/22/2019) ("[The Trade Desk is] struggling with the same challenges every other non-Chinese advertising platform faces: approval of every ad by Chinese sensors…, difficulty sharing data, and that brands have a different site behind the Chinese Firewall").

[556] GOOG-DOJ-03597654, at -660 (2019) ("Global Ads Financials Fact Pack Q3 2019", indicating 1.8% of Google Ads revenue in 2018 from China and 46% from US). GOOG-DOJ-14436571, at -597 (06/24/2019) ("Business Forecast Meeting Sell-Side" presentation, indicating LPS within China revenue representing 0.2% of total revenue within display for "Google Network Web" and LPS within US representing 16%.).

[557] Google, "Understanding Google Ads country restrictions," Google Ads Help, https://support.google.com/google-ads/answer/6163740?hl=en.

[558] Google, "Understanding AdSense country restrictions," Google AdSense Help, https://support.google.com/adsense/answer/6167308?hl=en; Google, "Understanding Google Ads country restrictions," Google Ads Help, https://support.google.com/google-ads/answer/6163740?hl=en; Google, "Google Publisher Policies," Google Ad Manager Help, https://support.google.com/admanager/answer/10502938?hl=en.

---

Expert Report of Robin S. Lee, PhD

(399)    The exclusion of customers within these excluded regions reflects a very small number of total open-web display transactions and, as a result, their inclusion or exclusion does not affect my opinions.[559]

(400)    For the rest of this report, when I use "worldwide," I am referring to all countries and regions excluding those described above.

## IV.F.2. A relevant geographic market for all product markets is the United States

(401)    The United States is also a relevant geographic market for each of the relevant product markets for examining Google's market power and the competitive effects of its conduct. This is for two main reasons.

(402)    First, a hypothetical monopolist of all publisher ad servers, ad exchanges, or advertiser ad networks available to customers (advertisers or open-web publishers) located in the United States would likely profitably exercise market power over those customers, and would not likely be constrained by the prices charged by ad tech products available only to open-web publishers and advertisers that are both located outside of the United States. This is because there is significant evidence that a hypothetical monopolist of each of the relevant product markets would be able to engage in price discrimination based on the location of its customers.[560] Indeed, Google has demonstrated its ability to do so in the relevant product markets:

- For publisher ad servers, Google cites different prices to publishers located in different countries, including the US.[561]

- For ad exchanges and advertiser ad networks, Google is able to dynamically adjust the fee on its AdX and Google Ads products across publishers, and even in some cases within publisher across impressions.[562]

---

[559]    Among all exchanges for which I have data, only AdX and AdSense Backfill provide country- or region-level granularity for publisher or advertiser locations that allows for these restrictions. In 2022, less than 0.1% of AdX open-web display impressions were from publishers reported to be within these excluded regions (Google AdX data (DOJ RFP 53)). For AdSense Backfill, roughly 0.1% of 2022 open-web display impressions were from publishers within these excluded regions (Google AdSense Backfill (DOJ RFP 7)). For DFP, in 2022 less than 0.1% of open-web display transactions were from publishers reported to be located within these excluded regions (Google DRX Internal Stats data). For Google Ads, in 2022, there were no open-web display impressions from advertisers reported to be located within these restricted regions (Google Ads aggregate data (DOJ RFP 54)).

[560]    HMG § 4.2.2 ("When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of targeted customers.").

[561]    See, e.g., "Google Responses to DOJ Ad-Tech Data Follow-Up Questions (July 10, 2020)"; "Appendix A – Corrected sell-side rate card – HIGHLY CONFIDENTIAL.xlsx." See Section II.D for a discussion of fees in the ad tech stack.

[562]    For AdX, see GOOG-AT-MDL-006217592, at -593, (Google's response to the European Commission's RFI 10,"Dynamic Revenue Share provided the flexibility for publishers to accept a lower revenue share in some auctions, if other auctions transact at a correspondingly higher revenue share.") and GOOG-AT-MDL-009045058, at -063 (08/04/2021) (A document by AdX's Rita Ren which records that: "DRS under first-price was implemented and experimented with during 2020Q3-Q4. The experiment result showed ~$100M ARR"). For Google Ads, see: GOOG-

Expert Report of Robin S. Lee, PhD

_____
Robin S. Lee, PhD

_December 22, 2023_
Date

**HIGHLY CONFIDENTIAL**